Exhibit 1



# White Paper on Remixes, First Sale, and Statutory Damages

Copyright Policy, Creativity, and Innovation
in the Digital Economy

THE DEPARTMENT OF COMMERCE
INTERNET POLICY TASK FORCE

January 2016

<u>Message from Secretary Penny Pritzker</u>

Since the founding of our nation, the United States has recognized the importance of copyright in encouraging creative expression by incentivizing people to produce and share the works that contribute to America's leading role as a cultural and economic powerhouse. Our copyright system plays a critical role in promoting and disseminating works of authorship and provides diverse benefits for large and small businesses, consumers, authors, artists, and workers in the information, entertainment, and technology sectors.

A healthy copyright system strikes important balances between rights and exceptions—delineating what is protectable and what is not, determining which types of uses require permission or payment, and establishing appropriate frameworks to effectively protect rights and foster creativity and innovation. These balances must be reviewed regularly to ensure they continue to function well as a foundation for America's culture and economy.

The Internet has transformed the world by introducing new ways for people to communicate, create, innovate, and conduct business in the global digital economy. The goals of our national copyright policy and our global Internet policy should work in tandem.

The U.S. Department of Commerce has played a key role in addressing Internet policy-related issues since it launched the Internet Policy Task Force in April 2010. Two years ago, the Task Force published a Green Paper on *Copyright Policy, Creativity and Innovation in the Digital Economy*—the most comprehensive assessment of digital copyright policy issued by any Administration since 1995. The review process that culminated in this White Paper serves as a testament to the importance the Administration has placed on the development of updated and balanced copyright law in the digital environment.

We hope the White Paper will stimulate discussion and lead to adoption of our recommendations. We continue to recognize the importance that copyright law plays in the digital environment and why it is necessary to achieve a result that takes into account the interests of all stakeholders. We will remain engaged and monitor these and other areas of copyright policy to ensure that our copyright system continues to adapt and thrive, furthering the Constitutional goal of "promot[ing] the Progress of Science and useful Arts."


Penny Pritzker
U.S. Secretary of Commerce

## FOREWORD

This White Paper by the U.S. Department of Commerce's Internet Policy Task Force addresses important issues at the intersection of copyright law and Internet policy. It is the result of a comprehensive, multi-year review of three key topics: 1) the legal framework for the creation of remixes; 2) the relevance and scope of the first sale doctrine in the digital environment; and 3) the application of statutory damages in the context of individual file-sharers and secondary liability for large-scale online infringement.

Led by the U.S. Patent and Trademark Office (USPTO) and the National Telecommunications and Information Administration (NTIA), the Internet Policy Task Force conducted a public meeting at USPTO headquarters; received and reviewed dozens of comments from a range of stakeholders including rights holder organizations, Internet-based companies, public interest groups, libraries, academics, and individual authors and artists; and held roundtables around the country to create a record upon which to analyze those issues.The input we received over the last two years has further underscored the importance that copyright law continues to play in the digital environment.

Each section of the White Paper provides recommendations based on the stakeholder input received.In some areas, we believe now is the right time to consider legislative solutions.In others, we recommend bringing stakeholders together to develop best practices. We also recognize that the changing nature of market conditions and technology may call for future re-evaluation of some of our conclusions.

This White Paper reflects indispensable contributions from members of our staffs who organized the consultation processes and engaged in the tasks of  analysis and writing. At USPTO, the project was led by Shira Perlmutter, Chief Policy Officer and Director for International Affairs, working with a team including David Carson, Susan Allen, Ann Chaitovitz, and Ben Golant. The NTIA team was led by John Morris, Associate Administrator, working with Winter Casey, Camille Fischer, and Luis Zambrano Ramos.

We appreciate the contributions of other agencies in the Administration that reviewed the White Paper and whose comments greatly improved the final draft. We are also grateful to the United States Copyright Office, and in particular to Associate Registers Karyn Temple Claggett, Director of Policy and International Affairs, and Jacqueline Charlesworth, General Counsel, for their participation in a number of our public discussions and for their valuable input on the Copyright Office initiatives mentioned in the White Paper.

Effective and balanced copyright protection is critical in today's digital environment. We are confident that the recommendations outlined in the White Paper will help advance copyright policy and ensure that the United States' creative and innovative industries can continue to strengthen our nation's culture and economy.

Michelle K. Lee                                 Lawrence E. Strickling
Under Secretary of Commerce for        Assistant Secretary of Commerce and
Intellectual Property and Director,        Administrator, National
U.S. Patent and Trademark Office       Telecommunications and Information
                                                          Administration

iii

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. OVERVIEW OF CONCLUSIONS AND RECOMMENDATIONS ........................ 4

   A.   REMIXES .................................................................................................. 4
   B.   FIRST SALE ............................................................................................... 4
   C.   STATUTORY DAMAGES ............................................................................ 5

III. THE LEGAL FRAMEWORK FOR THE CREATION OF REMIX ..................... 6

   A.   INTRODUCTION ........................................................................................ 6
   B.   STAKEHOLDER VIEWS ............................................................................. 6
      1.   The Different Worlds of Remix ..................................................... 6
      2.   Legal Doctrines ........................................................................... 10
         a.   Fair Use............................................................................ 10
         b.   Guidelines and Best Practices........................................ 11
         c.   Possible Changes in the Law .......................................... 17
      3.   Current and Developing Licensing Mechanisms ........................ 19
      4.   The Relationship between Licensing and Fair Use ..................... 22
   C.   CONCLUSIONS AND RECOMMENDATIONS ............................................... 23
      1.   Overview ...................................................................................... 23
      2.   Recommendations ........................................................................ 24
         a.   Provide Greater Clarity for Fair Use: Guidelines and Best Practices........................ 27
         b.   Improve Voluntary Licensing Options ........................... 29
            i.   Micro-Licensing......................................................... 31
            ii.   Collective Licensing ................................................. 32
            iii.   Intermediary Licensing ............................................. 32
         c.   Sharing of Revenues Generated by Remixes ................. 33
      3.   Relationship to Other Task Force Recommendations................. 33

IV. FIRST SALE DOCTRINE AND DIGITAL TRANSMISSIONS ....................... 35

   A.   INTRODUCTION ...................................................................................... 35
   B.   STAKEHOLDER VIEWS ........................................................................... 36
      1.   Benefits of the First Sale Doctrine ............................................. 36
         a.   Resale or Gift .................................................................. 36
         b.   Lending or Rental ........................................................... 37
         c.   Other Benefits ................................................................. 37
      2.   Comparison to Online Marketplace ............................................ 38
         a.   Download Offerings ........................................................ 39
            i.   Sharing/Lending......................................................... 40
            ii.   Lower-Priced Copies ................................................. 41

b. Access-Based Services ....................................................................... 42

3. Lost First Sale Benefits ........................................................................... 44

    a. The Shift from Statutory Guarantees to Rights Holder Permission ............ 45

    b. Loss of Resale and Lending Markets ...................................................... 46

    c. Other Issues Raised ................................................................................ 46

        i. Library Lending ................................................................................ 46

        ii. Preservation ..................................................................................... 48

        iii. Privacy ............................................................................................ 49

        iv. Issues Relating to Sales of Consumer Devices and Products ................. 50

4. Risks of Extension of First Sale Doctrine ................................................. 51

    a. Potential Effect on Primary Markets ....................................................... 51

    b. Loss of Market Flexibility ..................................................................... 52

5. "Forward and Delete" Technology ........................................................... 52

6. Solutions Proposed by Stakeholders ........................................................ 54

7. Consumer Expectations and Contract Terms ............................................ 55

C. CONCLUSIONS AND RECOMMENDATIONS ..................................................... 58

1. Overview ................................................................................................ 58

2. Benefits of the First Sale Doctrine Provided by the Current Online Marketplace ......... 58

3. Consumers' Inability to "Resell" Downloaded Copies ............................... 59

4. Other Concerns Raised ............................................................................ 60

    a. Library Lending .................................................................................... 60

    b. Preservation and Privacy ....................................................................... 62

    c. Sales of Consumer Devices and Products ................................................ 63

5. The Risks of Extending the First Sale Doctrine to Digital Transmissions .................... 65

    a. Potential Damage to Primary Markets ..................................................... 65

    b. Loss of Flexibility ................................................................................ 66

6. The Balance of Benefits and Risks .......................................................... 67

7. Improve Consumer Information and Awareness ........................................ 68

**V. ASSESSING STATUTORY DAMAGE AWARDS ........................................... 70**

A. INTRODUCTION ........................................................................................... 70

B. STAKEHOLDER VIEWS ................................................................................. 70

1. Individual File-Sharers ........................................................................... 70

    a. The Level of Statutory Damages ............................................................ 70

    b. Inconsistencies in Application ................................................................ 73

    c. Litigation Abuse ................................................................................... 74

    d. Solutions Proposed by Stakeholders ....................................................... 77

2. Secondary Liability for Large Scale Online Services .................................. 79

    a. Chilling Effects ..................................................................................... 79

    b. Deterrence and Incentives ...................................................................... 82

    c. Solutions Proposed by Stakeholders ....................................................... 82

3. The Innocent Infringement Defense ........................................................... 83

C. CONCLUSIONS AND RECOMMENDATIONS ....................................................... 85

1. Overview ........................................................................................... 85

2. Recommendations .............................................................................. 86

    a. Specify Factors in the Copyright Act to Consider in Assessing Statutory Damages . 86

      i. Relating Awards to Actual Harm and Benefits ...................................... 88

      ii. Relating Awards to Value of Works .................................................... 89

      iii. Assessing Deterrence and Punishment ................................................ 89

        (a) The Defendant's State of Mind .................................................... 90

        (b) The Defendant's Financial Situation ............................................ 91

        (c) The Nature of the Infringement ................................................... 92

        (d) Punishing Willful Infringement .................................................. 92

      iv. Adjusting for Multiple Works ............................................................ 93

      v. Promoting Consistency and Transparency ............................................ 94

      vi. Other Proposals ............................................................................. 94

    b. Remove Notice Bar to the Innocent Infringement Defense ........................ 97

    c. Provide Greater Discretion in Cases of Non-willful Secondary Liability for Large Scale Online Services ...................................................................... 97

    d. Establish a Streamlined Procedure for Adjudicating Small Claims .......................... 99

**APPENDIX I** ...................................................................................... **101**

**APPENDIX II** ..................................................................................... **104**

## I. Introduction

This White Paper is an outcome of the work of the Department of Commerce Internet Policy Task Force ("Task Force"). The Task Force was formed in 2010 to critically examine privacy policy, the global free flow of information, cybersecurity, and copyright in the context of innovation and the Internet economy.[1]

After extensive public consultations, the Task Force released a green paper on July 31, 2013, entitled "Copyright Policy, Creativity, and Innovation in the Digital Economy" ("Green Paper").[2] The Green Paper provides a comprehensive review of current policy related to copyright and the Internet, and identifies important issues that call for attention and development of solutions.[3] It is the most thorough and comprehensive analysis of digital copyright policy issued by any administration since 1995.

The Green Paper identified three broad areas for further work by the Task Force. The first focused on the development of policy recommendations on three specific substantive policy issues: (1) the legal framework for the creation of remixes; (2) the relevance and scope of the first sale doctrine in the digital environment; and (3) the appropriate calibration of statutory damages in the contexts of individual file-sharers and secondary liability for mass online services. The second dealt with the establishment of a multistakeholder forum aimed at finding ways to improve the technical day-to-day operation of the Digital Millennium Copyright Act's ("DMCA") notice and takedown system. The final area involved the question of what role the government could play to help improve the online licensing environment for copyrighted works.

In October 2013, the Task Force published a Notice in the Federal Register seeking comment on the specific subjects identified above and announcing a public meeting to discuss them.[4] The Task Force then held an all-day forum on December 12, 2013, at USPTO's headquarters in Alexandria, Virginia, to explore those topics.[5] Dozens of comments from industry, academia,

---

[1] For a description of the Task Force and its mission, *see Internet Policy Task Force*, USPTO.GOV, http://www.uspto.gov/learning-and-resources/ip-policy/copyright/internet-policy-task-force (last visited Oct. 20, 2015). The Task Force's work on copyright policy, led by the United States Patent and Trademark Office ("USPTO") and the National Telecommunications and Information Administration ("NTIA"), has been coordinated with the Office of the Intellectual Property Enforcement Coordinator ("IPEC") in the Office of Management and Budget, and other divisions of the Executive Office of the President.

[2] The Green Paper is available at http://www.uspto.gov/sites/default/files/news/publications/copyrightgreenpaper.pdf (last visited Oct. 20, 2015).

[3] *See id* at 4, *et. seq.*

[4] *See* Request for Comments on Dep't of Commerce Green Paper, 78 Fed. Reg. 61337, 61339 (Oct. 3, 2013), *available at* http://www.gpo.gov/fdsys/pkg/FR-2013-10-03/pdf/2013-24309.pdf (last visited Oct. 20, 2015). *See also* Notice of Change in Public Meeting Date and Change in Public Comment Periods, 78 Fed. Reg. 66337 (Nov. 5, 2013), *available at* http://www.gpo.gov/fdsys/pkg/FR-2013-11-05/pdf/2013-26487.pdf (last visited Oct. 20, 2015), and Extension of Comment Period for Public Comments, 78 Fed. Reg. 78341 (Dec. 26, 2013), *available at* http://www.gpo.gov/fdsys/pkg/FR-2013-12-26/pdf/2013-30690.pdf (last visited Oct. 20, 2015).

[5] The webcast of the forum is available at http://livestream.com/uspto/copyright and a transcript is available at http://www.uspto.gov/ip/global/copyrights/121213-USPTO-Green_Paper_Hearing-Transcript.pdf.

public interest organizations, and individuals were submitted for consideration both before and after the forum.[6]

Between May and August 2014, the Task Force conducted four roundtables in different parts of the country to discuss the three policy issues raised in the Green Paper.[7] More than 60 people participated in these discussions as panelists, and more than 750 joined either in person or online.[8] The Task Force heard from a diverse group of stakeholders from across the United States, including composers and musicians in Nashville,[9] publishers and librarians in Cambridge,[10] independent filmmakers in Los Angeles,[11] technology companies in Berkeley,[12] and academics, industry, and public interest advocates at all four locations. The roundtables gathered stakeholder input to provide a foundation for the policy recommendations in this paper.[13]

As to the initiative on the DMCA notice and takedown process, the multistakeholder forum met six times in public session and established a smaller working group to work on specific issues. The last public meeting was held on December 18, 2014. In April 2015, the Task Force's efforts culminated in the release of a document entitled "DMCA Notice-and-Takedown Processes: List of Good, Bad and Situational Practices."[14] The document represents the outcome of months of intensive discussions by a broad range of stakeholders, including rights holders and individual creators, service providers of different sizes, and consumer and public interest representatives. The Task Force expects to convene another meeting of the multistakeholder forum at a future date to review progress in the application of the agreed-upon practices and related topics.

---

[6] Comments are available at http://www.uspto.gov/learning-and-resources/ip-policy/copyright/public-comments-green-paper.

[7] *See* Notice of Public Meetings on Copyright Policy Topics, 79 Fed. Reg. 21439 (Dep't of Commerce Apr. 16, 2014), *available at* http://www.gpo.gov/fdsys/pkg/FR-2014-04-16/pdf/2014-08627.pdf; *see also* Notice of Public Meetings on Copyright Policy Topics, 79 Fed. Reg. 34497 (Dep't of Commerce June 17, 2014) (announcing times and locations of the two California roundtables), *available at* http://www.gpo.gov/fdsys/pkg/FR-2014-06-17/pdf/2014-14092.pdf. The notices invited members of the public to participate in the roundtables. USPTO and NTIA staff then placed participants on particular panels with the goal of ensuring a rich mix of various viewpoints.

[8] At these roundtables, USPTO and NTIA staff asked participants a series of questions on a variety of issues related to remixes, statutory damages, and the first sale doctrine in the digital environment. The goal was to further address subjects first raised in written comments submitted in response to the October 3, 2013 Public Notice. For agendas, webcasts, transcripts, and additional information on the roundtables, *see* http://www.uspto.gov/learning-and-resources/ip-policy/copyright/roundtable-discussions-remixes-first-sale-and-statutory-3.

[9] The Nashville roundtable was held on May 21, 2014, at Flynn Auditorium, Vanderbilt University Law School.

[10] The Cambridge roundtable was held on June 25, 2014, at Wasserstein Hall, Harvard Law School.

[11] The Los Angeles roundtable was held on July 29, 2014, at the Walter J. Lack Reading Room, Loyola Law School.

[12] The Berkeley roundtable was held on July 30, 2014, at Booth Auditorium, Boalt Hall, UC Berkeley School of Law.

[13] The agendas, webcasts, and transcripts for all four of these roundtables, as well as the other two Green Paper workstreams, are available at http://www.uspto.gov/learning-and-resources/ip-policy/copyrights.

[14] Information on the multistakeholder forum, including the "Practices" document, is available at http://www.uspto.gov/learning-and-resources/ip-policy/copyright/multistakeholder-forum-dmca-notice-and-takedown-system.

To advance work in the third area, determining an appropriate role for the government in facilitating the further development of the online marketplace, the Task Force published a notice[15] and convened an open meeting on April 1, 2015.[16] Based on the comments received, we are focusing on the development and use of standard identifiers for all types of works of authorship, interoperability among databases and systems used to identify owners of rights and terms of use, and a possible portal for linking to such databases and to licensing platforms. Work on these subjects is expected to continue through 2016.

Through these efforts, the Task Force has sought public input to ensure that an updated and balanced copyright system continues to thrive. As U.S. Department of Commerce Secretary Penny Pritzker said in the introduction to the Green Paper, "[e]nsuring that copyright policy provides strong incentives for creativity, while promoting innovation in the digital economy, is a critical and challenging task."[17] The tools available in the digital ecosystem have changed the nature of what creators can produce and how they share works with the public, and the ways the public can access and interact with the content. Effective and balanced copyright protection should work in tandem with the free flow of information. In fact, as the Supreme Court has recognized, "the Framers intended copyright itself to be the engine of free expression."[18]

To that end, this White Paper examines critical components of copyright policy in the digital age, and offers recommendations and suggestions to "ensure balanced and meaningful protection for intellectual property while preserving the dynamic innovation and growth that have made the Internet and digital technology so important to our economy and society."[19]

Our discussion of each issue is organized into three parts:  (1) an introduction that provides a brief overview of the issue, (2) a summary of the comments and testimony received from stakeholders (without the Task Force's endorsement of any of the views presented), and (3) our conclusions and recommendations.

---

[15] *See* Public Meeting on Facilitating the Development of the Online Licensing Environment for Copyrighted Works, 80 Fed. Reg. 13325 (Dep't of Commerce March 13, 2015), *available at* http://www.gpo.gov/fdsys/pkg/FR-2015-03-13/pdf/2015-05765.pdf.

[16] Webcasts of the meeting are available for viewing here: http://www.uspto.gov/learning-and-resources/ip-policy/copyright/public-meeting-facilitating-development-online-licensing. The following subjects were covered at the public forum: (1) Standard Identifiers-An Overview of the Current Landscape; (2) The Challenges: Gaps in Coverage and Areas for Improvement; (3) The Path Forward: Interoperability of Standard Identifiers and Incorporation into Databases of Rights Information—Music Sector; (4) The Path Forward: Interoperability of Standard Identifiers and Incorporation into Databases of Rights Information—Other Sectors; (5) U.K. Copyright Hub: One Model of Public/Private Cooperation; and (6) Toward a U.S. Copyright Hub?

[17] Green Paper at ii.

[18] *Harper & Row Publ'rs, Inc. v. Nation Enter.*, 471 U.S. 539, 558 (1985); Green Paper at 1-2.

[19] Green Paper at ii.

## II. Overview of Conclusions and Recommendations

### A. Remixes

Remixes make valuable contributions to society in providing expressive, political, and entertainment content. It is important that the copyright framework continues to allow the broad range of remixes to thrive, ensuring that a vibrant fair use space coexists with effective licensing structures. The Task Force concludes that the record has not established a need to amend existing law to create a specific exception or a compulsory license for remix uses. We have several recommendations that would make it easier for remixers to understand when a use is fair and to obtain licenses when they wish to do so. Specifically, the Task Force recommends pursuing three goals:

- The development of negotiated guidelines providing greater clarity as to the application of fair use to remixes;

- Expanding the availability of a wider variety of voluntary licensing options; and

- Increasing educational efforts aimed at broadening an understanding of fair use.

### B. First Sale

The first sale doctrine provides many benefits to the public, including sharing favorite books with friends, enabling libraries to lend materials to their patrons, and providing reduced-price versions to impecunious students. We posed the question whether there is a way to preserve the doctrine's benefits in the online environment. Based on the record before us, the Task Force concludes:

- Amending the law to extend the first sale doctrine to digital transmissions of copyrighted works is not advisable at this time. We have seen insufficient evidence to show that there has been a change in circumstances in markets or technology, and the risks to copyright owners' primary markets do not appear to have diminished. Innovative business models and licensing terms provide some of the benefits traditionally provided by the first sale doctrine. The Task Force acknowledges that licensing terms can be changed, but we expect that copyright owners, as rational commercial actors, will meet the changing demands of consumers.

- The Task Force notes the concerns expressed by libraries about the loans of eBooks. The licensing agreements between eBook publishers and libraries are new and evolving, and early government intervention into the eBook market could skew the development of innovative and mutually beneficial arrangements. If over time it becomes apparent that libraries have been unable to appropriately serve their patrons due to overly restrictive terms imposed by publishers, further action may be advisable (such as convening library and publisher stakeholders to develop voluntary best practices, or amending the Copyright Act).

- The Task Force believes that there is a need to provide consumers with more clarity about the nature of the transactions they enter into when they download copies of works. We therefore recommend the creation of a multistakeholder process to establish best practices to improve consumers' understanding of license terms and restrictions in connection with online transactions involving creative works.

## C. Statutory Damages

The Task Force is mindful that statutory damages have become increasingly important in cases of online infringement, where the scope of the infringing use may not be ascertainable. Our inquiry focused on the level of statutory damages that may be assessed against individual file-sharers and against online services, which can be secondarily liable for infringement for large numbers of works. The Task Force recommends the following three amendments to the Copyright Act to address some of the concerns presented and to better balance the needs of copyright owners, users, and intermediaries:

- Incorporate into the Copyright Act a list of factors for courts and juries to consider when determining the amount of a statutory damages award;

- Implement changes to the copyright notice provisions that would expand eligibility for the lower "innocent infringement" statutory damages awards; and

- In cases involving non-willful secondary liability for online services offering a large number of works, give courts discretion to assess statutory damages other than on a strict per-work basis.

Furthermore, the Task Force supports the creation of a streamlined procedure for adjudicating small claims of copyright infringement and believes that further consideration should be given to the proposal of the Copyright Office to establish a small claims tribunal. This could help diminish the risk of disproportionate levels of damages against individual file-sharers.

## III. The Legal Framework for the Creation of Remix

### A. Introduction

In the Green Paper, the Task Force described remixes—works created through changing and combining existing works to produce something new and creative—as part of a trend of user generated content ("UGC") that has become a hallmark of the Internet.[20] We noted that some remixes may qualify as fair uses, and that in certain contexts, licensing mechanisms have been developed as an alternative to relying on fair use. We also recognized that best practices and industry-specific guidelines have been developed to offer guidance to remix creators. We posed the questions whether the creation of remixes is nevertheless being unacceptably impeded by legal uncertainty, whether there is a need for new approaches that would make it easier to engage in remixing, and whether there are efficient ways to compensate rights holders in cases where fair use does not apply.[21]

### B. Stakeholder Views

#### 1. The Different Worlds of Remix

"Remixes" as defined in the Green Paper are a broad category including mashups and sampling with respect to music, as well as creations using other types of preexisting material.[22] The comments received in this proceeding made clear the variety of activities that are at issue. In the audiovisual field, remixes include UGC videos using preexisting audio or audiovisual material combined with new authorship, and "fan videos" that combine music with footage from television programs and motion pictures to comment on the audiovisual material or to "tell new stories."[23] With respect to visual art, remixes may include photo manipulation, digital or mixed analog/digital collage, stock photography or stock illustration, fractals, multimedia, vector files, digital wire frames, and 3D renderings.[24] Literary remixes include fan fiction, in which aficionados of works such as the Harry Potter stories or the Smallville television show write new stories to share and express their devotion to the original stories and characters, make comments about society, or hone their skills as writers.[25]

---

[20] Green Paper at 28.

[21] Although this Paper discusses fair use primarily in the context of remix works, the Task Force has acknowledged the important role fair use plays in advancing the goals of copyright law more generally. *See id.* at 21-23.

[22] Some stakeholders saw "remix" as a misnomer for such a broad spectrum of works. They explained that "remix" is a term of art in the music industry referring to certain kinds of alterations made to sound recordings, typically by the recording artists or producers of the original records, such as remix of tracks (*e.g.*, to make the vocals louder or softer, amplify the bass, etc.) (Cooper (LA) at 83) or a new version such as a dance remix (NMPA *et al.*, Nov. Comments at 3). The Task Force recognizes this specialized use of the term in the recording industry, but notes that the term has obtained a larger meaning in society at large. *See* LAWRENCE LESSIG, REMIX: MAKING ART AND COMMERCE THRIVE IN THE HYBRID ECONOMY (2009).

[23] OTW Nov. Comments at 13-14.

[24] DeviantART Nov. Comments at 10.

[25] OTW Nov. Comments at 6, 12, 44, 49 and *passim*.

The Task Force also heard that the creators of remixes are a diverse group—from teenagers who create fan fiction or videos for their own amusement and that of their friends, to commercial artists, to professional DJs who create mashups that they play for large paying audiences or make available on advertising-supported websites.[26] The wide range of participants in remixing includes both amateurs who engage in noncommercial self-expression and professionals who remix for profit.[27]

In many cases, these remixes will constitute derivative works, compilations, or collective works, as defined in the Copyright Act.[28] Whether or not they fall into these categories, they are likely to be infringing unless they are authorized or qualify for a defense such as fair use.[29]

Some stakeholders urged that different treatment should be given to nonprofessional, nonprofit remixers. One participant observed that "ordinary people who are just engaging in noncommercial activity … are not going to be interested in participating in a licensing regime" and should not have to do so when they are "sharing with their friends and their fans and maybe audiences."[30] A commenter suggested that creators of fan fiction should be insulated from liability for expressive, noncommercial activities since "[o]ften the best way to learn a musical instrument or develop artistic or creative writing skill is to imitate the works of others" and copyright owners should not be concerned about such activity.[31]

A number of stakeholders, however, stressed that the lines between amateur and professional, and between noncommercial and commercial, are often blurred. A music industry representative observed that performers may be considered "noncommercial" early in their careers when they are not yet making money, but that their goal is to enter the commercial marketplace.[32] A representative of Google noted that amateur creators such as those starting out on YouTube often want to become professionals, but may find it difficult to negotiate the transition from amateur to professional given the different "clearance culture" in the professional world.[33] A university

---

[26] *See* McSherry/EFF (Berkeley) at 32; Menell (Berkeley) at 13.

[27] The terms "amateurs" and "professionals" do not entail any value judgment as to the creativity or the quality of the work produced.

[28] The Association of American Publishers noted that the Task Force's broad definition overlaps with the Copyright Act's definitions of compilations, collective works, and derivative works. AAP Nov. Comments at 2-3; Adler/AAP (Cambridge) at 29-30. Other participants stated that all remixes would be "derivative works." *See, e.g.*, LaPolt (LA) at 70; Turley-Trejo (LA) at 102, Cooper (LA) at 103.

[29] As some commenters noted, other doctrines may also come into play in particular cases, including the idea-expression dichotomy, the originality requirement, the substantial similarity requirement, and the concept of *de minimis* use. *See* ASCAP Nov. Comments at 9; CA Jan. Comments at 11; MPAA Jan. Comments at 6; PK Nov. Comments at 8-12. However, there was very little discussion of those doctrines, presumably because they will not apply to the typical remix, which takes substantial portions of expressive content. Our discussion addresses those remixes that would need to be licensed if they do not qualify as fair use.

[30] McSherry/EFF (Berkeley) at 32.

[31] Menell Jan. Comments at 111.

[32] Rosenthal/NMPA (Alexandria) at 197.

[33] Von Lohmann/Google (Berkeley) at 75.

lawyer-librarian whose duties include counseling students and faculty on copyright matters observed that in the world in which she works, "the commercial/non-commercial distinction is not as bright as one would think a lot of times."[34] She stated that somebody working on a project that appears to be noncommercial may hope to make money from it at some point in the future.[35] A technology industry group made the point that consumers may also create commercial content.[36]

Copyright owners discussed another blurred line between noncommercial and commercial remixes: while ". . . many user-generated works incorporating existing works are not commercial, many of the platforms where this user-generated content is promoted to viewers are."[37] A motion picture industry representative pointed out that while a creator of UGC may be making it for enjoyment and to share freely with others, the commercial platform on which it is posted may place advertisements around it and earn revenues from its dissemination.[38]

An organization advocating on behalf of remixers expanded on the Green Paper's point[39] that advances in digital technology have made remixing existing works easier and cheaper than ever, noting that sophisticated and widely available technologies enable those with limited financial resources to create and distribute polished remixes.[40] It explained that "[r]emixes produce valuable cultural and political commentary. They are particularly attractive to groups underrepresented in American mass culture—women, nonwhites, and LGBT individuals, among others—who use remix to talk back to that culture, to identify what it's leaving out and explain what they see."[41] The primary motivation for such noncommercial remixers is not to make a profit, but to engage in self-expression.[42]

Regardless of the motivation of the remixer, however, some participants expressed concern that even entirely noncommercial activities can cause harm to the market for the original work or for licensed derivative works. A professor suggested that the relevant issue is not whether the remixer is engaging in commercial activity, but whether the rights holder has suffered

---

[34] Gilliland (Cambridge) at 78.

[35] *Id.* at 79.

[36] CCIA Nov. Comments at 2.

[37] CA Jan. Comments at 6.

[38] Sheffner/MPAA (Nashville) at 152.

[39] Green Paper at 6, 28.

[40] OTW Nov. Comments at 30 (*citing* Rebecca Tushnet, *I Put You There: User-Generated Content and Anticircumvention*, 12 VAND. J. ENT. & TECH. L. 889, 903–05, 930 & note 168 (2010)).

[41] *Id.* at 3, 28-29 and 38.

[42] *Id.* at 63.

commercial harm.[43] An organization representing copyright owners came forward with examples of other types of harm involving the incorporation of preexisting works into hate speech.[44]

Professional creators and their representatives expressed the conviction that the author of an underlying work has and should continue to have the right to say no to someone who wishes to remix his or her work.[45] Many pointed to existing licensing mechanisms, which they argued can accommodate the desire to remix while permitting copyright owners to control and be compensated for the use of their works.[46] They expressed concern that permitting remixing without authorization would upset established industry practices that provide important sources of revenue. Attorneys who represent recording artists noted that maintaining approval of how their works are used is one of the most important deal points in their contract negotiations.[47]

Several copyright owner representatives urged that, at least in cases where it does not constitute fair use, an author should be entitled to forbid the use of his or her work in ways that he finds offensive, or simply does not like.[48] A few rights holders, while acknowledging that remixes can contain creative artistic expression, nevertheless viewed such expression as secondary to protecting the authors and owners of pre-existing copyrighted material, and stressed the goal of "of protecting the property interest of the original author or providing incentive for original authors to create original works."[49] At the same time, as described below, most copyright owners also acknowledged that some remixes will be protected by the fair use doctrine.[50]

---

[43] Gervais (Nashville) at 148-49. *See also* Strohm (Nashville) at 148 ("it [is] possible that you could have a work that's ostensibly noncommercial that still harms the infringed work in a way that impacts its commerciality . . .").

[44] Aistars/CA (LA) at 130-31 (giving as an example the rewriting of the lyrics of "Hey Jude" to transform it into an anti-Semitic creed). *See also* CA Jan. Comments at 6.

[45] *See, e.g.*, LaPolt and Tyler Jan. Comments at 3 (asserting that recording "[a]rtists can, and should continue to be able to, deny a use that they do not agree with."); *id.* at 6-7 & apps. (appending letters from various recording artists asserting importance of "the right to say 'no'" and importance of the ability to give approval over how their music is used); LaPolt (LA) at 70-72; Muddiman/Hollywood Composers (LA) at 98-99, 118-19. *See also* AAP Nov. Comments at 3 (referring to "the general rule that such use of preexisting works requires permission from the copyright owner"); IPI Nov. Comments at 6 ("permission is a feature, not a bug, of a civil society operating under the rule of law").

[46] *See, e.g.*, Aistars/CA (LA) at 131-32; Freundlich (LA) at 79-80; Rosenthal/NMPA (Cambridge) at 17-20. *See also* discussion *below* at Part B.3 of this Section, p. 19 (Current and Developing Licensing Mechanisms).

[47] Given (Berkeley) at 49; LaPolt and Tyler Jan. Comments at 2-3.

[48] *See* CA Jan. Comments at 6 (noting that "copyright law protects creators . . .from having their works used in advertising against their will, to cast them in an unflattering light, or by groups or individuals morally or politically opposed to them"); LaPolt and Tyler Jan. Comments at 3 (discussing "past instances of performing artists and songwriters expressing frustration with political uses of their music"); Rosenthal/NMPA (Alexandria) at 187 (identifying a recording artist who never agrees to license samples of his recordings).

[49] ASCAP *et al.* Jan. Comments at 5. *See also* IPI Nov. Comments at 5-6 (asserting that remixes are "a subordinate form of creativity" and should require permission from the creator of the original work).

[50] AAP Nov. Comments at 2, 3; AAP Jan. Comments at 2-3; ASCAP Nov. Comments at 9; IPO Nov. Comments at 3; Marks/RIAA (Nashville) at 124-25; RIAA Nov. Comments at 6. *See also* Freundlich (LA) at 80-81.

2.      Legal Doctrines

a.  Fair Use

The Green Paper recognized that the fair use doctrine is a "fundamental linchpin of the U.S. copyright system."[51] The doctrine's flexibility ensures that it can accommodate new, unforeseen activities, but it can also create uncertainty. As noted in the Green Paper, many remixes will qualify as fair uses while others will not. Nevertheless, some will fall into a gray area where it is difficult to determine their status without potentially costly litigation.[52]

The Task Force heard from many stakeholders that the fair use doctrine is effective in permitting the creation of remixes. One public interest organization noted that fair use is flexible and robust, and that to the extent there is uncertainty, it is a worthwhile consequence of having those benefits.[53] Another such organization surveyed recent case law on fair use and concluded that the current legal framework is generally favorable to remix.[54] An organization representing copyright owners stated that "fair use fosters creativity by allowing creators to produce new cultural contributions that may not have been possible without building on or referencing existing works;"[55] and a group of music industry stakeholders support fair use to protect critical expression for which the use of underlying works is necessary.[56] Motion picture studios noted that millions of creators, both small and large, distribute transformative creative works online relying on fair use and other doctrines. They asserted that the wide availability of these transformative works, as well as the low number of infringement actions, demonstrate that the current legal framework preserves the space necessary for such activity.[57]

Other commenters, however, shared with the Task Force the challenges they experienced—either directly or on behalf of third parties—in applying the fair use doctrine to remixes, stressing that it is a complex inquiry on which courts frequently disagree.[58] Some stated that in many cases it is difficult to determine whether remixes are fair uses and that even lawyers have a hard time advising on this issue, given disparate court decisions on similar fact patterns.[59] A publishers' representative stated with respect to transformative uses that "this is an area where there's tremendous disagreement about what the law is, what the law should be, whether or not the law has been consistent, whether or not the law is clear, and whether there is a clear path to follow in

---

[51] Green Paper at 21 & n.97 (citing 17 U.S.C. § 107).

[52] *Id.* at 21. *See also* Rothman (LA) at 76.

[53] McSherry/EFF (Berkeley) at 16.

[54] OTW Nov. Comments at 5-11.

[55] CA Jan. Comments at 7.

[56] ASCAP *et al.* Jan. Comments at 3.

[57] MPAA Jan. Comments at 6-7.

[58] DeviantART Nov. Comments at 17.

[59] *Id.*; Khanna & Tehranian Nov. Comments at 9-10; Menell (Berkeley) at 27-28; PK Nov. Comments at 3; Perzanowski (Nashville) at 121.

taking that area of the law and attempting to apply it here . . . ."[60] A commenter from an Internet art platform asserted that "no citizen/artist is effectively capable of applying fair use unassisted" and that current practices in the visual arts using rich digital tool sets "do not mesh with current law."[61]

While not all commenters and participants in the discussions shared the same interpretation of the law,[62] there appeared to be a near-consensus that fair use should remain the principal doctrine used to determine whether a remix is lawful. As discussed below, no alternative approach garnered significant support. Most roundtable participants speaking on behalf of remixers and users believed that fair use serves to resolve most cases appropriately and that the benefits of flexibility outweigh the costs of uncertainty.[63]

### b. Guidelines and Best Practices

To address the uncertainty as to whether a particular use will be judged to be fair, one approach would be to clarify the circumstances in which the doctrine applies. As noted in the Green Paper, there have been several initiatives over the years aiming to provide greater predictability to fair use by formulating guidelines and statements of best practices.[64] In their comments and during the public meetings, many stakeholders expressed the view that guidelines or best practices can play a useful role in offering guidance to remix creators.[65]

Other participants, primarily from the rights holder community, were less enthusiastic about such initiatives. One raised the concern that guidelines and best practices could be used to expand exceptions, which the commenter said would "begin to swallow the set of rights you intend to protect."[66] Another characterized them as "really dangerous" because some users may be misled into believing that they represent the law.[67] An attorney who represents creators and copyright

---

[60] Adler/AAP (Cambridge) at 63.

[61] DeviantART Nov. Comments at 16-17.

[62] It is not surprising that as a general rule, rights holders tended to view the scope of fair use more narrowly than those who spoke on behalf of users, including varying interpretations of the concept of transformative use. *Compare* the comments cited *above* at notes 50, 55-57, 60 and *below* at 146 with OTW Nov. Comments at 5-12 ("Most remixes that borrow from in-copyright works while adding creative elements of their own have strong claims to fair use."); CCIA Nov. Comments at 2-3; NMR Nov. Comments at 4.

[63] OTW Nov. Comments at 3, 62-75. *See also* McSherry/EFF (Berkeley) at 16; Courtney (Cambridge) at 70-71 ("Recent scholarship shows patterns and predictability in some of the fair use cases. … Lawyers can forecast likely outcomes where there are precedents that have analogies; that does exist."); Rosenblatt/OTW (LA) at 107 ("Fair use does a good job of making room for commentary, criticism, transformative work, and particularly for noncommercial transformative work"); Turley-Trejo (LA) at 81 ("Fair use is working, I think, to some extent, for a lot of these remixes and mash-ups . . . . [E]specially with some of the case law with fair use, it is working.").

[64] Green Paper at 22-23; *see also id.* at 29, 104.

[65] *See* Adler/AAP (Cambridge) at 48; ASCAP Nov. Comments at 12; Courtney (Cambridge) at 56-59, 71; Gilliland (Cambridge) at 60-62; Google Nov. Comments at 6; IFTA Nov. Comments at 3; Karobonik/NMR (LA) at 113-15 (but opposing a single set of guidelines); MPAA Jan. Comments at 7; OTW Nov. Comments at 78-79.

[66] Fox (LA) at 111.

[67] LaPolt (LA) at 109-10.

owners asserted that the courts already handle fair use issues well and that guidelines would be confusing and add "another layer of complexity."[68]

A university copyright advisor pointed out that guidelines may not only advise what uses are permissible or impermissible, but also explain where to be careful, and what factors to consider.[69] Another participant stressed that guidelines should be drafted in a way that makes them accessible to users and does not require interpretation by an attorney, since it is the remix creators themselves who need to use the guidelines.[70] One professor warned that the process of developing guidelines can be difficult.[71]

A number of precedents were brought to the Task Force's attention. Those precedents fall into two categories: (1) what might be called "single sector" guidelines, and (2) "negotiated" guidelines. Single sector guidelines are prepared by a community of stakeholders, generally either users or rights holders, based on what is considered appropriate and common practices within that specific community. Negotiated guidelines are characterized by the inclusion of a variety of stakeholders, including both users and rights holders, with a goal of reaching consensus on principles that are agreed by all. As noted by several commenters, there are advantages and disadvantages to each approach.

*Single Sector Guidelines*. Over the years, communities of users of creative works have issued guidelines or statements of best practices that set forth their views as to what kinds of activities are likely to be fair use or otherwise appropriate, and provide guidance regarding factors to be considered. The most well-known recent examples are a series of statements of best practices coordinated by the American University Center for Social Media and the AU Washington College of Law Program on Information Justice and Intellectual Property. These relate to uses of various types of works and in various contexts, including works of poetry,[72] dance-related materials,[73] orphan works,[74] and uses in visual arts,[75] documentary films[76] and online videos,[77] by journalists,[78] and in academic and research libraries.[79]

---

[68] Freundlich (LA) at 117-18. *See also* Muddiman/Hollywood Composers (LA) at 118; Brown (Cambridge) at 66.

[69] Courtney (Cambridge) at 59.

[70] McDonough/FMC (Cambridge) at 67-68.

[71] Gervais (Nashville) at 143. Professor Gervais specifically referred to the classroom photocopying guidelines and the guidelines developed by American University, discussed in notes 72, 83-77, and 90 *below*.

[72] AM. U., CTR. FOR SOCIAL MEDIA *et al.,* CODE OF BEST PRACTICES IN FAIR USE FOR POETRY (2011), *available at* http://www.cmsimpact.org/sites/default/files/documents/pages/fairusepoetrybooklet_singlepg_3.pdf (last visited Oct. 5, 2015).

[73] DANCE HERITAGE COAL., STATEMENT OF BEST PRACTICES IN FAIR USE OF DANCE-RELATED MATERIALS (2009), *available at* http://www.danceheritage.org/DHC_fair_use_statement.pdf (last visited Oct. 5, 2015).

[74] AM. U., CTR. FOR SOCIAL MEDIA *et al.,* STATEMENT OF BEST PRACTICES IN FAIR USE OF COLLECTIONS CONTAINING ORPHAN WORKS (2014), *available at* http://www.cmsimpact.org/sites/default/files/documents/pages/orphanworks-dec14.pdf (last visited Oct. 5, 2015).

[75] AM. U., CTR. FOR SOCIAL MEDIA *et al.,* CODE OF BEST PRACTICES IN FAIR USE FOR THE VISUAL ARTS (2015), *available at* http://www.cmsimpact.org/sites/default/files/best_practice_rfnl.pdf (last visited Oct. 5, 2015).

One of the leaders of these projects has described them as "an effort to help practice communities claim their legal rights by formulating consensus statements of what kinds of unlicensed use of copyrighted materials are necessary and reasonable for the creative work they do."[80] An organization established to promote the acceptance of "noncommercial fanworks" pointed to these best practices statements as offering "understandable copyright

rules that individuals can respect," in contrast to what it described as the "counterintuitive and arcane" nature of the law.[81] One roundtable participant found such guidelines to be "a very helpful starting place to work when I'm working with documentary filmmakers to at least get them up to speed," but expressed concerns about the challenge of creating one set of guidelines to fit every factual scenario, especially through a multistakeholder process.[82] A university copyright advisor described guidelines as "an expression of the users that are in this community[,]"[83] observing that the guidelines are carefully crafted and include limiting

---

[76] AM. U., CTR. FOR SOCIAL MEDIA *et al.*, DOCUMENTARY FILMMAKERS' STATEMENT OF BEST PRACTICES IN FAIR USE (2005), *available at* https://www.wcl.american.edu/pijip/go/film-bestpractices (last visited Oct. 5, 2015).

[77] AM. U., CTR. FOR SOCIAL MEDIA *et al.*, CODE OF BEST PRACTICES IN FAIR USE FOR ONLINE VIDEO (2008), *available at* http://www.cmsimpact.org/sites/default/files/online_best_practices_in_fair_use.pdf (last visited Oct. 5, 2015).

[78] AM. U., CTR. FOR SOCIAL MEDIA *et al.* SET OF PRINCIPLES IN FAIR USE FOR JOURNALISM (2013), *available at* http://www.cmsimpact.org/sites/default/files/documents/pages/principles_in_fair_use_for_journalism.pdf (last visited Oct. 5, 2015).

[79] AM. U., CTR. FOR SOCIAL MEDIA *et al.*, CODE OF BEST PRACTICES IN FAIR USE FOR ACADEMIC AND RESEARCH LIBRARIES (2012), *available at* http://www.cmsimpact.org/sites/default/files/documents/code_of_best_practices_in_fair_use_for_arl_final.pdf (last visited Oct. 5, 2015).

[80] Henry Jenkins, *Recut, Reframe, Recycle: An Interview with Pat Aufderheide and Peter Jaszi (Part One)* (Feb. 6, 2008) (quoting Peter Jaszi), *available at* http://henryjenkins.org/2008/02/an_interview_with_pat_aufderhe.html. A proponent of "community-based" best practices and roundtable participant argues that "[b]ringing everyone to the table almost certainly would have led to the same results as similar attempts in the past—'guidelines' offering crabbed interpretations of fair use that would not satisfy anyone" and that "the guidelines made the argument that documentary filmmakers' principles were normatively desirable understandings of fair use, even in the absence of agreement from commercial copyright owners." Rebecca Tushnet, *User-Generated Discontent: Transformation in Practice*, 31 COLUM. J.L. & ARTS 497, 500 (2008). Other proponents of "community-based" guidelines have stated that one of the benefits of such guidelines is that they "provid[e] judges with information about community norms, which research suggests can be very influential to their decisions." Brandon Butler, *Issue Brief: Massive Open Online Courses: Legal and Policy Issues for Research Libraries* 6-7 (Ass'n of Research Libraries 2012), http://www.arl.org/storage/documents/publications/issuebrief-mooc-22oct12.pdf (last visited Oct. 5, 2015).

[81] OTW Nov. Comments at 2, 78. Google also identified best practices as being among the mechanisms that can solve "some of the legal uncertainties facing some remix creators with respect to some copyrighted works," *citing* AM. U., CTR. FOR SOCIAL MEDIA *et al.*, CODE OF BEST PRACTICES IN FAIR USE FOR ONLINE VIDEO (2008), *above* note 77. Google Nov. Comments at 6.

[82] Karobonick/NMR (LA) at 113-14. *See also* Gervais (Nashville) at 143 (referring the same best practices guidelines as "really important" and stating "the more of that we have, the more there'll be a signal from interested parties as to what shouldn't be licensed.").

[83] Courtney (Cambridge) at 56.

statements and "stories about how the community is using [the guidelines]."[84] The documentary filmmakers' statement of best practices has been described with approval as having "had a profound effect on the documentary marketplace."[85]

Others pointed out shortcomings. Book publishers stated that the AU guidelines "express the view of current general practices within the community of users . . . [and] have deliberately not sought out the views of rights holders," resulting in "a kind of self-confirmation that your own practices should be widely viewed as legitimate and sufficiently authorized."[86] In considering possible guidelines for remixes, they urged that the single sector model should not be followed and stated that guidelines produced with input from all sides would be useful, although more difficult to achieve.[87]

A similar critique was offered by a law professor and former documentary filmmaker who has studied the issue of best practices.. She observed that the group that created the documentary filmmakers' best practices was "not particularly representative of the stakeholders" because it excluded those "whose works were being used."[88] While accepting that it may be appropriate for various communities to develop their own guidelines so that "people can look at them as reference points or not," she concluded that the AU guidelines should not be adopted more broadly.[89]

*Negotiated Guidelines*. In contrast to single sector approaches, negotiated guidelines are developed with the participation of a mix of stakeholders, which may include authors and copyright owners, users, and other relevant intermediaries. Such negotiated guidelines have a mixed history. The most well-known were developed in 1975, during the final stages of enactment of the current Copyright Act. At the urging of the Chairman of the Subcommittee on Courts, Civil Liberties, and Administration of Justice of the House Judiciary Committee, an Ad Hoc Committee of educational institutions, authors and publishers agreed to guidelines for

---

[84] *Id.* at 58-59. Another university copyright advisor also referred to the "stories" included in the guidelines, noting that they help "people who aren't that practiced in taking a set of abstractions and applying them to an actual situation . . . ." Gilliland (Cambridge) at 60-61.

[85] Henry Jenkins, *Recut, Reframe, Recycle: An Interview with Pat Aufderheide and Peter Jaszi (Part Two )* (Feb. 8, 2008) (quoting Patricia Aufderheide), *available at* http://henryjenkins.org/2008/02/recut_reframe_recycle_an_inter.html, *referenced in* OTW Nov. Comments at 74. The Jenkins article also noted that the four error and omissions insurance companies most used by documentary filmmakers announced programs to cover fair use claims within 18 months after the statement was issued. *Id.*

[86] Adler/AAP (Cambridge) at 48.

[87] *Id.* at 48-49.

[88] Rothman (LA) at 115.

[89] *Id.* at 115-17. *See also,* Jennifer E. Rothman, *Best Intentions: Reconsidering Best Practices Statements in the Context of Fair Use and Copyright Law,* 57 J. COPYRIGHT SOC'Y 371 (2010). In that article, Professor Rothman identified some value in single sector best practices as documenting the needs of a particular community and serving an educational purpose, but described them as products of "wishful thinking rather than reality," potentially mischaracterizing community practices and the role of custom. *Id.* at 376-78.

classroom copying from book and periodicals in not-for-profit educational institutions.[90] Similar guidelines were prepared by music educators and music publishers relating to use of music in education settings.[91] These guidelines were reprinted with approval in the legislative history of the Copyright Act of 1976.[92] They have been relied on by a number of courts, although they are not binding and cannot replace the necessary multifactor fair use analysis.[93]

A subsequent effort to develop multistakeholder fair use guidelines for the digital age was inconclusive. The Conference on Fair Use (CONFU), convened in 1994 by the Clinton Administration's Information Infrastructure Task Force to develop guidelines for fair uses of copyrighted works in the digital environment by librarians and educators, involved a broad range of stakeholders who were unable to reach final consensus.[94] Several commenters held CONFU

---

[90] U.S. COPYRIGHT OFFICE, CIRCULAR 21: REPRODUCTION OF COPYRIGHTED WORKS BY EDUCATORS AND LIBRARIANS 5-7 (Aug. 2014) (describing history of and setting forth the classroom copying guidelines), *available at* http://www.copyright.gov/circs/circ21.pdf; *see* Gervais (Nashville) at 143 (describing the photocopy guidelines as "great precedents for guidelines").

[91] U.S. COPYRIGHT OFFICE, CIRCULAR 21: REPRODUCTION OF COPYRIGHTED WORKS BY EDUCATORS AND LIBRARIANS 7-8 (Aug. 2014) (setting forth Guidelines for Educational Uses of Music), *available at* http://www.copyright.gov/circs/circ21.pdf (last visited Oct. 6, 2015).

[92] H.R. REP. NO. 94-1476 (Comm. on the Judiciary) at 68-70 (1976), *available at* http://www.copyright.gov/history/law/clrev_94-1476.pdf (last visited Oct. 14, 2015). These guidelines were endorsed by the House Judiciary Committee as "a reasonable interpretation of the minimum standards of fair use." *Id.* at 72.

[93] *See, e.g.*, *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1273-74 (11th Cir. 2014) ("We note that the Classroom Guidelines, although part of the legislative history of the Copyright Act, do not carry force of law. In any case, to treat the Classroom Guidelines as indicative of what is allowable would be to create the type of 'hard evidentiary presumption' that the Supreme Court has cautioned against, because fair use must operate as a 'sensitive balancing of interests.' As discussed, the fair use analysis must be performed on a work-by-work basis, and so we must not give undue weight to the amounts of copying set forth in the Classroom Guidelines.") (internal citations omitted); *Princeton University Press v. Mich. Document Servs.*, 99 F.3d 1381, 1390 (6th Cir. 1996) ("Although the Classroom Guidelines purport to 'state the minimum and not the maximum standards of educational fair use,' they do evoke a general idea, at least, of the type of educational copying Congress had in mind."); *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 919 (2d Cir. 1994) ("Though these guidelines are not considered necessarily binding on courts, they exist as a persuasive authority marking out certain minimum standards for educational fair uses . . . .") (citations omitted); *Marcus v. Rowley*, 695 F.2d 1171, 1178 (9th Cir. 1983).

[94] The CONFU Final Report described the outcome as follows:

> In summary, the CONFU process resulted in much discussion on the issue of fair use in a digital environment. It also resulted in the development of fair use guidelines for educational multimedia, proposals for fair use guidelines for digital images and some aspects of distance learning, the adoption of a statement of scenarios dealing with the use of computer software in libraries, and the identification and referral of two important issues for possible legislative solutions, i.e., (1) reproduction of works for the visually-impaired or other persons with disabilities, and (2) digital preservation. Though the proffered guidelines in the area of electronic reserve systems were not widely supported by CONFU participants, and it was determined by the parties involved that it was premature to draft guidelines addressing digital transmission of digital documents in the context of interlibrary loan and document delivery activities, it was felt that the discussions on these issues had been extremely valuable if not immediately fruitful.

BRUCE A. LEHMAN, U.S. PATENT AND TRADEMARK OFFICE, THE CONFERENCE ON FAIR USE: FINAL REPORT TO THE COMMISSIONER ON THE CONCLUSION OF THE CONFERENCE ON FAIR USE 17 (1998), *available at* http://www.uspto.gov/sites/default/files/documents/confurep_0.pdf (last visited Oct. 6, 2015).

up as an example of a process that failed.[95] Nevertheless, as the Green Paper observed, despite the lack of consensus, the discussions, guidelines, and draft proposals that resulted may serve as useful resources.[96]

More recently, a group of rights holders and online platforms announced the Principles for User Generated Content Services ("UGC Principles"), intended to "foster an online environment that promotes the promises and benefits of UGC Services and protects the rights of Copyright Owners."[97] An organization representing copyright owners described the UGC Principles as a "set of recommendations that work toward the goals of eliminating infringing content on UGC services, encouraging uploads of wholly original and authorized user-generated audio and video content, accommodating the fair use of copyrighted content on UGC services, and protecting legitimate interests of user privacy."[98] The UGC Principles state that filtering technology used to block content should be implemented in a way that accommodates fair use.[99]

Several roundtable participants and commenters suggested an even greater government role in the creation of fair use guidelines relating to remix, with the Copyright Office and/or the Patent and Trademark Office developing the guidelines.[100] Some participants were opposed to such an endeavor, however, with one lawyer representing copyright owners warning that unsophisticated users might misinterpret such guidelines as representing the law.[101] Book publishers proposed that "the Task Force work with stakeholders to clarify how remixes and mashups fit within the Copyright Act's taxonomy of compilations and derivative works," or that the Copyright Office

---

[95] Courtney (Cambridge) at 56; Crews (LA) at 139-40.

[96] Green Paper at 22. *See also* Adler/AAP (Cambridge) at 49 (noting that although CONFU had "difficulties" in developing guidelines, "at least … everybody had the opportunity to participate and they had the opportunity to make their views known and to share them, and there was a real opportunity for dialogue.").

[97] PRINCIPLES FOR USER GENERATED CONTENT SERVICES, http://www.ugcprinciples.com (last visited Oct. 14, 2015) [*hereinafter* "UGC PRINCIPLES"]. The companies supporting the principles include CBS Corp., Crackle, Dailymotion, Fox Entertainment Group, Microsoft Corp., MySpace, NBC Universal, Sevenload, Sony Pictures, Viacom, Veoh Networks, Inc., and The Walt Disney Company and Youku. *Id.*

[98] CA Jan. Comments at 11-12. A public interest organization pointed to a separate set of "UGC Fair Use Guidelines" developed by a number of nonprofit advocacy groups—the *Fair Use Principles for User Generated Video Content*—as a "good starting point" for discussions (albeit on the topic of notice and takedown under the DMCA rather than on remix), and characterized the UGC Principles as being "much less protective of fair use." CIS/EFF Nov. Comments at 11 & n.32. Another organization has claimed that the UGC Principles "offered no guidance concerning how the copyright enforcement [the UGC Principles supporters] called for might avoid entangling remixes or other fair uses." CDT Nov. Comments at 12.

[99] UGC PRINCIPLES, note 97 *above*, para 3d. One commenter has noted that while Google and its YouTube subsidiary did not sign onto the UGC Principles, YouTube's Content ID system follows the UGC Principles. Menell Nov. Comments at 94. Google has said that "Content ID is a supplement to, not a substitute for, fair use." Google Nov. Comments at 4.

[100] AAP Nov. Comments at 3; CA Nov. Comments at 11-12; Turley-Trejo (LA) at 119; Rothman (LA) at 116. Rothman also suggested the possibility that the Copyright Office issue opinion letters at the request of users who are not certain whether a particular use is fair, which could be used to demonstrate good faith. *Id.* at 117.

[101] LaPolt (LA) at 109-10. *See also* Freundlich (LA) at 117-18 ("I have complete fear of any guidelines that come with the Copyright Office imprimatur because I think the courts are working fine within the guidelines of Section 107 . . . . I think the courts would be confused by any other statement of guideline by the Copyright Office.").

conduct a notice-and-comment proceeding culminating in a circular or other statement of best practices.[102]

A majority of those commenters and roundtable participants who addressed negotiated guidelines spoke of them with approval, although some expressed ambivalence. One professor described them as "great precedents" that "carry a lot of weight" and a commenter cited them as a useful model in the context of the DMCA notice and takedown process.[103] But another participant dismissed them as having "utterly failed to meet their goals."[104] The ambivalence was captured by one commenter observing that a number of sources have developed competing guidelines. She remarked that "having a unitary source of information" to help lay persons understand the law "seems good," but also noted the danger of creating "quasi law," a violation of which would be considered infringement.[105]

### c. Possible Changes in the Law

There was little support for the possibility of revising the Copyright Act itself, either by creating a compulsory license, or a new specific exception.[106] One academic presented a detailed proposal for a compulsory license for musical mash-ups that could incorporate portions of multiple works, on the ground that such remixes are being made anyway, and a compulsory license would enable money to flow to the creators.[107] He argued that this would avoid the risk-taking caused by the uncertainty of the status of remixes under existing law[108] as well as the potentially prohibitive costs of obtaining licenses for works with multiple samples.[109]

---

[102] AAP Jan. Comments at 4.

[103] Gervais (Nashville) at 143; ASCAP Nov. Comments at 11-12.

[104] Crews (LA) at 139-40 (referring to both the 1976 guidelines and the CONFU process discussed *above*, notes 94-96 and accompanying text).

[105] Rosenblatt/OTW (LA) at 122.

[106] Some commenters and participants did suggest changes in other areas of the law that the Task Force is examining, as ways to alleviate concerns that might impede the creation of remixes. These changes generally involved amending the statutory damages regime and/or the DMCA notice and takedown regime. *See, e.g.*, CDT Comments at 11; Engstrom (Berkeley) at 27; McSherry/EFF (Berkeley) at 17; U. Mich. Lab at 3. We discuss statutory damages in Section V of this paper. The multistakeholder forum addressing improvements to the DMCA notice and takedown system, established pursuant to the Green Paper, agreed on a statement of good, bad and situational practices. DMCA NOTICE-AND-TAKEDOWN PROCESSES: LIST OF GOOD, BAD, AND SITUATIONAL PRACTICES, http://www.uspto.gov/sites/default/files/documents/DMCA_Good_Bad_and_Situational_Practices_Document-FINAL.pdf (last visited Oct. 14, 2015).

[107] Under this proposal, the compulsory licensee would pay a royalty based on the amount of current mechanical compulsory license to make and distribute sound recordings of musical works, which would be divided among the holders of rights in the various musical works and sound recordings included in the mash-up. Menell (Berkeley) at 27-31; Menell Jan. Comments at 113-18.

[108] Menell (Berkeley) at 27-28.

[109] Menell Jan. Comments at 116; *see also* Strohm (Nashville) at 125-26.

No other roundtable participant supported this proposal, however, with one characterizing it as "a solution in search of a problem."[110] Remix advocates observed that one does not need permission to engage in fair use and should not be required to obtain a compulsory license,[111] and creators stressed the importance of retaining the right to say "no" to uses of their works that do not qualify as fair, especially when they find them offensive.[112]

One commenter and participant suggested that a 2012 Canadian exception for noncommercial UGC could serve as a model for statutory reform in the United States, asserting that it would encourage noncommercial fan fiction and related creative activity.[113] The only response to the suggestion was opposition from motion picture studios, arguing that the statute goes beyond fair use in several respects.[114] There was no further support for or discussion of a specific exception for remixes, apart from statements opposing any new exceptions in general.[115]

---

[110] McSherry/EFF (Berkeley) at 32. In its written comments, the American Association of Independent Music voiced general "support [for] the creation of licensing mechanisms where remixes can be created under a compulsory licenses [*sic*], subject to the terms of the license and what musical copyrights are made available[;]" but did not address Professor Menell's specific proposal or explain how such a license would work or why it favored this approach. A2IM Nov. Comments at 4.

[111] McSherry/EFF (Berkeley) at 31; Courtney (Cambridge) at 37. *See also* AAP Nov. Comments at 2 (stating that the legal uncertainty surrounding fair use should not be resolved by compulsory licensing and that existing and developing market-based solutions, evolving with technological advances and new business models, can address remix issues).

[112] Aistars/CA (LA) at 129-30; ASCAP *et al.* Jan. Comments at 3-4; Carnes (Nashville) at 129; Cooper (LA) at 83-84, 104-05 ("[Y]ou can't get licenses for everything, but that's okay. . . . There are another billion songs you can go get to create whatever you want to create. Why is my property so important to you that you only can do your creation with my property?"); Given (Berkeley) at 49 ("The ability to control one's creative work is paramount."); LaPolt (LA) at 71-72; Muddiman/Hollywood Composers (LA) at 98, 118-19. Strohm noted that "one of the rights we have as rights holders is the right to turn something down if we just don't approve of the use for ideological reasons, or for aesthetic reasons for that matter. And that's the stumbling block I always run into is how would you structure a compulsory framework that still gave creators the right to say no if it was something that was truly objectionable to their ideology or aesthetic?" Strohm (Nashville) at 126. *See also* note 48 *above* and accompanying text.

[113] OTW Nov. Comments at 79 (quoting PETER S. MENELL, THIS AMERICAN COPYRIGHT LIFE: REFLECTIONS ON RE-EQUILIBRATING COPYRIGHT FOR THE INTERNET AGE, at 113 (Oct. 30, 2013); Tushnet/OTW (Alexandria) at 196-97. That exception provides that it is not copyright infringement to use an existing work, after it has been published or made available to the public, in the creation of a new work, or to authorize an intermediary to disseminate it, when the use or authorization is done solely for noncommercial purposes and the new work does not have a substantial adverse effect on the exploitation or potential exploitation of the existing work or its existing or potential market. *See* Canada Copyright Act, R.S.C. 1985, c. C-42, Section 29.21, *available at* http://laws-lois.justice.gc.ca/eng/acts/C-42/page-20 html (last accessed on Oct. 15, 2015).

[114] MPAA Jan. Comments at 7, n.30.

[115] *See, e.g.*, A2IM Nov. Comments at 4; AAP Nov. Comments at 2, 3; ASCAP *et al.* Jan. Comments at 2, 4; CA Jan. Comments at 11; CEA Nov. Comments at 7; IPI Nov. Comments at 4, 6; NMPA Nov. Comments at 4.

To sum up, the vast majority of commenters and participants who addressed the issue believed that, while not perfect, the current legal framework works, and did not believe it advisable to create a new exception or a compulsory license.[116]

### 3. Current and Developing Licensing Mechanisms

Regardless of their views of fair use, commenters acknowledged that not all remixes will qualify. In such cases (assuming that no other defense applies), remixers who do not want to run afoul of the law will need to seek permission from the copyright owners.

The Green Paper noted that because remixes often use multiple copyrighted works as source material, they can raise daunting licensing issues.[117] Many commenters agreed, stating that identifying, locating, and negotiating with owners of works can present difficulties and impose high transaction costs.[118] One professor's research found that, for small musicians not affiliated with a label, there are barriers and inefficiencies in the system.[119] Another professor agreed that "the market isn't working very well for certain types of commercial remixes."[120] Others noted that in cases involving multiple samples, it can be particularly cost-prohibitive and impractical to clear the necessary rights.[121] A professor referred to a "royalty stacking problem," where a musical recording has a large number of samples and the cumulative demands for royalties from the different owners of those samples can exceed 100 percent of the remixer's revenues.[122]

Copyright owners and their representatives pointed out that the marketplace is responding to remixes by creating new licensing mechanisms.[123] Among those discussed during the roundtables were licensing through intermediaries such as Kindle Worlds and YouTube, as well as direct and micro-licensing initiatives at various stages of development.[124]

---

[116] *See, e.g.*, Courtney (Cambridge) at 38 ("[N]obody really wants compulsory licensing in this area."); Given (Berkeley) at 33 (noting that with one exception, "there is a large consensus among us here" against a compulsory license).

[117] Green Paper at 28.

[118] *See, e.g.*, FMC Nov. Comments at 9-10; CIS/EFF Nov. Comments at 2; Menell at 115-16 ("When we have a tremendous number of parties, each possessing 'exclusive rights,' the transaction costs skyrocket."). *See also* notes 119-122 *below.*

[119] DiCola (Alexandria) at 160. *See also* FMC Nov. Comments at 9-10 (asserting that there is a "chilling effect" on the development of remixes and describing instances in the sampling context) (citing KEMBREW MCLEOD & PETER DICOLA, CREATIVE LICENSE: THE LAW AND CULTURE OF DIGITAL SAMPLING (Duke Univ. Press ed., 2011)).

[120] Gervais (Nashville) at 121.

[121] Menell (Berkeley) at 13; Strohm (Nashville) at 126, 137 and 150-151.

[122] DiCola (Alexandria) at 160-61.

[123] *See, e.g.*, ASCAP *et al.* Jan. Comments at 4-5; CA Jan. Comments at 8-10; MPAA Jan. Comments at 6; NMPA Nov. Comments at 5-6; RIAA Nov. Comments at 6-7; Rosenthal/NMPA (Cambridge) at 17 ("The answer to all of this is the free market."), 18-19.

[124] *See, e.g.*, Aistars/CA (LA) at 131-32 (referring to Amazon's Kindle Worlds, which licenses fan fiction and lets authors share in the revenue generated); Marks/RIAA (Nashville) at 138-140 (description of music industry micro-licensing); Rosenthal (Cambridge) at 18-20.

Google described the intermediary licensing currently engaged in by YouTube.[125] YouTube has completed licensing agreements with many music publishers, the major record labels, and a number of independent labels, as well as with motion picture studios and television networks.[126] Its Content ID system identifies videos that include works designated by copyright owners, who have the option to permit the file to remain available and "monetize" it (i.e., share in the advertising revenue received in connection with the work), block the file altogether, mute the copyright holder's audio, or track the video viewership statistics.[127] If the video remains on YouTube, the uploading users become, in effect, the beneficiaries of the copyright owner's license without having to seek out the copyright owner and obtain permission.[128] A Google representative stated that "[n]ot only has [private licensing] gotten rights holders compensated, but it has also enabled an enormous amount of this new creativity that we've seen online."[129]

Bulk licensing of remixes has taken place in other contexts as well. A music attorney described a small "free market mashup" initiative that was operated by ESL Music, a record label.[130] ESL offered to a collective of deejays the right to use all of its releases to create remixes, which ESL would then market for use in commercials and motion pictures, sharing the revenues with the remixers.

A micro-licensing platform is also now under development by the recording and music publishing industries, intended to provide a streamlined licensing mechanism for small users, such as the app developer who wants to use a clip of music in the background or a wedding videographer recording a ceremony.[131] Record companies explained the platform as a central online destination where such users can go "to make the transaction and get the license that they need."[132] The music industry decided it was worth the time and expense to build such a platform because it would make such licensing simple and cost-effective, providing compensation for uses that might otherwise be unlicensed.[133] A university representative affirmed the need for establishing this type of micro-licensing for a variety of works in situations where a fair use defense is not available and there is not massive distribution or large potential license fees.[134]

---

[125] Google Nov. Comments at 2-6. *See also* Von Lohmann/Google (Berkeley) at 73-75.

[126] Google Nov. Comments at 3. *See also* NMPA *et al.* Nov. Comments at 5-6; Rosenthal (Cambridge) at 18.

[127] Described in the Green Paper at 29. *See* also Google Nov. Comments at 3, 5-6 (describing Content ID functions).

[128] Google Nov. Comments at 3. *See also* Marks/RIAA (Nashville) at 125.

[129] Von Lohmann/Google (Berkeley) at 73.

[130] Rosenthal/NMPA (Cambridge) at 19.

[131] ASCAP *et al.* Jan. Comments at 5 & n.11 (citing Ed Christman, *RIAA & NMPA Eyeing Simplified Music Licensing System, could Unlock "Millions" in New Revenue*, BILLBOARD, June 13, 2013, *available at* http://www.billboard.com/biz/articles/news/record-labels/1566550/riaa-nmpa-eyeing-simplified-music-licensing-system-could) (last visited Oct. 15, 2015); Marks/RIAA (Nashville) at 138-40.

[132] Marks/RIAA (Nashville) at 140.

[133] *Id.* at 139. *See also* ASCAP *et al.* Jan. Comments at 5.

[134] Gilliland (Cambridge) at 25.

Several commenters also mentioned Creative Commons as another licensing mechanism through which creators can authorize remixes of their works subject to certain restrictions.[135]

Overall, the Task Force heard that rights holders, both on their own and through intermediaries, are actively engaged in licensing various remix uses, and that these licensing efforts are expanding.[136] Several roundtable participants and commenters urged that the market should have more time to develop before new legislative or regulatory solutions are considered.[137]

One proposed approach focused on voluntary collective licensing, where organizations representing large numbers of rights holders operate as one-stop shops to license rights for numerous works. Voluntary collective licensing is well-established for some uses of some types of works,[138] and several participants and commenters endorsed it as a promising vehicle for the licensing of remixes. One commenter suggested that a transaction-facilitating organization similar to a performing rights society or the Harry Fox Agency could facilitate remix licensing.[139] It noted, however, that "the success of a transaction-facilitating clearinghouse is dependent on the availability of a centralized information database so that the clearinghouse could efficiently and accurately make sure the correct rights holders are compensated."[140] An attorney who represents recording artists agreed that such a mechanism would be a good idea,

---

[135] ASCAP *et al.* Jan. Comments at 4; CA Jan. Comments at 9; Freundlich (LA) at 80; LaPolt Jan. Comments at 5; NMPA *et al.* Nov. Comments at 20; Rosenthal/NMPA (Cambridge) at 21. *See also* Green Paper at 29, 88-89. *But see* CrComm Nov. Comments at 2 ("The fact that some authors choose to apply open licenses, whether from Creative Commons or other sources, to some of their works, is not a "fix-all" solution to the ambiguities of fair use.").

[136] *See* ASCAP Nov. Comments at 9-10 ("[C]onsidering the financial benefit to copyright owners for the use of their works, marketplace solutions will be created, if they do not exists [*sic*] already, to address licensing concerns."); MPAA Nov. Comments at 1-2, 5 ("To the extent interest in remixes continues to grow, creators of both underlying works and remixes will experiment further with business models that meet consumer demand while compensating the content creators.").

[137] *See, e.g.*, AAP Nov. Comments at 3 (stating that "it is unnecessary and inappropriate to consider enactment of a . . . specific limitation or exception to broadly authorize the creation of 'remixes' or 'mashups;'" and that "publishers would encourage stakeholders to continue collaborating to develop market solutions . . . ."); Dare/Oracle (Berkeley) at 23 ("[T]he market should do it. And I don't think we're ripe at this point for a legislative solution to come in."); Rosenthal/NMPA (Cambridge) at 19-20 (suggesting that the small "free market mashup collective" discussed *above* may be a model for a more large-scale licensing regime, which should be explored before considering legislative and regulatory action). *See also* Dina LaPolt, Jay Rosenthal & John Meller, *A Response to Professor Menell: A Remix Compulsory License Is Not Justified*, 38 COLUM. J.L. ARTS 365, 371 (2015) ("In fact, current music industry practice shows that this marketplace is already functioning, and for those newer art forms—like mash-ups—the market must be given sufficient time to develop, and this development is already underway.").

[138] For a description of the music performing rights societies and their licensing, *see* U.S. COPYRIGHT OFFICE, COPYRIGHT AND THE MUSIC MARKETPLACE; A REPORT OF THE REGISTER OF COPYRIGHTS at 32-34 (2015), *available at* http://copyright.gov/policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf. Another major collective licensing organization, the Copyright Clearance Center ("CCC"), licenses certain reproduction and distribution rights in books, journals, newspapers, magazines, and other kinds of works. CCC Nov. Comments at 2-3, 6; Green Paper at 88. *See also* COPYRIGHT CLEARANCE CENTER, http://www.copyright.com/content/cc3/en/toolbar/aboutUs.html (last visited Oct. 15, 2015).

[139] FMC Nov. Comments at 10.

[140] *Id.*

but echoed the point that a database of ownership rights would be necessary and observed that creating it would pose obstacles.[141] A composer-songwriter in the business of aggregating music catalogs acknowledged the difficulty of establishing a new collective licensing organization, but observed that the sophisticated technology available today is likely to make the task easier, including establishing the necessary global rights database.[142]

### 4. The Relationship between Licensing and Fair Use

Discussions concerning the relationship between licensing and fair use focused on two themes: first, the need for licensing to co-exist as an alternative to asserting fair use in borderline cases and second, the concern that as licensing expands, the availability of fair use could contract.

A number of participants stressed the important role that licensing can play in permitting remixes that do not fall within the scope of fair use.[143] There was considerable support for the point that adequate and attractive licensing mechanisms, in conjunction with fair use, can contribute to fostering creativity.[144] In the words of one professor, "we need to provide room for market experimentation to help license mash-ups while protecting this fair use zone."[145] Many rights holders, while acknowledging that some remixes will qualify as fair use, nevertheless emphasized the role of licensing in cases of uncertainty.[146]

The Task Force heard a variety of views as to current practices when works fall into the gray area. One participant expressed concern that because of the legal uncertainty, rational actors with viable fair use defenses will elect to seek licenses rather than risk statutory damages penalties in

---

[141] Cooper (LA) at 124-25.

[142] Muddiman/Hollywood Composers (LA) at 127-28.

[143] Curtis (Nashville) at 130-31 (favoring licensing scheme such as micro-licensing and questioning "whether we even need to get to the fair use analysis in a lot of these gray areas."); Marks/RIAA (Nashville) at 119, 125 (a combination of licensing and legal doctrines are working well to permit remix). A user advocate also noted that "[f]air use isn't everything[;]" and "exists for those cases where licensing might be impossible." Karobonik/NMR (LA) at 94; Rothman (LA) at 96.

[144] *See* citations in note 143 *above*; Perzanowski (Nashville) at 140-41 (supporting reduction of transaction costs and enabling creators to obtain licenses in a low cost and efficient manner, as long as they are for uses that require permission).

[145] Rothman (LA) at 96.

[146] *See, e.g.*, AAP Nov. Comments at 2 ("[T]here are an increasing number of licensing mechanisms available in the market to facilitate the legal creation of such combination works that would not qualify as fair use. This is an important practical and creative consideration in light of the Task Force's observation that the applicability of fair use to any particular such combination of original expression from preexisting works is subject to 'legal uncertainty…given the fact-specific balancing required by fair use.'" [footnote omitted]"); MPAA Jan. Comments at 7 ("The availability of licenses is … a valuable method by which parties can avoid unnecessary disputes . . . ."); Stehli/HoriPro (Nashville) at 146-47 ("… if they think it's fair use, they can take it and proceed accordingly or if they feel that it's a fair use they can go ahead and license it just to be safe."). *See also* LaPolt (LA) at 89 (describing a conversation with Weird Al Yankovic, during which he said, "If I'm going to defend my fair use analysis, I'd rather just get permission and if they say no, they say no. I'll find someone else to give me permission").

the event they are found to infringe.[147] Several academics and public interest groups agreed and made the point that fair use uncertainty should not always be resolved in favor of licensing.[148]

Library groups and some academics also expressed concern about the impact of available licensing on the application of the fair use defense. They cautioned that the development of mechanisms to license remixes might be relied on by courts to conclude that the fourth factor— "the effect of the use upon the potential market for or value of the copyrighted work"—disfavors a finding of fair use.[149] One professor responded that when considering this factor, courts focus not simply on whether a license option exists, but also on whether the defendant's activity would reasonably be expected to be licensed by rights holders.[150]

### C. Conclusions and Recommendations

#### 1. Overview

The Task Force heard descriptions of two very different worlds. One is the domain of noncommercial remixers, such as vidders, who use preexisting music for their soundtracks, or fan fiction writers who view their works as homage to the original author. Based on the comments we received, these remixers often may not seek licenses, whether due to reliance on fair use or a lack of awareness of copyright law.[151] They may believe that there is no need to obtain permission to engage in expressive activity, even when that activity draws on the creative expression of others.

On the other hand, when professional artists and authors engage in remix activities, their use is typically commercial and competitive. Many appropriation artists, hip-hop artists, parodists, music remixers, and mash-up artists create commercial remixes and intend to earn a profit. They

---

[147] Khanna-Tehranian Nov. Comments at 3-4, 12-13.

[148] CIS/EFF Nov. Comments at 4 ("[T]he combination of fair use's uncertainty and statutory damages forces many remixers to pay unnecessary license fees simply to avoid the risk of suit and an adverse judgment"); Rosenblatt/OTW (LA) at 86-88 (noting that fair use exists to allow people to make commentary without getting the original author's permission, but arguing that legal uncertainty permits overreaching by copyright owners).

[149] *See* LCA Jan. Comments at 2 (where rights holders license rights for uses such as those for which fair use is claimed, the existence of such licensing "could tip the fourth factor, and conceivably the fair use calculus, against the user.") and 3 (warning about "the dangers of encouraging licensing regimes that would supersede fair use"); Perzanowski (Nashville) at 141 (noting that "an expanding licensing market can correspond to sort of a shrinking scope of fair use[]" and asserting that "it should remain the case that there are uses that don't require permission."); *id.* at 142 (stating that "courts would have to be incredibly careful about how they think about the fourth factor, in particular"). *See also* Courtney (Cambridge) at 37 (expressing general concern "about the proliferation of licensing as a detriment to fair use.").

[150] Gervais (Nashville) at 144 (referring to the Second Circuit's discussion of the fourth factor in *American Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 929-30 (2d Cir. 1994)).

[151] *See above,* notes 30-31 and accompanying text. The Task Force notes that to the extent a remixer is making a fair use of a copyrighted work, the remixer is not required to ask the copyright holder permission for such use.

generally are aware of copyright law, sometimes relying on fair use but sometimes seeking permission from the creators and copyright owners whose works they use.[152]

Despite these differing perspectives, the two worlds are not sealed off from each other. First, fair use is not the sole province of noncommercial actors; it is regularly relied upon by publishers, motion picture studios, and other copyright owners. While a remix prepared for commercial gain may be less likely to fall within the scope of fair use than a purely noncommercial one, the commercial nature of the defendant's activity is only one factor considered in determining whether or not a use is fair.[153] Similarly, some noncommercial remixers can and do take advantage of licenses, and as licensing becomes easier, there is reason to believe that more will do so in cases where their uses are not clearly fair. So both fair use and licensing will always be relevant in both worlds, albeit to different extents.

Second, many amateur creators aspire to become professionals, and virtually all professional creators were at one time amateurs. While professional authors and copyright owners may focus more on permissions and licensing and may be less tolerant of unauthorized uses, those tendencies do not establish an unbridgeable gulf. If and when a remix creator makes the transition to becoming professional, she may be more likely to view the world from a rights holder's perspective. Attitudes and approaches are not immutable but  tend to vary depending on the creator's changed circumstances.

In any event, both remix worlds make valuable contributions to society in providing expressive, political, and entertainment content. It is important that the copyright framework continues to allow both to thrive, ensuring that a vibrant fair use space coexists with effective licensing structures. The recommendations set out below are intended to safeguard that goal.

2.    Recommendations

Commenters and participants mentioned three alternatives for achieving greater certainty: a specific exception for remixes, a compulsory license, and voluntary licensing, whether individual or collective.[154] The Task Force concludes that enhanced voluntary licensing options should play a significant role in permitting remixes alongside fair use in appropriate cases, as discussed below.[155] We do not recommend enactment of either an exception or a compulsory license for remix, and note that there was virtually no support for either option among stakeholders.

---

[152] *See above* note 146.

[153] *E.g.*, *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 576-79 (1994) (discussing the application of factors set forth in Section 107 of the Copyright Act).

[154] *See above,* Parts B.2.c (Possible Changes in the Law), pp. 17-19, & B.3 (Current and Developing Licensing Mechanisms), pp. 19-22.

[155] *See* discussion *below*, Part C.2.b (Improve Voluntary Licensing Options).

*Specific Exception.* The sole proponent of a UGC specific exception offered the recent Canadian law as a model.[156] No further support was offered for such an exception, and the record does not establish a need for this change in the law.

The Task Force cannot recommend abandoning the multifactor approach of fair use in favor of a UGC exception similar to that in Canada. We believe that fair use, which requires consideration of the purpose of the use, the nature of the copyrighted work, the amount of the work used, and its effect on the market or potential market, represents a nuanced and balanced approach that has worked well in the United States. While some circumstances may justify abrogating the normal right of copyright owners to say no to use of their work in a remix, such as when the refusal to license is based on a desire to censor critical commentary, the fair use doctrine more appropriately draws these distinctions.

*Compulsory License.* The compulsory license proposed by Professor Peter Menell would offer certain advantages.[157] In his words, "[s]uch a regime would not resolve the inevitably case-specific fair use questions, but it could offer a sweet spot in which copyright owners, remix artists, and fans could participate in a market-based system for more fairly allocating value among creators."[158] It would provide compensation to the copyright owners whose works are remixed, and permit remixers to make derivative works without navigating the uncertain waters of fair use.

The Task Force does not believe, however, that the case has been made to abandon fundamental market principles for the more drastic approach of a statutorily imposed license. While there are a handful of compulsory licenses in the Copyright Act, they have been enacted sparingly as exceptions to the normal structure of exclusive rights.[159] For example, the section 115 compulsory license, which Professor Menell uses as his model, was enacted in 1909 in response

---

[156] *See* note 113 *above* and accompanying text.

[157] *See above* notes 107-109 and accompanying text.

[158] Menell Jan. Comments at 116.

[159] U.S. CONST., art. I, § 8, cl. 8. *See WPIX, Inc. v. IVI, Inc.,* 691 F.3d 275, 281-282 (2d Cir. 2012) ("In 1999, Congress noted that in 'creating compulsory licenses, it is acting in derogation of the exclusive property rights granted by the Copyright Act to copyright holders, and that it therefore needs to act as narrowly as possible to minimize the effects of the government's intrusion on the broader market in which the affected property rights and industries operate.' S. Rep. No. 106-42, at 10 (1999)"); PAUL GOLDSTEIN, 1 GOLDSTEIN ON COPYRIGHT § 1.14.2, at 1:54 (Walters Kluwer ed., 3rd ed. 2015) (statutory licenses "reflect the conclusion that, in certain narrowly defined circumstances, the public interest in free access to copyrighted works, or in access at a statutorily controlled price, outweighs the producers' interests in appropriating the value that consumers attach to these works"); David Ladd *et al.*, *Copyright, Cable, the Compulsory License: A Second Chance,* 3 COMM. & L. 3 at 6, 59 (1981); Robert P. Merges, *Compulsory Licensing vs. the Three "Golden Oldies,* POL'Y ANALYSIS No. 508 (Cato Inst., D.C.), Jan. 15, 2004, at 4 ("Compulsory licenses, being creatures of federal statute, tend to be less flexible and more susceptible to political manipulation than market-based transactions. The costs that are saved by a compulsory license in the short run are usually more than offset by the inefficiencies that it causes over time."). *See also Fame Publ'g Co. v. Ala. Custom Tape, Inc.,* 507 F.2d 667, 670 (5th Cir. 1975) (interpreting the 1909 Copyright Act) ("We begin by noting that the [Section 115] compulsory license provision is a limited exception to the copyright holder's exclusive right to decide who shall make use of his composition. As such, it must be construed narrowly, lest the exception destroy, rather than prove, the rule.").

to what was perceived as one company's monopoly of the piano roll market.[160] We have seen no evidence that a similar monopoly exists today for remixes or their licensing. The other compulsory licenses were enacted to address market failure in cases involving such large numbers of works that individual negotiations were not feasible, and are generally available to users that are commercial or professional entities.

The proposed license would also break with precedent in allowing the creation of derivative works. The existing statutory licenses permit only acts of reproduction, distribution, and/or public performance of the licensed work without alteration.[161] As noted by a number of commenters, this departure from the norm would give composers and recording artists no say when someone makes an objectionable use of their work, even when it does not fall within the scope of the fair use defense.[162] A statutory license that permits changes to an author's work without her consent would be unprecedented. The record does not support the statutory license proposal.

We note some additional practical concerns. First, the proposed license would be of limited use as it relates solely to music, and therefore would address only one area of remix activity.[163] Pre-1972 sound recordings, which are not protected by federal law, would fall outside the scheme but could lead to state law liability.[164] Second, it would require a universal database of musical works and recordings—a desirable goal, but hard to achieve.[165] Finally, it is unclear how uses of the remixes would be tracked and revenue fairly divided.[166] The Section 115 license is itself a

---

[160] Robert Merges, *Contracting into Liability Rules: Intellectual Property Rights and Collective Rights Organizations,* 84 CALIF. L. REV. 1293, 1309-10 (1996); 2 GOLDSTEIN, *above* note 159, at § 7.2.1.1 at 7:15 & n.11 (2008 supp.).

[161] *See* 1 GOLDSTEIN, note 159 *above*, § 1.14.2, at 1:54 (statutory licenses are enacted in response to "the public interest in free *access* to copyrighted works, or in *access* at a statutorily controlled price") (emphasis added). The section 115 mechanical license does permit "making a musical arrangement of the work to the extent necessary to conform it to the style or manner of interpretation of the performance involved, but the arrangement shall not change the basic melody or fundamental character of the work, and shall not be subject to protection as a derivative work under this title, except with the express consent of the copyright owner." 17 U.S.C. § 115(a)(2) (2015).

[162] *See above* notes 44, 45, 48 & 112 and accompanying text.

[163] Dare/Oracle (Berkeley) at 34 ("There's really not music separate. So much of what I see is video plus the music.").

[164] Green Paper at 83; Ravas/MLA (Berkeley) at 36-37.

[165] U.S. COPYRIGHT OFFICE, COPYRIGHT AND THE MUSIC MARKETPLACE: A REPORT OF THE REGISTER OF COPYRIGHTS at 62-67, 123-124 (2015). *See also* pp. 21 *above. See generally* Transcript, U.S. Pat. & Trademark Off., Public Mtg. on Facilitating the Dev. of the Online Licensing Dev. for Copyrighted Works 90-122 (April 1, 2015), http://www.uspto.gov/learning-and-resources/ip-policy/copyright/public-meeting-facilitating-development-online-licensing (last visited Oct. 15, 2015); Webcast, The Path Forward: Interoperability of Standard Identifiers and Incorporation into Databases of Rights Information—Music Sector, Public Mtg. on Facilitating the Dev. of the Online Licensing Env't for Copyrighted Works, U.S. Pat. & Trademark Off, April 1, 2015, http://helix-1.uspto.gov/player/20150401_OnlineLicensingPt4.html (last visited Oct. 15, 2015). To address this concern, Menell suggests requiring copyright owners to opt-in to be paid. Menell (Berkeley) at 42.

[166] As to revenue, the proposed compulsory license recommended a Copyright Office rulemaking to provide a formula for dividing revenue among the musical composition and sound recording owners. Menell Jan. Comments at 117. It will be difficult to devise any formula that could allocate the royalties based upon the actual value of each sampled work, when in the marketplace, a license to remix Bob Dylan's "Like a Rolling Stone" (selected by Rolling

historical anomaly in various respects,[167] and has been criticized on many grounds, including for inadequately compensating authors and rights holders.[168]

In sum, with respect to proposals both for a specific remix exception and for a compulsory license, we conclude that the record has not established a need to amend existing law.[169] Rather than making fundamental changes in the copyright landscape, we believe that improving it through greater clarity and enhanced licensing options can support a healthy environment for the creation and dissemination of remixes.

While some remixes may clearly fall on one side or the other of the fair use line, the status of others will be uncertain. The Task Force believes it would be valuable to lessen this uncertainty and at the same time to ease the ability to license works. Our recommendations address the challenges described above, making it easier for remixers to understand when a use is fair and to obtain licenses when they wish to do so.

Specifically, the Task Force recommends pursuing two goals: (1) the development of negotiated guidelines providing greater clarity as to the application of fair use to remixes, and (2) availability of a wider variety of licensing options.

a.   Provide Greater Clarity for Fair Use: Guidelines and Best Practices

Although fair use is a fundamental linchpin of the copyright system, it may be difficult for prospective users of copyrighted works to predict whether a fair use defense will succeed or fail in areas where there is not yet established precedent.[170] While many stakeholders see a benefit from voluntary guidelines or statements of best practice, views as to their feasibility vary, in part

---

Stone magazine as the greatest song of all time. *See 500 Greatest Songs of All Time*, ROLLING STONE, April 7, 2011, http://www.rollingstone.com/music/lists/the-500-greatest-songs-of-all-time-20110407/bob-dylan-like-a-rolling-stone-20110516) would cost far more than a license to remix an obscure song with minimal sales or acclaim.

[167] *See Music Licensing Reform: Hearing Before the Subcomm. on Intell. Prop. of the S. Comm. On the Judiciary,* 109th Cong. 136 (2005) (statement of Marybeth Peters, Register of Copyrights, U.S. Copyright Office) (characterizing the section 115 compulsory license as "an anomaly"), *available at* http://www.gpo.gov/fdsys/pkg/CHRG-109shrg22919/pdf/CHRG-109shrg22919.pdf (last visited Oct. 16, 2015).

[168] Rosenthal/NMPA (Cambridge) at 41, 44; Stehli/HoriPro (Nashville) at 127; *Music Licensing Under Title 17: Hearing Before the Subcomm. on Courts, Intell. Prop. & the Internet of the H. Comm. On the Judiciary,* 113th Cong. 27-28 (2014) (statement of David Israelite, President and Chief Executive Officer, National Music Publishers' Association), *available at* http://judiciary.house.gov/_cache/files/6e799edc-1cb8-4365-a9bb-e48c32b91353/113-105-88240.pdf (last visited Oct. 16, 2015).

[169] We acknowledge that some stakeholders expressed concerns that market uncertainties and the legal regime create significant hurdles for artists who use remixes as a form of cultural expression. *See above,* notes 41-42 and accompanying text. However there was very little support in the record for either an exception or compulsory license, including from those expressing these concerns. *See above* Part B.2.c (Possible Changes in the ), pp.17-19. We believe the recommendations outlined below will help foster an environment that will better allow the development of non-infringing remixes.

[170] *See* Green Paper at 21; discussion *above* at Part B.2.a (Fair Use), p. 10.

due to the limited authority of single sector guidelines and the inherent difficulty of developing multilateral ones.[171]

While it is easier for groups composed only of users, or only of rights holders, to reach consensus on what practices qualify as fair uses, such statements can encounter resistance from those who were not part of the process and draw criticism that they represent a preferred outcome rather than objective, balanced statements.[172] On the other hand, while guidelines that represent a consensus among stakeholders may carry greater weight, the ability to achieve such consensus cannot be taken for granted. The CONFU process gives an indication of this challenge, and the current environment may be even more difficult given the considerable disagreement as to the proper interpretation of the fair use factors.[173]

To some degree, such concerns may reflect unrealistic expectations. Best practices and guidelines cannot be comprehensive codes enumerating everything that can be done in a particular realm of activity. A more modest endeavor, aiming to identify what conduct can be agreed on as permissible or impermissible, can serve a valuable function. Such a process would leave gaps in that there will be some conduct as to which no guidance is offered, either because the fair use status is too unclear or because stakeholders hold divergent views. This does not mean that the outcome is not worthwhile. While the guidelines may be legally persuasive, they would not be definitive and traditional fair use analysis would still apply on a case-by-case basis as courts deem proper and necessary.

With that in mind, the Task Force encourages stakeholders to develop guidelines and best practices for remixing, either independently or with the government serving as the convenor. While such an exercise is likely to focus on fair use as the principal doctrine governing remixes, other copyright doctrines may also inform the discussion, such as the idea-expression dichotomy and the doctrine of de minimis taking.[174] Beyond developing guidelines, more educational efforts aimed at broadening an understanding of fair use would be valuable.[175]

---

[171] *See* discussion *above* at Part B.2.b (Guidelines and Best Practices), pp. 11-17.

[172] *See above* at notes 86-89 and accompanying text.

[173] *See above* at p. 15 (discussing CONFU) & notes 58-60 and accompanying text (discussing fair use).

[174] *See above*, note 29.

[175] The Copyright Office has recently published a fair use index collecting cases involving fair use and describing their outcomes. US COPYRIGHT OFFICE FAIR USE INDEX (last updated September 2015), http://copyright.gov/fair-use/; *see also* Green Paper at 23 (noting the public utility of a fair use index established and maintained by the US Copyright Office). As articulated in the Intellectual Property Enforcement Coordinator's *2013 Joint Strategic Plan on Intellectual Property Enforcement*, the goal of the fair use index is to "make fair use more accessible to authors of the 21st Century, ease confusion about permissible uses, and thereby encourage the production of a greater variety of creative works." U.S. INTELL. PROP'Y ENFORCEMENT COORD'R, 2013 JOINT STRATEGIC PLAN ON INTELLECTUAL PROPERTY ENFORCEMENT, 18 (2013), https://www.whitehouse.gov/sites/default/files/omb/IPEC/2013-us-ipec-joint-strategic-plan.pdf (last accessed Oct. 16, 2015). This project provides useful public education and can make a valuable contribution to clarifying a doctrine that plays a key role in determining the legality of remixes.

The Task Force offers the following observations:

- The most useful and authoritative guidelines will generally be developed by groups composed of all relevant stakeholders, including authors and copyright owners as well as users of various types.[176]

- To maximize the legitimacy and credibility of negotiated guidelines, the conveners should be disinterested parties who can encourage participation by a broad cross-section of relevant stakeholders. One possible choice would be one or more government bodies with expertise in the subject matter.

- Guidelines are more likely to be successful if they are tailored to specific types of remix uses and/or works, since both the relevant stakeholders and the best practices will vary. Moreover, the process of developing guidelines and best practices can be time consuming, and narrowing the focus of each project will help to ensure that those who participate are able to see it through.

- The goal need not be (and probably could not be) a comprehensive code that defines all activities that are lawful and all that are not. One possible outcome could be guidelines that identify those activities that can be agreed to be clearly fair use or clearly not fair use.

- Because the primary audience will be laypersons rather than lawyers, statements should be drafted in plain English and offer concrete, real-world examples.[177]

- Guidelines and best practices should be periodically reviewed and updated as law and technology evolve, in order to stay current and continue to provide useful guidance. For example, the classroom photocopying guidelines are now nearly 40 years old, and teaching by digital means raises issues that were not considered in 1976.

### b. Improve Voluntary Licensing Options

The Task Force sees licensing mechanisms as an important alternative path, either for those remixes that do not qualify for fair use or those whose status is unclear. A remixer who determines that obtaining a license is preferable to the risk of litigation should have the option to take the less risky course of action.

The Task Force has heard that rights holders are embracing the opportunity to open up new revenue streams and accommodate those that wish to create remixes. The record indicates that they are actively engaged in licensing of a variety of remix uses, and that those efforts are

---

[176] *See* Green Paper at 23. Statements drafted solely by one side, whether by groups of rights holders or groups of users, can also provide meaningful guidance to a community by expressing the views of these groups as to what ought to be lawful, or documenting actual practices and norms (but the statements would likely have less influence in both political and legal proceedings). *But see above* at note 85.

[177] *See* discussion *above* at note 70.

expanding in ways designed to make licensing simpler and more cost-effective.[178] But many authors and rights holders will also insist on their right to say no to a license request, especially when the prospective licensee is seeking permission for a use that the author or rights holder considers offensive.[179] The participation of rights holders in the licensing of UGC on YouTube indicates that a licensing scheme that respects those principles can make many millions of works (including remixes) available to the public while providing licensing income to authors, performers and copyright owners.[180]

We understand the concerns expressed by some stakeholders that availability of a license could have a negative impact on a fair use defense.[181] It is important to recognize, however, that while the availability of a remix licensing option would be relevant to the fourth fair use factor, it would not be dispositive.[182] A leading case on this subject, *American Geophysical Union v. Texaco, Inc*., eschews a mechanical application of the fourth fair use factor that would disfavor fair use whenever the subject use could have been licensed.[183] We agree with the professor who drew the conclusion from the *Texaco* case that when the defendant is asserting fair use based on a normative purpose that is favored under the first fair use factor,[184] the availability of a license

---

[178] *See* discussion *above* at Part B.3 (Current and Developing Licensing Mechanisms), pp. 19-22.

[179] *See above*, notes 44-48, 112 and accompanying text.

[180] *See* YOUTUBE, STATISTICS, https://www.youtube.com/yt/press/statistics.html (last visited Oct. 5, 2015) ("as of July 2015, there are 8,000+ partners using Content ID — including many major network broadcasters, movie studios and record labels — who have claimed over 400 million videos, helping them control their content on YouTube and make money on videos containing copyrighted material."). *See also* Google Nov. Comment at 4 ("The system has created a new source of revenue for copyright owners, as well as for YouTube. In fact, today Content ID 'claimed' videos account for more than one-third of all monetized YouTube views. Content ID benefits YouTube creators, as well. When copyright owners choose to monetize or track user-submitted videos, it allows creators to remix and upload a wide variety of new creations built on that existing content, without having to independently seek out licenses for it."); notes 126-129 *above* and accompanying text.

[181] *See* discussion above at note 149.

[182] As the court noted in *Princeton Univ. Press v. Michigan Doc. Svs., Inc.,* 99 F.3d 1381, 1387 (6th Cir. 1996), "even the availability of an existing system for collecting licensing fees will not be conclusive" with respect to the fourth factor. However, "[i]t is sensible that a particular unauthorized use should be considered 'more fair' when there is no ready market or means to pay for the use, while such an unauthorized use should be considered 'less fair' when there is a ready market or means to pay for the use." *Id.* at n.4 (quoting *Texaco*). The Senate Report on the Copyright Act of 1976 observed that "the existence of organizations licensed to provide photocopies of out-of-print works at reasonable cost is a factor to be considered." S. REP. NO. 94-473, at 64 (1975), *available at* http://copyright.gov/history/law/clrev_94-473.pdf (last visited Oct. 16, 2015).

[183] While the Second Circuit relied in part on the existence of a licensing option to hold that a particular use was not fair, it did so based on the conclusion that, on the facts before it, it would have been reasonable to license the use. The court stated that "not every effect on potential licensing revenues enters the analysis under the fourth factor," noting that courts traditionally have considered "only traditional, reasonable, or likely to be developed markets when examining and assessing a secondary use's "effect upon the potential market for or value of the copyrighted work." In other words, the fact that the plaintiff is prepared to license the defendant's use does not necessarily mean that the unlicensed use has had a cognizable adverse impact on the market for the work. *American Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 929-30 (*Texaco*) (2nd Cir. 1994), *cert. denied sub nom. Texaco v. American Geophysical Union,* 516 U.S. 1005 (1995) (internal citation omitted).

[184] The "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C.S. § 107(1) (Lexis 2015).

normally should not defeat a fair use defense.[185] That conclusion is consistent with numerous cases (including *Texaco*) that have recognized that there is likely to be no cognizable market harm under the fourth factor when the defendant's use consists of a critical review or a parody.[186]

The Task Force expects that the marketplace will continue to develop a variety of options, including micro-licensing and possibly collective licensing platforms, to enable efficient licensing of pre-existing works for use in remixes. We agree with commenters that open licenses, like Creative Commons licenses, can provide a viable approach for remixes in some circumstances.[187] We are separately exploring issues relating to whether and how the government can facilitate the further development of a robust online licensing environment, focusing on the use and interoperability of standard identifiers, and a possible portal for linking to such databases and to licensing platforms.[188] The outcome of that inquiry may also help further improved licensing of remixes.

### i. Micro-Licensing

As described above, the recording and music publishing industries are currently developing a micro-licensing platform for small scale uses of their members' works. Since many remix creations are multi-media and use a variety of pre-existing works, the Task Force encourages other rights holders to set up similar micro-licensing platforms.[189] The ultimate goal could be a single platform where users could obtain a license for remixes involving any type of work.[190] This could include both noncommercial and small-scale commercial uses, which otherwise may not be economical to license. Providing a simple way to license these transactions would provide revenue for rights holders, while enabling the user to get permission at an affordable cost.

---

[185] *See* note 150 *above. See also Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014) ("We note that it is not determinative that programs exist through which universities may license excerpts of Plaintiffs' works .... [T]he ability to license does not demand a finding against fair use").

[186] See *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 591-92 (1994); *Texaco*, 60 F.3d at 930; *A.V. ex. rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 643 (4th Cir. 2009); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 615 (2d. Cir. 2006); *SunTrust Bank v. Houghton Mifflin Co.,* 268 F.3d 1257, 1274-75 (11th Cir. 2001); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998); *Castle Rock Ent. v. Carol Publ'g Grp*, 150 F.3d 132, 145-46 (2d Cir. 1998); *New Era Pubs. Int'l ApS v. Carol Pub. Grp*, 904 F.2d 152, 160 (2d Cir. 1990).

[187] *See* note 135 and accompanying text, *above.*

[188] *See* Dep't of Comm. *et. al*, Notice of Public Mtg. on Facilitating the Dev. of the Online Licensing Env't for Copyrighted Works, 80 Fed. Reg. 13325 (March 13, 2015), *available at* http://www.gpo.gov/fdsys/pkg/FR-2015-03-13/pdf/2015-05765.pdf (last visited Oct. 16, 2015).

[189] Such platforms should of course be tailored in a manner consistent with the antitrust laws.

[190] Connecting creative sectors' licensing offers was one of the motives for the establishment of the Copyright Hub being developed in the United Kingdom. The Copyright Hub is "a portal established and operated by industry to make licensing easier, especially for low-value, high-volume requests, by linking to a network of private and public copyright exchanges, rights registries and other copyright-related databases, with the government playing a facilitating and advisory role." Notice of Public Mtg.*, note 188 *above*, at 13227.

    ii.    <u>Collective Licensing</u>

Voluntary collective licensing may offer another path forward. Rights holders could use existing collective licensing organizations or establish new ones to engage in the licensing of remixes.[191] The single-label "collective" described at the Cambridge roundtable[192] provides an example of the type of licensing that could be organized on a larger scale, enabling remixers to obtain permission to remix works and then monetize the result, sharing the revenue with the owner of the pre-existing material.

    iii.    <u>Intermediary Licensing</u>

Intermediary licenses offer solutions that can benefit the intermediary, the original rights holder, and the creator of the remix.[193] The intermediary obtains a license to make the underlying work available and the ability to earn revenue from advertising placed alongside the work, without any risk of liability. The original rights holder obtains a share of that revenue. And the creator of the UGC is authorized to make available to the public, on the licensed platform, the UGC incorporating the original work.[194] In fact, the Task Force notes that the UGC creator is not limited to the licensed platform, but can also make the UGC available from another location by "embedding" it, satisfying the desire of many remixers to offer their creations on their own blogs, social media pages, etc.[195]

---

[191] The current antitrust consent decrees may restrict ASCAP and BMI from engaging in this activity. The Department of Justice is in the process of reviewing those consent decrees, and ASCAP and BMI have requested that the decrees be revised to give them greater latitude in licensing. *See* U.S. Dep't of Justice, *Antitrust Consent Decree Review—ASCAP & BMI (2014)* (Sept. 22, 2015), http://www.justice.gov/atr/cases/ascap-bmi-decree-review.html (last visited Oct. 16, 2015).

[192] Discussed *above* at p. 20.

[193] Discussed *above* at pp. 19-20. In addition to YouTube, other UGC platforms have offered licensing programs similar to YouTube's using other, similar technology. *See, e.g.* News Release, *Warner Music and Dailymotion Enter Strategic Video Distribution and Revenue Partnership,* http://investors.wmg.com/phoenix.zhtml?c=182480&p=irol-newsArticle&ID=952496 (last visited Oct. 16, 2015); *SoundCloud Partners with Zefr for Content ID and Monetisation,* COMPLETE MUSIC UPDATE, April 13, 2015, http://www.completemusicupdate.com/article/soundcloud-partners-with-zefr-for-content-id-and-monetisation/ (last visited Oct. 16, 2015); *Content Protection,* DAILYMOTION, http://www.dailymotion.com/legal/contentprotection (describing partnership with Audible Magic matching content uploaded to Dailymotion with that provided by media industry companies to Audible Magic) (last visited Oct. 20, 2015).

[194] In some circumstances the creator of the UGC may also be able to share in the advertising revenues. *See* YouTube Help, *Monetizing Eligible Cover Videos,* https://support.google.com/youtube/answer/3301938?hl=en (last visited Oct. 16, 2015).

[195] *See* RIAA Nov. Comments at 6-7. Embedding involves the placement on a webpage of a link to the content that one wishes to appear on that a webpage. The embedded content is not actually placed on the webpage or stored on the server hosting the webpage, but is streamed to the user directly from the source (in this case, YouTube). However, to the user it appears that the content is on the webpage itself. *See* YouTube Help, *Embed Videos and Playlists,* https://support.google.com/youtube/answer/171780?hl=en (last visited Oct. 16, 2015); HMTLGoodies, *How To Add a YouTube Video to Your Web Site,* http://www.htmlgoodies.com/tutorials/web_graphics/article.php/3480061/How-To-Add-a-YouTube-Video-to-Your-Web-Site.htm (last visited Oct. 16, 2015).

The Task Force believes that these licenses can be a promising model for other remix platforms and other kinds of creative content.[196] Whether that promise will materialize will depend upon the willingness of rights holders to license additional platforms, the willingness of other platforms to develop or acquire the necessary technology, and the willingness of remix creators to use such platforms for the dissemination of their remixes.

### c. Sharing of Revenues Generated by Remixes

As a number of commenters observed, models are beginning to develop for sharing the revenue generated by remixes between the owner of the pre-existing work and the remix creator.[197] There is increased recognition that there need not be a zero-sum game in which only the original author or only the creator of the remix receive any revenue from its exploitation. The commercial appeal of a remix may be due in part to the appeal of the underlying work and in part to interest in what the remixer has added. Such works can reach new audiences, creating opportunities for both creators to reap profits.

Because existing law permits parties to make such arrangements by contract, no change in the law would be necessary in order for such arrangements to flourish.

### 3. Relationship to Other Task Force Recommendations

Some of the recommendations made in Section V below, and future work in connection with the Task Force's work on facilitating the development of the online licensing environment,[198] may also help alleviate concerns raised by both users and owners with respect to the treatment of remixes.

In particular, remix creators or their advocates have expressed concern that given the unpredictability of fair use determinations, the threat of high statutory damages can stifle lawful activity. If the reforms the Task Force recommends below relating to statutory damages are carried out, the likelihood that remixers will face the prospect of high awards should be significantly reduced. In setting statutory damages, courts and juries would be required to consider good faith attempts to engage in fair use as well as lack of commercial intent, and a

---

[196] The Task Force recognizes that certain stakeholders have concerns about the terms offered under such licenses, *see, e.g.,* Nicole Laporte, *A Million YouTube Views Won't Pay Your Rent, But TubeStart Could Help*, FAST COMPANY, Sept. 24, 2013, http://www.fastcompany.com/3018123/a-million-youtube-views-wont-pay-your-rent-but-tubestart-could (last visited Oct. 16, 2015); PJ Wassermann, *My Songs got 151,781 Plays on YouTube. I received $10…*, DIGITAL MUSIC NEWS, Jan. 28, 2015, http://www.digitalmusicnews.com/permalink/2015/01/28/songs-got-151781-plays-youtube-received-10 (last visited Oct. 16, 2015); Leslie Kaufman, *Chasing Their Star, on YouTube,* THE NEW YORK TIMES, Feb. 1, 2014, *available at* http://www.nytimes.com/2014/02/02/business/chasing-their-star-on-youtube.html?_r=1. *See also* DiCola (Alexandria) at 200-01. The Task Force neither takes a position nor comments on this issue.

[197] Such models (*e.g.*, Kindle Worlds, and the single-label "collective") were discussed in the text *above* at notes 124, 129 & 130. Although remix creators do not currently share in the revenue generated by most of the new works on YouTube, creators of cover song videos of eligible songs are able to share the revenues that those videos generate on a pro rata basis with the music publisher. YouTube Help, *Monetizing Eligible Cover Videos*, https://support.google.com/youtube/answer/3301938?hl=en (last visited Oct. 15, 2015).

[198] See discussion *above* at note 188.

major obstacle to the innocent infringement defense would be removed. Together, these changes should give remixers greater comfort about their prospects in the event they are found to have infringed.

In addition, as many commenters and participants have noted, the establishment of a small claims tribunal with a lower statutory damages cap would enable remix creators in many cases to avoid the risk of high awards.[199]

We also note that the multistakeholder forum convened by the Task Force to improve the notice and takedown process under Section 512 of the DMCA identified several "good practices" worth mentioning here.[200] Among these are measures to make the takedown and counter-notice mechanisms on websites easy to find and understand, directions on providing a clear, "plain English" explanation of who can submit a DMCA notice and counter-notice, and other ways to improve the efficiency of the current system.[201]

---

[199] *See* discussion *below* of small claims in the statutory damages context in Section V.C.2.d., p. 99.

[200] DMCA NOTICE-AND-TAKEDOWN PROCESSES: LIST OF GOOD, BAD AND SITUATIONAL PRACTICES (2015), *above*, note 14.

[201] *Id.* For example, Point I.A.6 (Good General Practices for Service Providers) should ensure that where a takedown notice for a remix has been withdrawn, or a counter-notification has been served, the remix will be reposted in a timely fashion. In addition, Point I.C.3 (Good General Practices for Notice Senders) will lessen the likelihood that a takedown notice will be sent for remixes that make fair use of the underlying content or that a remix will be erroneously removed because it shares certain metadata (*e.g.*, a title) with another work. Likewise, Part II.B (Bad General Practices for Notice Senders) should discourage submission of an invalid takedown notice to silence criticism or without a good faith belief that use of the material complained of is not authorized by law (including fair use).

## IV. First Sale Doctrine and Digital Transmissions

### A. Introduction

The first sale doctrine, as codified in Section 109 of the Copyright Act, is a limitation on the scope of the distribution right that allows the owner of a physical copy of a work to resell or otherwise dispose of that copy, including by transfer of ownership, without the copyright owner's consent. As noted in the Green Paper, the first sale doctrine does not permit the distribution of a work through digital transmission where copies are created, because the reproduction right is implicated.[202]

The Green Paper described a 2001 report by the Copyright Office, which concluded that extending the first sale doctrine to cover digital transmissions was not advisable given the fundamental differences between the transfer of a physical copy and an online transmission.[203] The Copyright Office stressed that digital transmissions have a greater potential impact on the market for creative works and increase the risk of piracy by enabling the easy proliferation of perfect copies. It considered whether some of those concerns might be addressed by rules or technology ensuring that the sender's copy of the work is destroyed following the transmission, but concluded that such solutions were unavailable at that time.[204]

In the Green Paper, the Task Force observed that business models for the distribution of certain types of works often structure the transaction as a license rather than a sale.[205] In a world of increasingly digital distribution, this could render the first sale doctrine meaningless for works only offered in digital format and could make the resale market obsolete.[206] We posed the question whether there is a way to preserve the doctrine's benefits in the online environment, allowing the equivalent of sharing favorite books with friends or providing reduced-price

---

[202] Green Paper at 35. *See also, e.g.,* AAP Nov. Comments at 5 ("first sale doctrine does not apply to any digital copies of copyrighted works"); AIPLA Jan. Comments at 3; BSA Jan. Comments at 2; Curtis/Creator's Freedom Project (Nashville) at 94-95 ("In the digital world distribution doesn't actually exist. All distribution in the digital world is copying, reproduction." ); Digital Liberty Jan. Comments at 1; ESA Nov. Comments at 1-2; MPAA Jan. Comments at 8; NMPA Nov. Comments at 8; RIAA Nov. Comments at 7SGA Nov. Comments at 6; ; SIIA Jan. Comments at 3-4,16; WGAW Jan. Comments at 3; stakeholders who were inclined to support application of the first sale doctrine to at least some digital transmissions accepted that this would involve "extending first sale into the digital environment in some fashion." *See, e.g.,* CDT Nov. Comments at 14; Cobb Nov. Comments at 1; Dennis Nov. Comments at 1; Schwartz Nov. Comments at 1, 3. This section focuses on the distribution of a work via digital transmission, which typically involves making a copy of the work. The first sale doctrine permits the owner of a lawfully made copy of a work to resell or otherwise dispose of that copy, including a copy in a digital format, without the copyright owner's consent when the action does not implicate the reproduction right (*e.g*., a person who lawfully owns a copy of a work installed in a hard drive can transfer the hard drive, including its contents, to someone else). *See* discussion *below* at Part C.4.c. (Sales of Consumer Devices and Products), pp. 63-65.

[203] Green Paper at 35-36, *describing* U.S. COPYRIGHT OFFICE, A REPORT OF THE REGISTER OF COPYRIGHTS PURSUANT TO § 104 OF THE DIGITAL MILLENNIUM COPYRIGHT ACT SECTION (2001) ("the Copyright Office Report"), *available at* http://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf.

[204] The Copyright Office Report at 98-100.

[205] Green Paper at 36-37.

[206] *Id.* at 36-37, 101-02.

versions to impecunious students, including through market offerings.[207] Finally, we asked whether there have been any changes in technological capabilities since 2001 that would alter any of the Copyright Office's conclusions.[208]

### B. Stakeholder Views

#### 1. Benefits of the First Sale Doctrine

All commenters agreed that the first sale doctrine confers important benefits on consumers and society as a whole.[209] As discussed below, commenters and participants offered a range of views and information on the extent to which those benefits may continue to be enjoyed in a world where copies of works are acquired, or access to them is obtained, by means of digital transmission.

##### a. Resale or Gift

One principal benefit that the first sale doctrine confers upon the owner of a copy of a work, such as a book, a CD or a DVD, is the ability to resell or give away that copy without having to obtain the permission of the copyright owner. Resale allows for efficient reallocations of goods from those that value them less to those value them more. For example, the first sale doctrine enables businesses, such as used book and secondhand record stores, to resell previously owned copies at prices lower than the prices of new ones.

A number of commenters noted that resale businesses can reach purchasers who would not be willing or able to pay the full price of a new copy,[210] and that competition from used copies helps to keep prices of new ones affordable. They identified two ways in which the doctrine helps the market for new copies and services: first, it increases the value of the initial copy because purchasers know that they can recoup some of the cost by reselling it;[211] and, second, owners of copies of works in older formats (*e.g.*, videocassettes or CDs) will be more willing to "upgrade" to newer formats and platforms if they can partially offset the cost by selling their older

---

[207] Green Paper at 37. Although Section 109 applies to the transfer of ownership of digital works in a physical form, such as CDs or DVDs, the Task Force focuses here on works embodied in digital files that are transmitted either by wired or wireless Internet connections, such as Video-On-Demand a la carte movies and television programs, MP3 files, eBooks, software, and videogames.

[208] *Id.* The Task Force also noted that the recent Supreme Court decision in *Kirtsaeng v. John Wiley & Sons, Inc.,* 568 U.S. ___, 133 S. Ct. 1351 (2013) (holding that the first sale doctrine applies to copies lawfully made and purchased with the authorization of the copyright owner anywhere in the world) could have an impact on the ability of rights holders to offer their works on different terms in different countries. Green Paper at 37. None of the comments or roundtable discussions suggested that *Kirtsaeng* controls the analysis of the first sale doctrine in the context of digitally transmitted works.

[209] *See, e.g.*, AAP Nov. Comments at 5.

[210] *See* ScreenPlay Jan. Comments at 4-6; ReDigi Nov. Comments at 4. *Cf.* PK Nov. Comments at 13; CDT Nov. Comments at 12.

[211] CIS/EFF Nov. Comments at 13; McSherry/EFF (Berkeley) at 84 (observing that ability to resell copies may make consumers more willing to purchase copies in the first place, since they know that they can resell the copies if they don't like what they have purchased); ScreenPlay Jan. Comments at 5.

formats.[212] As an association of technology companies put it, "the first sale doctrine promotes free and open commerce by moving products from those who value them less to those who value them more."[213]

### b. Lending or Rental

The first sale doctrine also allows the owner of a physical copy of a work to lend it to another person.[214] This means that an individual may lend a DVD to a family member or a friend, and a library may lend a book to a patron.[215] Public interest groups also observed that lending may enhance markets because borrowers might become fans of a particular author or genre and purchase additional titles.[216] Entrepreneurs (*e.g.*, video rental services) may also engage in the business of lending copies.[217] A roundtable participant stated that the first sale doctrine permits third parties to develop new and innovative means of delivering creative works to consumers, noting that it was the first sale doctrine that enabled Netflix to offer rentals of DVDs of movies and enabled textbook rental services to come into being.[218] As with the secondary market for used copies of works, the rental market can reach customers who may be unable or unwilling to pay the full price for the purchase of a new copy.[219]

### c. Other Benefits

Other benefits resulting from the first sale doctrine were identified by some commenters, particularly the doctrine's effect on preserving works that might otherwise be lost to posterity, and the safeguards it may provide for personal privacy. Thus, a public interest group described the preservation of both digital devices and media as critical because it enhances the chance of at least one copy of a work surviving as time and generations pass, and allows "the serendipitous discovery of works that plays a key role in cultural transmission." [220] A library group added that

---

[212] CDT Nov. Comments at 13.

[213] CCIA Nov. Comments at 3.

[214] As noted in the Green Paper, however, section 109(b) "contains a carve-out prohibiting the rental of computer programs and sound recordings, except in limited circumstances by nonprofit libraries or educational institutions." Green Paper at 35, n.189.

[215] *See* PK Nov. Comments at 13. *See also* AAP Nov. Comments at 5 ("With respect to books, it is because of the first sale doctrine that U.S. libraries can lend physical books in their collections to the public . . . ."). Libraries are discussed at greater length below, Part 2 (First Sale) II.C.3.a and, III.C.1.

[216] CIS/EFF Nov. Comments at 14.

[217] CDT Nov. Comments at 13; PK Nov. Comments at 13.

[218] Siy/PK (Alexandria) at 101.

[219] CDT Nov. Comments at 12 (first sale doctrine "enables secondary markets that provide lower-priced options for consumers—from secondhand purchase to library borrowing to commercial rental to hand-me-downs from family or friends"); ScreenPlay Jan. Comments at 4 (including "99-cent video rentals from kiosks" as an example of ways in which the first sale doctrine gets "works out into the hands of people that the first seller may consider too marginal").

[220] PK Nov. Comments at 14 ("Preservation also is a natural benefit of the first sale doctrine. . . . Indeed, it is only the first sale doctrine that permits books to be passed down through the generations—without it, a father would infringe copyright if he left his personal library to his children in his will."). *See also* CIS/EFF Nov. Comments at 14

loss or corruption of digital information can be "just as profound, if not more so, as those that face older formats" given that the data can be unique to a time and place and thus irreplaceable or expensive to regenerate.[221]

Some commenters and participants also observed that the first sale doctrine can protect privacy by making it difficult to track the identities of consumers who have obtained copies of particular works.[222] They explained that the right to read anonymously is protected by the ability to obtain works from decentralized, secondary distributors who have little incentive to track their movement.

One public interest organization noted that "the first sale doctrine is older than this statutory codification, and finds its source in the common law."[223] It stated that "the doctrine goes further than merely limiting a copyright owner's distribution rights, and more comprehensively assures that the owner of a copy is able to exercise all the incidents of chattel ownership over her property, by modifying, repairing and displaying it, in addition to alienating it."[224] A number of other stakeholders, in contrast, described the purpose of the first sale doctrine as ensuring the alienability of tangible personal property—i.e., the physical object in which a work is fixed.[225]

### 2. Comparison to Online Marketplace

In the online world, consumers enjoy works either by downloading files or by viewing or listening to them by streaming.[226] These new markets have become a major source of revenue for

---

("Items no longer available for sale in a primary market may be available in secondary markets, or preserved in personal or institutional libraries. Similarly, first sale provides the underpinnings for the preservation of our cultural commons.").

[221] LCA Jan. Comments at 5.

[222] *See* CIS/EFF Nov. Comments at 14; PK Nov. Comments at 15-16 (*citing* Aaron K. Perzanowski & Jason Schultz, *Digital Exhaustion*, 58 UCLA L. Rev. 889, 897-901 (2011)); Samuelson (Berkeley) at 82; Siy/PK (Alexandria) at 102.

[223] PK Nov. Comments at 16.

[224] *Id.*

[225] *See* AAP Nov. Comments at 4, note 8 (noting that the principle that the first-sale doctrine applies to the copy of a work embodied in a physical object is subject to further modification in cases involving works that are acquired pursuant to licenses); ASCAP *et al.* Jan. Comments at 5 (first sale doctrine is only appropriate in the physical realm); Bridge/Disney (Los Angeles) at 145 ("first sale is a limitation on the distribution right that is really there to facilitate the alienation of physical property, and that's not what we're talking about here"); Digital Liberty Jan. Comments at 2 ("The purpose of the [first sale] doctrine is to recognize the difference between the physical object and the underlying copyright").

[226] *See* discussion below at notes 251-252. The licenses often state that the licensee does not "own" downloaded copies and may not sell or otherwise transfer them to others. *See, e.g.,* Amazon's *Kindle Store Terms of Use*, ¶ 1, http://www.amazon.com/gp/help/customer/display.html?nodeId=201014950 (last updated Sept. 6, 2012); Barnes and Noble's *NOOK Store Terms of Service*, ¶ 4(a), (c), http://www.barnesandnoble.com/include/nook_store_terms_of_service.asp (last updated April 1, 2015); the *Google Play Terms of Service*, ¶ 6, https://play.google.com/about/play-terms.html (last updated Dec. 10, 2014); and Vudu's *Terms of Service*, http://www.vudu.com/termsofservice.html (last updated Sept. 29, 2014).

copyright owners.[227] Consumers can also order physical copies of works online, and the first sale doctrine continues to govern their ability to dispose of those copies.

Commenters offered views and information on these two current models of online transmission and how the models do and do not offer benefits similar to those offered by the first sale doctrine. The Task Force heard that consumers' ability to engage in acts traditionally within the scope of the first sale doctrine is increasingly controlled by licenses.[228] Many stakeholders extolled the benefits of licensing, which they say enables more flexible and often lower-cost forms of access to works, but others criticized this shift as giving copyright owners too much control and often binding consumers to opaque contractual terms without clear notice.

### a. Download Offerings

Copyright owners presented a case that flexible options are being offered to consumers for downloading copies of works that may replicate or go beyond the benefits offered by the first sale doctrine. In many cases consumers have the option to share copies with family and friends, and students have the ability to obtain reduced-price copies of textbooks.[229] They may also be able to sample works under a "try-before-you-buy" model,[230] similar to the sampling made possible through lending.

---

[227] For example, Price Waterhouse estimates that in 2013, consumers spent more than $22.4 billion on online video game content. ESA Nov. Comments at 4. As of 2012, digital revenues accounted for approximately 60% -- over $ 4 billion—of the recording industry's revenues. RIAA Nov. Comments at 1. The Copyright Alliance stated that as of 2013, over 15 million households had signed up for accounts with UltraViolet, a service that offers "a broader, multiple access framework for viewing films and television shows." CA Jan. Comments at 15. Publishers referred to "copyrighted content that millions of U.S. consumers are constantly downloading or streaming on Amazon, Spotify, Scribd, etc." AAP Jan. Comments at 5. According to BMI, "There are at least ten billion plays of conditionally downloaded music each year…" BMI Nov. Comments at 12. Additional information was provided by commenters other than copyright owners. For example, the Consumer Federation of America reported the following information about the recorded music industry: "By 2012, digital singles were being downloaded at the rate of almost 1.4 billion per year in the U.S. alone, a compound annual growth rate of over 150% per year. Digital album sales were more than half of CD sales." CFA Nov. Comments at 20. Professor Menell stated that as of March 2013, Spotify reported 6 million paying subscribers and a total of 24 million active users worldwide. Menell Jan. Comments at 58.

[228] CDT Nov. Comments at 14 ("As more and more copyrighted works are distributed in digital form, more and more of the market for copyrighted works is no longer subject to first sale. As the Green Paper noted, the prospect of a media market without meaningful first sale protections is moving closer to reality: '[i]n a world of increasingly digital distribution, the traditional field of application of [*sic*] first sale doctrine may disappear'") (quoting Green Paper at 37).

[229] See discussion *above* in Parts B.1.a (Resale or Gift), p.36, & B.1.b (Lending or Rental), p. 37.

[230] Dare (Berkeley) at 87 (noting that software companies offer options such as "a try and buy so you pay something or you pay nothing to try it for 30 days, then you pay your commercial fee"). There are other examples of instances where consumers are given the opportunity to sample a work for free. *See* Amazon, *Kindle Samples,* https://www.amazon.com/gp/help/customer/display html?nodeId=201612700&tag=kwab-20; (last visited Sept. 23, 2015); Barnes & Noble, *Can I try a NOOK Book sample?,* https://help.barnesandnoble.com/app/answers/detail/a_id/2037/kw/nook%20book%20sample (last visited Sept. 23, 2015); (Greg Sandoval , *iTunes song samples may double in length,* CNET (Aug. 30, 2010, 2:42 PM), http://www.cnet.com/news/itunes-song-samples-may-double-in-length/.

i. <u>Sharing/Lending</u>

- Many book publishers, at least for a portion of their catalogue, permit the sharing of eBooks between multiple devices and among friends. Amazon, a leading eBook seller, offers a "Family Library" option which allows two adults and up to four children of the same household to share books, apps, and audiobooks on devices with Kindle software.[231] Another service, Nook, allows books to be stored on up to six devices or apps.[232] Both services can permit the lending of an eBook to another account holder for a period of up to 14 days, during which the lender would not have access to the work (partially replicating the circumstances surrounding the lending of a physical book).[233]

- For motion pictures, rights holders described various online services, including cloud storage options that "provide . . . multi-copy, multi-format access to content anywhere, at any time, by multiple members of a household and on multiple devices and platforms."[234] They noted that "[a] rapidly evolving array of services currently offer consumers access to movies and TV programs in a variety of forms (e.g., hard copy, digital download, on-demand transmission, and streaming) through a variety of business models (e.g., purchase, rental, and subscription)."[235]

- Online music and other content services allow the sharing of playlists with friends and "family plans" that permit the streaming of music to members of a subscribing family or making of multiple copies on their devices.[236]

---

[231] *See* Amazon, *About Family Library*, http://www.amazon.com/gp/help/customer/display html?nodeId=201620400 (last visited Sept. 23, 2015).

[232] *See* Barnes and Noble's *NOOK Store Terms of Service*, ¶ 4(a), http://www.barnesandnoble.com/include/nook_store_terms_of_service.asp (last updated April 1, 2015).

[233] *See* Amazon, *Lend or Borrow Kindle Books*, http://www.amazon.com/gp/help/customer/display html?nodeId=200549320 (last visited Sept. 23, 2015); Section 4(b) of the Barnes and Noble *NOOK Store Terms of Service*, http://www.barnesandnoble.com/include/nook_store_terms_of_service.asp (last updated April 1, 2015). *See also* AAP Nov. Comments at 6 and note 20; IFTA Nov. Comments at 4; Zagaja Jan. Comments at 6.

[234] MPAA Jan. Comments at 9; *see also* CA Jan. Comments at 15.

[235] MPAA Jan. Comments at 9, referring to wheretowatch.org for a list of licensed services.

[236] RIAA Nov. Comments at 8 (noting that "under the iTunes system, users can have and enjoy a purchased recording on 10 devices simultaneously. *See* http://support.apple.com/kb/ht4627."); *see also* Apple, *Family Sharing*, http://www.apple.com/icloud/family-sharing/?cid=wwa-us-kwg-features-com (last visited Sept. 23, 2015). Spotify permits subscribers to share entire playlists for free, NMPA Nov. Comments at 8, and share accounts with family and friends. *See* Tom Warren, *Spotify Family Lets You Share a Subscription From $14.99 per Month; Available Worldwide in the Coming Weeks,* THE VERGE (Oct. 20, 2014, 6:19 AM), http://www.theverge.com/2014/10/20/7013227/spotify-family-shared-premium-subscription-pricing-features. *See also* "Family Sharing" section of Apple, http://www.apple.com/legal/internet-services/itunes/us/terms.html (last updated June 30, 2015) (sharing for a variety of kinds of works).

ii.    <u>Lower-Priced Copies</u>

One rights holder group observed that the "legal digital marketplace presents consumers with a myriad of options for acquiring copies of music and other cultural works—typically at a price point far below what would be spent for a physical equivalent."[237] Examples were given as follows.

- *Textbooks*. Publishers stated that rentals and sales of electronic textbooks are offered at prices considerably below the cost of purchasing hard copies.[238] They also offer opportunities to purchase e-chapters instead of entire books, allowing students to pay less for what they need.[239]

- *Music*. A representative of the recording industry remarked that digital albums have been generally sold at lower prices than physical albums, and that this has led to a drop in the prices of CDs as well.[240] The Consumer Federation of America provided more broad-based statistics on price savings, reporting that for recorded music, "[b]illions of singles and streaming spins replace hundreds of millions of albums, resulting in billions of dollars of cost savings for music that can be enjoyed in a variety of new ways."[241]

- *Software*. Software publishers noted that they often offer their products at reduced prices for particular markets. This may include "academic" versions for students; "OEM" (original equipment manufacturer) versions packaged with hardware, sold through hardware manufacturers; and site licenses, allowing the use of software by a set of related users, at per-user discounts.[242]

In contrast, another commenter stated that he found examples of video games, music, and books that were licensed at an equivalent price to the physical product.[243]

Copyright owners stressed that being able to license without transferring ownership of the copies transmitted to consumers is indispensable to the new, flexible ways in which creative works are

---

[237] RIAA Nov. Comments at 8.

[238] *See* AAP Nov. Comments at 6 & note 17 (referring to "widespread availability of online e-textbook rentals" and referring to a service "offering innovative rental packages at significant cost savings, for example, 'access to as many as 6 e-textbooks for [150 days for] $200.'"); SIIA Jan. Comments at 6-7 ("The average eTextbook costs significantly less than a new version of that same print textbook. For example, the digital version of the widely used textbook, 'Biology' by Sylvia Mader and Michael Windelspecht, published by McGraw-Hill Education, costs $120. Its traditional print counterpart is priced significantly higher at $229. Many eTextbooks are also available for rental by students—a business model that further lowers students' textbook spending and has begun to reduce the market share of the traditional used book market.").

[239] AAP Nov. Comments at 6 & n.18.

[240] Marks/RIAA (Nashville) at 90.

[241] CFA Nov. Comments at 31-32.

[242] SIIA Jan. Comments at 5. *See also* Kupferschmid/SIIA (Cambridge) at 188; BSA Jan. Comments at 3.

[243] Perzanowski (Nashville) at 84-85 (citing instances where obtaining copies online costs no less than buying hard copies).

made available. They identified in particular the potential impact on pricing. Software publishers asserted that "[a]ny change in the copyright law that made the first sale defense applicable to these software licenses would . . . jeopardize the future availability of discounted software to those markets."[244] They explained that if the licensee were deemed to own the copy and therefore could, under the first sale doctrine, resell it in the secondary market, the publisher would have to set a higher initial price in order to recoup its investment.[245] Otherwise, for example, lower-priced versions intended for particular (e.g., educational) markets might be resold to users in commercial markets, where the price is much higher.[246] For textbook publishers as well, one "significant factor in the reduced eTextbook price is the secondary market. Because the publisher of a print textbook has to factor in the likelihood that the book will be resold by the original student buyer, either directly to another student or indirectly through a campus bookstore offering used books, the publisher has to set a higher price for the new print book in order to recoup its investment."[247]

In addition, in the software area in particular, copyright owners noted the ongoing relationships that licensing makes possible. Software publishers explained that licensees generally receive benefits pursuant to licenses to which they would not be entitled if the transaction were a sale. A license establishes a relationship that continues long after the initial transfer of a copy, and may include the provision of patches and other updates to improve functionality and fix security vulnerabilities, as well as new versions of software. One organization stated that application of the first sale doctrine to software could endanger their ability to deliver such updates, etc., since it would involve accessing the consumer's computer—something that a license would permit but that could otherwise give rise to liability.[248] Cloud computing providers noted the increasing importance of licensing, as software is updated and adapted to the user's needs on a regular basis.[249]

### b. Access-Based Services

Many participants and commenters described a marketplace that is evolving from services involving the distribution of copies to those in which consumers are offered different levels of access at a choice of price points.[250] Copyright owners outlined a number of ways in which they provide content online, largely by means of "access models" under which consumers pay a monthly subscription fee to enjoy all content that is offered by a service or a single fee for on-

---

[244] SIIA Jan. Comments at 6.

[245] *Cf. Id.* at 7.

[246] *See* BSA Jan. Comments at 3.

[247] SIIA Jan. Comments at 7-8.

[248] BSA Jan. Comments at 2-3.

[249] *Id.*; SIIA Jan. Comments at 4-6.

[250] *See, e.g.*, Bridge/Disney (LA) at 145; CA Jan. Comments at 15; MPAA Nov. Comments at 5; MPAA Jan. Comments at 9. *See also* CA Jan. Comments at 14; Sheffner/MPAA (Nashville) at 98. *But cf.* McSherry/EFF (Alexandria) at 139 ("the people that I represent want to not just access goods, they want to mess with them, they want to change them, they want to recreate them, they want to make, they want to do things with them that then in turn will spur further innovation").

demand (pay-per-view) enjoyment. These models do not trigger application of the first sale doctrine, as no copies are sold or otherwise disposed of in the first place.

- *Music*. Record companies observed that the "clear trend towards subscription streaming services and other cloud-based business models enables consumption of copyrighted materials in ways that make possession of the copy by the consumer far less significant, or even irrelevant."[251]

- *Motion pictures*. Motion picture studios described research showing a shift in consumer preferences, with interest in access rather than ownership, reinforced by statistics on revenue trends.[252] They also noted the multiplicity of price points, "from free online viewing or free mobile viewing to downloads of movies for prices that are similar to DVDs,"[253] or a subscription to a streaming service for "eight or nine dollars a month."[254]

- *Books*. Books are offered to consumers to read online through subscription services such as 24Symbols, Scribd, and Entitle.[255]

- *Games*. Computer and video game publishers offer software platforms, including web portals, cloud and streaming services, that enable game play in the online environment.[256]

- *Computer software*. Software publishers explained that the industry is in transition from licensing software installed on devices to accessing it through the cloud and to other licensing models, such as subscriptions.[257]

---

[251] RIAA Nov. Comments at 8; Marks/RIAA (Nashville) at 73 (there is "a trend, frankly, toward access and away from ownership if you're looking at the market"). *See also* NMPA Nov. Comments at 10. One of the three major music labels, Warner Music Group, recently announced that revenue from streaming music had for the first time exceeded income from downloads. Warner Music Group, *Warner Music Group Corp. Reports Results for Fiscal Second Quarter Ended March 31, 2015*, (May 11, 2015), http://www.wmg.com/news/warner-music-group-corp-reports-results-fiscal-second-quarter-ended-march-31-2015-20696.

[252] Sheffner/MPAA (Nashville) at 98; Sheffner/MPAA (Berkeley) at 118-19. Sheffner described this as part of a larger phenomenon that extends beyond access to or ownership of works of authorship, noting that there are "business models where people, for example, they don't own tools anymore, they have these websites where you can go and rent tools from somebody." *Id.* at 119. *See also* SIIA Jan. Comments at 11 (quoting an article predicting that "[t]he next few decades will witness a massive decline in ownership. Renting, not owning, will become the primary way people [] consume").

[253] Bridge/Disney (LA) at 145. An industry representative observed consumers have the option of "renting" a movie online for a 48-hour period for one relatively low price of about $5.99 or of acquiring a download for a price of about $15.00. Sheffner/MPAA (Nashville) at 74-75.

[254] Sheffner/MPAA (Nashville) at 74-75.

[255] AAP Jan. Comments at 9; Adler/AAP (Cambridge) at 184. For additional details, *see First Sale Under Title 17: Hearing Before The Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong., 2d Sess. 151, 153-54 (2014) (Statement of the American Association of Publishers), *available at* http://judiciary.house.gov/_cache/files/8fc16abf-b2ed-4bf6-b5a2-108dfecbe09e/113-98-88109.pdf.

[256] ESA Nov. Comments at 3.

[257] Simon/BSA (Alexandria) at 83, 122.

Copyright owners and some observers stressed that industry policies in this area are evolving, at least in part in response to the demands of the marketplace.[258] They emphasized that for those consumers who still want to own copies, that option remains available, as most types of works continue to be distributed in physical formats.[259]

Participants and commenters, including but not limited to copyright owners, identified various consumer benefits from these access-based models. These included a greater variety of different options for enjoying content; more flexibility; and the ability to choose a lower price for only the amount of access desired.[260] One professor favoring an expanded first sale doctrine acknowledged that licensing, subscription and rental models "do in fact play a really important role in getting consumers access to content for a lower price. And oftentimes consumers aren't interested in owning things forever."[261]

The Center for Democracy and Technology, while acknowledging the existence of scenarios where it would be appropriate to extend first sale principles, also noted the lack of applicability of first sale for subscription-based access models:

> Consumers often buy access to large libraries of content via subscriptions, or buy cloud-based services in which they have an ongoing relationship with the provider rather than conducting a one-time transaction that feels like a single "purchase." Spotify and Netflix streaming are leading examples from the music and movie marketplaces. Increasingly, then, consumers' access to content need not involve ownership. For these new business models, the first sale doctrine would fit awkwardly if at all.[262]

### 3. Lost First Sale Benefits

Commenters identified two primary respects in which the online marketplace fails to provide the benefits traditionally offered by the first sale doctrine. First, several expressed concern that reliance on licensing terms is not a full substitute for statutory guarantees, especially as these terms can be changed. Second, the licensing model does not replicate the ability of consumers to resell their copies, which enables the existence of a secondary market. In addition, some raised questions with respect to impacts on library lending, preservation, and privacy.

---

[258] *See*, *e.g*., Adler/AAP (Alexandria) at 126; Kupferschmid/SIIA (Alexandria) at 131; MPAA Jan. Comments at 9; MPAA Nov. Comments at 1; Villasenor (Alexandria) at 111 ("we've had just really a few years to watch the digital markets develop and I think we'll see a great wealth of higher degrees of flexibility in the solutions that are offered downstream.").

[259] *See, e.g.,* Bridge/Disney (LA) at 145.

[260] *See, e.g.,* CA Jan. Comments at 13-15; CDT Nov. Comments at 15; ESA Nov. Comments at 3; MPAA Nov. Comments at 5; MPAA Jan. Comments at 9; NMPA Nov. Comments at 10; Perzanowski (Nashville) at 85.

[261] Perzanowski (Nashville) at 85.

[262] CDT Nov. Comments at 14, 15. *See also* Newhoff (Cambridge) at 176 ("the whole idea of ownership at all is actually, even as we're speaking, becoming something of an anachronism. People are moving toward . . . a desire for a subscription-based relationship"); *id.* Newhoff (Cambridge) at 222 (predicting that because of access-based models, "it's quite possible that my kids and future generations aren't even going to download anything anymore").

a.  The Shift from Statutory Guarantees to Rights Holder Permission

Several commenters, primarily from the academic and public interest communities, stressed that the benefits permitted under licenses could not fully replace those provided by the first sale doctrine.[263] A professor concluded that "true ownership needs to remain on the menu," as the lower prices are accompanied by restrictions on what the acquirer of the copy may do.[264]

Another commenter observed that "currently, all of the comparable [first-sale permitted] activities fall into a 'licensing' scheme controlled by the copyright holder . . . . Permission-based market substitutes [for first-sale benefits] are clumsy, at best. . . . Permission may be revoked on a whim."[265] A public interest organization stated that while there are examples of the online marketplace providing functionalities that mimic  analog activities facilitated by first sale, the revenue-maximizing strategy of copyright owners will not always be consistent with the existence of secondary markets, lending, and other attributes associated with the doctrine.[266] Others argued that the shift from ownership to licensing gives all the power to copyright owners, to the detriment of consumers who are left owning less in the digital environment.[267] A professor expressed concern about the degree of control that content owners and platforms may be able to exercise over users, including the ability to monitor users' habits, enabling and disabling access or terminating accounts.[268] One library group noted concerns about "the use of contract terms to circumvent limitations in the Copyright Act."[269]

The Center for Democracy and Technology described the role of the first sale's doctrine as follows:

> [F]irst sale tends to limit the amount of control rightsholders can exercise over how downstream users engage with their works, because it prevents rightsholder from having privity of contract with all downstream users or purchasers. This means more freedom for users and more full enjoyment of copyrighted works. Rightsholders can't force book purchasers to read chapters in a specific order, or prohibit purchasers from framing or mounting an artwork as they see fit.[270]

---

[263] *See, e.g.,* CDT Nov. Comments at 13-14.

[264] Perzanowski (Nashville) at 85.

[265] ScreenPlay Jan. Comments at 6-7. *See also* SCI/EFF Nov. Comments at 19 ("Shifting to licensing gives all the power-for the extraordinarily long copyright term-to copyright holders to decide the conditions of use for vast portions of our cultural commons.").

[266] CDT Nov. Comments at 13 ("the premise and raison d'etre of the first sale doctrine is that rightsholders will not always believe it is in their self-interest to do so. The revenue-maximizing strategy of rightsholders will not always be consistent with the existence of secondary markets, lending, etc.").

[267] CIS/EFF Nov. comments at 17; PK Nov. Comments at 22.

[268] Niva Elkin-Koren, *Can Formalities Save the Public Domain? Reconsidering Formalities for the 2010s*, 28 BERKELEY TECH. L.J. 1537, 1550 (Symposium 2013), attached as Appendix C to Samuelson Jan. Comments.

[269] LCA Nov. Comments at 7.

[270] CDT Nov. Comments at 13 (footnote omitted).

b. Loss of Resale and Lending Markets

Proponents of expanding the doctrine argued that the same principle that applies to resales or loans of physical copies should apply to resales taking place through digital transmission, and that the means by which the copy is distributed should not make any difference.[271]

In contrast, many authors and rights holders questioned the continued viability and relevance of secondary markets, given the new business models outlined above. A writer-filmmaker concluded that "the digital age has all but obviated the need for a secondary market," noting that the access offered to consumers online, along with "the incredible pricing … begs the question as to what a secondary market actually would look like."[272] Book publishers observed that the "diversity of distribution models for eBooks, such as streaming, subscriptions, downloads, rentals, etc., many permitting access on multiple devices, raises the question of whether the equivalent of physical resale for the online environment is even necessary or desirable."[273] Motion picture studios concurred, concluding that the "diversity of models for providing access undermines calls for sanctioning 'resale' in the digital environment" and that "this diversity would likely be threatened by an expansion of the first sale doctrine, which should remain a physical concept."[274] Music industry representatives questioned the need for a digital first sale doctrine in light of the already low cost of obtaining copies of or access to music, asserting that the market has already taken account of the lack of a secondary market for digitally transmitted music.[275]

c. Other Issues Raised

i. <u>Library Lending</u>

A number of commenters, including libraries, publishers, and authors, discussed limitations on what libraries may do with digital materials, including eBooks. Libraries voiced concern about the shift from owning physical copies to the new licensing paradigm for eBooks,[276] and warned

---

[271] PK Nov. Comments at 12-13; ScreenPlay Jan. Comments at 6; ReDigi Nov. Comments at 4.

[272] Newhoff (Cambridge) at 176. *See also* Shems/GAG (Cambridge) at 192 ("for $1.25, they don't need to have that secondary market, being able to take it off their computer and resell it."). Another roundtable participant stated that "I don't really have any interests to represent," and agreed that "the secondary market concept is kind of going away, especially with the current pricing regime, which seems very fair for the convenience of accessing something on any of your devices anywhere you are." Harrison (Cambridge) at 154, 177-78.

[273] AAP Nov. Comments at 7.

[274] MPAA Jan. Comments at 9 (footnote omitted).

[275] NMPA Nov. Comments at 10 ("The ability to buy a download for 99 cents on average, the ability to subscribe to a portable music service for $10 per month, the ability to stream music over computers and portable devices for free, and the availability of music services designed specifically for public libraries suggests [that] the market is clearly providing a range of products and services at a reasonable cost that allow wide access to and the sharing of music."); Marks/RIAA (Nashville) at 89 ("It may be a $10 a month, you know, for every recording that's ever been released, it may be something for 99-cents. There's just a variety of different models out there. And so I'm not sure that I see that expectation of needing to have this first sale in the music space.").

[276] *See* discussion below, Part C.4.a (Library Lending), p. 60.

that their traditional role of lending books could be endangered.[277] Publishers touted the flexibility inherent in a licensing model, and individual authors stated that the rights of creators should be respected in any discussion about library uses.[278]

Libraries traditionally rely on the first sale doctrine to make books available to "those willing and able to wait their turn for the limited loans and use of library materials."[279] Several libraries reported that some eBooks are not made available to libraries at all, due to the reluctance of publishers to permit them to access and lend digitally formatted books.[280] One librarian stated that "when journals and books go into an e-book format, sometimes the license makes us incapable of loaning,"[281] another objected to the high costs of licensing eBooks from major publishers,[282] and others noted that some licenses place severe limits on the activities of libraries with respect to digital content,[283] including restrictions on the number of times an eBook may be loaned.[284] A public librarian expressed concern about time limitations, stating that they "mean that we should not even invest in books that may be good but not popular enough."[285]

A library consortium reported that some small and medium sized publishers "agree to a reasonable interpretation of First Sale in the digital realm" (as set forth in a Statement of Common Understanding) and permit it to buy eBooks and treat them as it would treat print copies, with a one-copy to one-user requirement. The consortium concluded that licensing can provide library users with useful access to eBooks (for example, allowing multiple uses of a title while it is still in hot demand), but cannot serve as a permanent means to preserve a library's collection.[286]

---

[277] *See* discussion below, Part C.4.a (Library Lending), p. 60.

[278] *See* AAP Jan. Comments at 8. *See also* Bahnsen Nov. Comments at 1; Cherry Nov. Comments at 1.

[279] Califa Nov. Comments at 1.

[280] Schwartz Nov. Comments at 2 (pointing out that Kindle Singles are sold to consumers but not made available to libraries). *See also* Ohio Library Nov. Comments at 1; Juneau Nov. Comments at 1. It appears that since those comments were submitted in November 2013, the practices of publishers have changed and all major publishers are now willing to license eBooks to libraries (we have also noticed changes in publishers' licensing terms since the comments were submitted). AAP Jan. Comments at 8; Robert C. Maier, *Big Five Publishers and Library Lending*, AMERICAN LIBRARY ASSOCIATION, http://www.americanlibrariesmagazine.org/wp-content/uploads/2015/04/BigFiveEbookTerms042215.pdf (last updated Apr. 22, 2015). Issues still remain, however, with respect to the terms under which publishers will permit library lending. See the discussion immediately below.

[281] Courtney (Cambridge) at 157.

[282] Juneau Nov. Comments at 1.

[283] Schwartz Nov. Comments at 2 (pointing out that Kindle Singles are sold to consumers but not made available to libraries).

[284] Califa Nov. Comments at 1 ("libraries are stuck with titles [that] are subject to restrictions of all kinds, including titles that disappear after 26 checkouts from the library's virtual shelves"). As noted below, see text at note 289, publishers justified restrictions on the number of times a books may be lent by asserting that such restrictions approximate the number of times a book will be lent before it is retired from circulation due to deterioration.

[285] Naylor Nov. Comments at 1.

[286] Califa Nov. Comments at 1.

A university copyright advisor asserted that libraries often are required to pay higher prices for eBooks than consumers. He also expressed concerns regarding limitations on the number of times an eBook may be checked out and distinguished public libraries from academic libraries, where certain books are checked out hundreds of times, including books on reserve which may be checked out for only an hour at a time.[287] A school librarian stated that "popular items tend to be borrowed hundreds of times without the book falling apart and being unusable," implicitly rejecting the argument that libraries retain books in their collections only after a relatively small number of loans.[288]

Publishers responded by stressing that lending of eBooks can have a greater impact on the marketplace than traditional library lending. They asserted that libraries will typically replace a physical book with a newly purchased copy after it has been loaned 25 or 26 times, due to deterioration in the book's condition. Unlike the traditional model where a library lends a book to one reader at a time, and readers have to visit the library in order to check out a book, eBooks can be loaned an indefinite number of times and simultaneously to multiple readers, each of whom can borrow the eBook remotely without having to visit the library. As a result, "the whole model of library lending is different today because of technological changes, because of economic changes, for a variety of reasons."[289]

Publishers also noted that due to antitrust considerations, they cannot jointly agree upon library e-lending policies.[290] As a result, publishers have come up with a variety of approaches intended to replicate the effects of the traditional lending model for hard copy books. Some require lending to only a single user at a time. Some have a limit on the number of loans or the time period in which loans may be made, requiring a new license once the limit has been reached.[291] While publishers acknowledged that such "market-based solutions are not yet fully-developed," they urged that "the recent momentum behind these endeavors should not be halted by awkwardly and impractically attempting to graft a doctrine crafted for the physical environment onto the online environment."[292]

ii.  Preservation

Library associations asserted that publishers "frequently include terms in their [eBook license agreements] that restrict libraries' ability to exercise their rights under sections 107 (fair use) [and] 108 (library exceptions)" of the Copyright Act.[293] They referred to a study concluding that digital materials are subject to risks of loss, corruption, and destruction at least as profound as the

---

[287] Courtney (Cambridge) at 169-70.

[288] Brosan Nov. Comments at 1.

[289] Adler/AAP (Cambridge) at 162-63. *See also* AAP Nov. Comments at 6.

[290] Adler/AAP (Cambridge) at 164.

[291] *Id.* at 164-68, referring to his 2014 Congressional Testimony (see citation above in note 255).

[292] AAP Nov. Comments at 6; *see also* AAP Jan. Comments at 8.

[293] LCA Nov. Comments at 7.

risks facing older formats.[294] They stated that many publishers will not have the financial incentive, or the institutional stability, to preserve digital materials for the long term, while libraries collectively seek to preserve all aspects of cultural heritage, not just materials with potential economic value. Accordingly, they argued that the copyright system must encourage these preservation activities.[295] Publishers themselves were cognizant that the market may not fully address library preservation concerns, but suggested that this issue should be addressed in the context of section 108 of the Copyright Act, which provides a specific exception for libraries.[296]

Outside of the library context, other commenters and roundtable participants raised issues relating to preservation of digitally transmitted media. Some asserted that, contrary to common assumptions about "digital" lasting forever,[297] digitally transmitted works may be lost because necessary distribution technologies become obsolete and cease functioning.[298] One academic responded that in an age "where almost everything we own is going to be in a cloud-based system," digital information is unlikely to degrade or disappear and the issue will be "managing a world in which all of our information is digital and in the cloud."[299] A motion picture industry representative observed that through licensing, the industry has come up with a solution for consumers whose copies on DVDs or similar media become damaged: services that permit the consumer to obtain a new download for free.[300] Another commenter worried that if a distributor of digital content goes out of business or ceases distribution, works may be lost to the public.[301]

    iii.   <u>Privacy</u>

Citing "the right to read anonymously," one commenter noted that the first sale doctrine protects privacy by "making it impossible for rightsholders to track the identities of all consumers who have obtained copies of their works."[302] Another warned that without a digital first sale doctrine, any transfer of ownership of a copy can be "affirmative knowledge of readership . . . removing a source of easy anonymization that could otherwise protect individuals who might be persecuted for seeking information about their conditions or beliefs."[303] A similar concern was expressed by

---

[294] LCA Jan. Comments at 4-5 (referencing Timothy H. Vines *et. al.*, *The Availability of Research Data Declines Rapidly with Article Age,* 1 CURRENT BIOLOGY 24, pp. 94-97 (Jan. 2014), *available at* http://www.sciencedirect.com/science/article/pii/S0960982213014000 (last visited Dec. 2, 2015)).

[295] *Id.* at 5.

[296] *See* AAP Jan. Comments at 8.

[297] Those assumptions were articulated by rights holders in support of their assertions that the resale of digital copies would have a much greater impact on the primary market than has the resale of physical copies. *See* below at Part B.4.a (Potential Effect on Primary Markets), p. 51.

[298] *See, e.g.*, Schwartz Nov. Comments at 2; LCA Jan. Comments at 4; Siy/PK (Alexandria) at 100; Butler (Alexandria) at 147; CDT Nov. Comments at 12.

[299] Villasenor (Alexandria) at 148.

[300] Sheffner/MPAA (Cambridge) at 214-15.

[301] *See* CDT Nov. Comments at 12.

[302] *Id.* at 13.

[303] PK Nov. Comments at 15-16.

a librarian, who stated that "[w]ith licenses there's a lot of surveillance, there's a lot of tracking that goes on with who owns what and where it goes."[304]

One professor, however, observed that whenever one acquires a book electronically, the transaction "would leave all sorts of footprints" that would make the transaction less private even if a digital first sale doctrine were in place. Accordingly, in his view, while there may be privacy implications when copies are obtained by means of digital transmission, this is the same whether or not the first sale doctrine applies.[305]

iv. Issues Relating to Sales of Consumer Devices and Products

Two other issues were raised by some commenters that were not specifically presented for comment by the Task Force's public notices:[306] sales of consumer products incorporating functional software, and sales of devices containing copies of works.

One of the most notable trends in technology in recent years is the digitization of everyday products. Consumer goods such as automobiles, refrigerators, and thermostats, are now sold with operational software to perform such functions as navigation and climate control.[307]

Several commenters and roundtable participants expressed concern over the possibility that manufacturers might assert that software embedded in consumer devices is only licensed and may not be resold as part of a sale of the device.[308] Examples given of licenses restricting resale appeared to relate to software used on computers and related equipment rather than to everyday consumer goods operated with the assistance of preloaded software.[309] The Digital Right to Repair Coalition stressed the importance of allowing subsequent purchasers of such goods to diagnose and repair them by accessing and using the software.[310]

A separate issue raised was whether consumers who have lawfully downloaded copyrighted music, eBooks, motion pictures or other content onto their devices may lawfully include that

---

[304] Klossner (Berkeley) at 90-91.

[305] Villasenor (Alexandria) at 104-05.

[306] *See* Request for Comments on Department of Commerce Green Paper, Copyright Policy, Creativity, and Innovation in the Digital Economy, 78 Fed. Reg. at 61338-39.

[307] *See, e.g.,* AIPLA Jan. Comments at 6; Kari/Arbitech (LA) 159-160 & 172-74; Evans/Adobe (Berkeley) at 96.

[308] *See, e.g.,* AIPLA Jan. Comments at 6; Samuelson (Berkeley) at 92. One participant observed that if a purchaser of a device did not enter into a license agreement, then that purchaser is not bound. He concluded that "there's a difference between a unilateral license which someone might claim you're party to and a contractually binding license which you have explicitly agreed to." Villasenor (LA) at 173-74.

[309] ORI Nov. Comments at 3-5 (ORI also stated (without offering any specific information) that at present, "manufacturers of computer and telecommunications equipment misuse software license agreements to interfere with resale," and cautioned that as more products are distributed with pre-installed software, such as cars and consumer appliances, this situation will become more widespread). *See also* Kari/Arbitech (LA) at 174.

[310] *See generally* DRTR Nov. Comments. *See also* PK Nov. Comments at 16; McSherry/EFF (Berkeley) at 93-94 (noting that someone had sent her an email stating that the Nook eBook reader comes with a license agreement that forbids a purchaser from servicing his own device).

content when they dispose of the devices. One academic commenter noted that individuals who give an old computer or iPod to a friend or family member will not realistically seek permission from all of the copyright owners whose works are contained in it.[311] There was little discussion of this issue, which involves the transfer of ownership of a physical object containing copies of copyrighted works, rather than the distribution of the copies themselves by means of digital transmission.

### 4. Risks of Extension of First Sale Doctrine

#### a. Potential Effect on Primary Markets

Most of the copyright owner groups that commented in this proceeding cited the conclusions in the Copyright Office Report, especially the reasons why physical media and digitally transmitted media should be treated differently for Section 109 purposes.[312] The Copyright Alliance pointed to statements in the Copyright Office Report about the ability to make perfect digital copies, concluding that a resale market for such copies would compete for market share with new copies. It stated that there has been no changes in technology that call those conclusions into question and asserted that extending the first sale doctrine to "used" digital goods would result in serious economic harm.[313] Music industry groups similarly stressed that a digital first sale doctrine would allow users to distribute perfect copies of works to others without the copyright owner receiving any compensation, "making piracy undetectable" and stifling the online marketplace.[314] An app developer concurred, observing that if purchasers who decide they do not want to keep his app are permitted to resell it, they can make it available for sale at a lower price and destroy his market.[315]

Book publishers cited the Copyright Office Report's observation that unlike used physical books that are subject to wear-and-tear, "used" digital copies can be as desirable as new ones, and their ability to "compete for market share with new copies is thus far greater."[316] Motion picture and television directors observed that such harm to the marketplace affects not only copyright owners, but also others, such as directors, whose income depends in part on revenues generated from authorized reuse of motion pictures.[317] Songwriters endorsed the Copyright Office Report's conclusion that "the risk that expansion of section 109 will lead to increased digital infringement

---

[311] *See* Samuelson (Berkeley) at 91-92 ("I think from the standpoint of most people to be able to give away an old computer, to give away my iPod to my sick grandmother is something that actually also is important. And I'm not going to get in touch with every single one of the software companies that might have licensed software for that machine."). *See also* Courtney (Cambridge) at 192-93.

[312] The Copyright Office Report, *above* note 203, at 82-83.

[313] CA Jan. Comments at 16-17. *See* the Copyright Office Report at 82-83.

[314] NMPA Nov. Comments at 9 (quoting the Copyright Office Report).

[315] Standfield (Berkeley) at 125 ("[T]here is no distinction between the used software and the new software…it's identical.").

[316] AAP Jan. Comments at 7 (quoting the Copyright Office Report at 82-83). *See also* AAP Nov. Comments at 4; NMPA Nov. Comments at 8-9 (digital copies of music degrade over time).

[317] DGA Jan. Comments at 3.

weighs heavily against such an expansion."[318] A public interest group noted that the fear of "runaway infringement" is not exclusive to digital first sale and occurs when new technologies enter the market.[319]

### b. Loss of Market Flexibility

A number of copyright owners also asserted that they would be unable to offer consumers the benefits from licensing discussed above, including the ability to tailor products, features, and prices to the needs of different customers, if the first sale doctrine applied to the copies involved in such transactions.[320] One observed that the first sale doctrine imposes a "one size fits all" model that logically would lead to a higher price even when a consumer wishes to make only limited use of the work.[321] For example, if a purchaser of a student edition of a book or software had the legal right to resell the copy to any willing purchaser, the publisher would face significant disincentives to offer that edition to students at a reduced price due to the likelihood of unfair competition from the resale of the student edition in the open market.[322] Publishers warned that online subscription services that offer access to eBooks, such as Scribd, Entitle, and Amazon's Kindle Library, could not exist if there were a digital first sale doctrine.[323]

### 5. "Forward and Delete" Technology

The Task Force asked whether there have been any advances in technology that will ensure that an original copy of a work is automatically deleted once another copy has been transmitted to another person.[324] As described above, some commenters suggested that such technology should be part of a solution, involving at least partial extension of the first sale doctrine to digital transmissions.[325] Only a few, however, provided any specifics.[326] One commenter suggested that

---

[318] SGA Nov. Comments at 6.

[319] *See* PK Nov. Comments at 29 ("Every type of media now faces the same pressures as before – it has long been possible for video-rental infringement to wreak havoc on the movie industry – and yet, . . . this has failed to happen.").

[320] *See* ESA Nov. Comments at 4-5 (quoting the Copyright Office Report at 91-92); RIAA Nov. Comments at 8; CDT Nov. Comments at 15; AAP Nov. Comments at 7; MPAA Nov. Comments at 5-6; CA Jan. Comments at 14-15.

[321] *See* SIIA Jan. Comments at 4. *See also* discussion *above* in text at note 260.

[322] *See* SIAA Jan. Comments at 7-8. *See also* BSA Jan. Comments at 3.

[323] Adler/AAP (Cambridge) at 184.

[324] *See* Request for Comments on Department of Commerce Green Paper, 78 Fed. Reg. at 61339 (Oct. 3, 2013), note 4 *above*.

[325] *See, e.g.,* PK Nov. Comments at 27; ScreenPlay Jan. Comments at 8-10; ReDigi Nov. Comments at 8; CDT Nov. Comments at 15.

[326] One company asserted that "[f]or many years, now, the basic "'forward-and-delete'" technology has been available," citing to legislation that was proposed but not enacted several years ago, the Copyright Office Report and the recording industry's 1999 Secure Digital Music Initiative. ScreenPlay Jan. Comments at 8-9. In contrast, a group of copyright ownersstated, "While theoretically a technology could be developed that eliminates all copies after the original has been redistributed, this is not currently a practical reality with sufficient security to be viable for commercial works of entertainment." CA Jan. Comments at 16.

the technology used to control the lending of eBooks and music between users could be employed to manage the transfer of the ability to access digital copies of works.[327]

The only existing technology brought to the Task Force's attention was that deployed by ReDigi, which is the subject of an ongoing copyright infringement suit filed by record labels. In a 2013 opinion, the district court concluded that while ReDigi's technology could detect whether, once a copy of a work was transmitted by a seller, any additional copies were retained on the seller's computer or attached devices, it did not delete the copies detected but simply prompted the seller to do so voluntarily. Nor could it detect copies that the seller had made on other computers or devices prior to the sale.[328]

The technology has evolved, however, since that time. In its comments in this proceeding, ReDigi asserted that "systems now exist that allow digital files to be secured … and provide the transfer of single instances of those protected files, while rendering ancillary copies inoperable." It characterized "forward and delete" methods as "old-fashioned" due to the availability of "instantaneous transactions, where copies are never made as part of a transaction between a buyer and seller," and stated that such technology "is in use and exists today."[329] Based upon ReDigi's statements as well as the brief description in the district court's opinion,[330] it appears that the new version does not involve "distribution" of a file. If that is the case, the analysis of ReDigi 2.0 under existing law might be different, and it remains to be seen how the courts may address this technology, or other technical approaches that may be developed.[331]

Copyright owners remained skeptical about the effectiveness of any "forward and delete" technology. Publishers asserted that there is no practical way to guarantee that the transfer of digital files would not result in unauthorized additional copies.[332] Others expressed doubt

---

[327] Zagaja Jan. Comments at 3.

[328] *Capitol Records, LLC v. ReDigi, Inc*, 934 F. Supp. 2d 640, 655 (S.D.N.Y. 2013). The district court held that defendant's forward and delete system was not shielded by the first sale doctrine in section 109 because, among other things, it involved new copies which were not "lawfully made under this title." The court granted the plaintiffs partial summary judgment, finding ReDigi liable on some but not all of the plaintiffs' claims, with triable issues on others. The case is still pending.

[329] ReDigi Nov. Comments at 8. At the Alexandria Public Meeting, ReDigi's CEO stated that "ReDigi 2.0" involves a consumer directly initially downloading a digital music file into ReDigi's cloud server. Following a sale, there is an "exchange of title and keys between buyers and sellers. No files are copied, no files are moved, et cetera." Ossenmacher/ReDigi (Alexandria) at 132-33.

[330] 934. F. Supp.2d at 646 n.3 (The district court described ReDigi 2.0 as "new software that, when installed on a user's computer, purportedly directs the user's new iTunes purchases to upload from iTunes directly to the Cloud Locker. Accordingly, while access may transfer from user to user upon resale, the file is never moved from its initial location in the Cloud Locker.").

[331] *See* DGA Jan. Comments at 3 ("Although the first sale doctrine does not permit the owner of a copy of a copyrighted work to make copies, technologies are being developed that may facilitate the ability of consumers to transfer digital files without copying, allowing them to transfer ownership of goods purchased both online and offline.").

[332] AAP Jan. Comments at 9 & n.34 (noting that "Given the fact that many users of digital content (typically, but not always, pursuant to an authorizing license) can currently download multiple copies on multiple devices (desktop computer, laptop, tablet, e-reader, smart phone, etc.) or access copies through remote cloud storage, the practical

whether it could ever be certain that a "reseller" of a digitally transmitted copy did not retain a copy.[333] Publishers of software and digital content argued that even if an absolutely effective "forward and delete" technology were to be available, it would be just a matter of time before it was hacked.[334] Some commenters and participants added that a "forward-and-delete" system would not mitigate the harm caused by the retransmission of perfect digital copies, which would substitute in the market for copies that otherwise would have been purchased from rights holders or their authorized distributors.[335]

### 6. Solutions Proposed by Stakeholders

Several advocates of an expanded first sale doctrine proposed solutions that would broaden its application while preserving the benefits of the new business models. The Center for Democracy and Technology identified a "policy conundrum" in that "[a]llowing first-sale principles to go completely extinct in digital markets is undesirable. But so is forcing digital content to be distributed via 'ownership' models in order to permit resale, when the market is embracing subscription and service-based distribution models." It urged finding ways to extend the first sale doctrine into the digital world without foreclosing business models where it does not fit, proposing the development of criteria for distinguishing scenarios where it would be appropriate to extend first sale principles from those where it would not. Possible criteria would be to apply a "digital first sale rule" only to purchases of digital content but not to non-purchase models, permitting resale when the seller's copy is deleted.[336] Another public interest organization similarly suggested that allowing "nonduplicative transfers" (i.e., transmission of a digital download to a third party, followed by the deletion of the download from the transmitter's devices) would ensure that owners of copies can resell them while preventing the multiplication of copies.[337]

The American Intellectual Property Law Association suggested that Congress consider distinguishing between the kinds of works that historically have been subject to first sale in the

---

likelihood that any technology could ensure compliance with a 'forward and delete' requirement is virtually nil, and the copyright owner's ability to monitor or enforce such compliance is essentially non-existent.").

[333] *See* Tepp/U.S. Chamber (Nashville) at 87; SIIA Jan. Comments at 16; NMPA Nov. Comments at 9 (observing that "a person's claim to have transmitted only a single copy and not retained a back up is extremely difficult to prove or disprove, making piracy undetectable.").

[334] SIIA Jan. Comments at 16. *See also* AAP Jan. Comments at 9 (citing to Professor Villasenor, at the Alexandria Public Meeting, and noting that it is "not clear that technology can ensure that backup copies are deleted and there will always be individuals that will crack such safety measures and increase online piracy to the detriment of creators that deserve compensation for their works.").

[335] *See, e.g.*, Tepp/U.S. Chamber (LA) at 150, 164-65 (observing that "to the extent what you're asking should we have a forward and delete model in furtherance of what's arguably a secondary market, I would argue that's not a secondary market at all because, as you know, the quality of the digital file does not degrade and is instantly transferable over unlimited distances, so it's going to substitute one for one for sales in the primary market."); SIIA Jan. Comments at 16. *See* Part B.4.a (Potential Effect on Primary Markets), p. 51 *above*, for a discussion of the effects on the market of such sales.

[336] CDT Nov. Comments at 15.

[337] PK Nov. Comments at 27.

analog world and those that have only existed in the digital space.[338] Others remarked that the Task Force should explore alternative statutory language, such as "carving out rights for 'possessors' of works 'lawfully made and acquired.'"[339]

### 7.      Consumer Expectations and Contract Terms

In the case of services that deliver copies of works to consumers online, concerns were raised about consumers' understanding of the nature of the transaction. These services often utilize end-user license agreements (EULAs)[340] setting forth what rights the consumer will enjoy with respect to the work, including whether he owns the copy that is transmitted and what he may do with it.[341] The license is in the form of an agreement presented online, to which the consumer typically confirms his consent by clicking on a "button" or box on the screen. Because it would be impractical for each transaction with a consumer to be individually negotiated, EULAs are necessarily standard-form agreements.[342]

Some public interest groups described EULAs as "contracts of adhesion" because consumers have no ability to negotiate terms and conditions and may even be unaware of their existence.[343] They urged the Task Force to "explore ways of limiting copyright holders' ability to use license agreements to require the public to waive the rights and protections afforded by the Copyright Act."[344] Motion picture studios pointed out that courts have upheld such online licenses. They remarked that EULAs often expand the rights that users obtain beyond those provided in the Copyright Act, and there is no reason why private parties cannot agree on how to calibrate the

---

[338] AIPLA Jan. Comments at 5 (noting that books, movies and sound recordings are "works for which there exists a widespread and reasonable expectation of resale and transfer rights," and contrasting those types of works with computer software, which has traditionally been licensed).

[339] CIS/EFF Nov. Comments at 18.

[340] A EULA is a legal agreement between the provider of an online service or manufacturer of software and the purchaser of the service or software that stipulates the terms of usage. EULAs can take the form of "shrinkwrap" agreements (for software), "browserwrap" agreements (for website usage), and "clickwrap" agreements (for online notices needing affirmative consent). *See* Aaron Rubin and Anelia V. Delcheva, *Implementing and Enforcing Online Terms of Use*, SOCIALLY AWARE BLOG (Oct. 6, 2014), http://www.sociallyawareblog.com/2014/10/06 /implementing-and-enforcing-online-terms-of-use/.

[341] As already noted, at notes 251-252, many of the new online services offering creative content do not involve transfers of ownership.

[342] *See* AAP Jan. Comments at 5 ("Standard EULAs enable efficient access to the copyrighted content that millions of U.S. consumers are constantly downloading or streaming on Amazon, Spotify, Scribd, etc. Just as in the world of physical goods and related consumer services, where basic contract agreements for renting or purchasing an automobile, a refrigerator or a night's lodging at a hotel typically are not negotiated anew with each consumer, negotiating individual contracts would add transaction costs and delays that negate the efficiencies of digital availability that are essential to expanding access to copyrighted works.") (footnote omitted).

[343] CIS/EFF Nov. Comments at 17.

[344] *See id.* at 17-18. *See also* McSherry/EFF (Alexandria) at 137-38 ("We're talking about EULAs, because we can talk all day long about what we want to do with the statute, but, you know, what the statute may giveth, the contract terms will taketh away. . . . So, we have these mass contracts of adhesion, to which everyone is agreeing without knowing what they include, without knowing what they're binding themselves to.").

contours of an acceptable use.[345] A software industry representative noted that such licenses are not a recent development; even when software was distributed only on discs and other physical media, the longstanding industry practice has been to structure the transactions as licenses rather than sales.[346] A number of rights holders observed that EULAs are commonplace in a wide variety of consumer transactions.[347]

One public interest group asserted that provisions barring redistribution of copies are at odds with the ordinary expectations of consumers, and that the terms of such licenses conflict with the general understanding of "buying" and "owning" copies.[348] Others argued that consumers rarely read or understand EULAs, which are long and complicated.[349] Commenters and participants noted that it is common for online services to feature a "buy" button that a consumer must click on in order to initiate a download,[350] and offered differing views as to what consumers believe when they are presented with such a button. Several academics and public interest groups claimed that consumers expect that when they click on the button, they will "own" the copy.[351] On the other hand, some copyright owner representatives expressed doubts, opining that in the particular contexts in which these transactions take place, consumers are likely to understand that they are paying for something that falls short of ownership.[352] One rights holder pointed out that

---

[345] MPAA Jan. Comments at 9 (citing cases).

[346] SIIA Jan. Comments at 5 ("For several decades, the software industry has relied on a licensing model for the distribution, maintenance, and updating of its software products and services to and for its customers."). While there can be genuine issues in particular cases as to whether a transaction amounts to a license or a sale, *see* Green Paper at 36 & note 196, if the transaction is governed by a license the first sale doctrine does not apply. *But see* PK Nov. Comments at 22-26 (questioning whether current case law is consistent with the seminal first sale case of *Bobbs-Merrill Co. v. Straus,* 210 U.S. 339 (1908)); ORI Jan. Comments at 4-5.

[347] *See, e.g.,* Adler/AAP (Cambridge) at 204-06 (referring to standardized car rental agreements and mass-market licenses); Kupferschmid/SIIA (Cambridge) at 208-10 (referring to credit card and cellphone agreements and observing that "this is not just a copyright problem at all. As a matter of fact, it's not even primarily a copyright problem. . . . This is a more generic consumer issue").

[348] PK Nov. Comments at 21-24.

[349] *See* Ossenmacher/ReDigi (Alexandria) at 118-19 ("50-page EULAs, license agreements people don't understand or know how they work"); Siy/PK (Alexandria) at 127 ("[H]ow many people here, and even granting that this particular crowd is more likely than others, have read the iTunes terms of service, have read the Amazon terms of services -- right?"); McSherry/EFF (Berkeley) at 100-01 ("[T]he hours that people would spend reading EULAs figuring out and trying to figure them out, you know, I just don't think that's the kind of national investment that we want people to be making . . . ."); McSherry/EFF (Alexandria) at 138.

[350] Lowney Nov. Comments at 1; Courtney (Cambridge) at 192; Villasenor (LA) at 151; Samuelson (Berkeley) at 107.

[351] *See, e.g.,* Perzanowski (Nashville) at 85 ("When I pay the 14.99, it's not a shiny button that says license now, it says buy now, it says purchase now, it says own this. That means something to consumers."); McSherry (Berkeley) at 84; Samuelson (Berkeley) at 107-08; Courtney (Cambridge) at 192-95. Professor Villasenor agreed that "the big fat 'buy' button deceives consumers." Villasenor (LA) at 154-55, 157. *See also* Evangelho Nov. Comments at 1.

[352] Sheffner/MPAA (Cambridge) at 200-02 ("If you ask people when you go to a site to buy a movie or a book or a song, I think they pretty much understand that you're not actually buying the copyright. What you are doing is you're purchasing or buying a license which permits you to do certain things."). *See also* Branch (LA) at 157-58 ("I'm not sure that the consumers have the expectation that when they hit the buy button for some music that they're thinking about how they're going to resell it. . . . We're looking at consumer expectation when they buy, and by pressing the

the language used on webpages that offer digital content is written not by copyright owners, but by the online services (e.g., Amazon and iTunes) that have the direct relationship with the public.[353]

Regardless of whether the "buy" button is misleading, and regardless of who is responsible for its use, commenters and participants on all sides agreed that consumers are entitled to clarity and that more should be done to communicate what rights they are or are not getting when they enter into a transaction involving digital transmissions of copies.[354] As one professor stated, "people facing consumers have not done a particularly good job or as good a job as they could in making clear to consumers what rights they have or do not have in the content[,]" concluding that if consumers were accurately informed of their ownership rights, "then the market would lead to pressures that would lead content owners and distributors to provide more flexible offerings of content . . . ."[355] Copyright owners agreed that more could be done,[356] with some stating that they already try to explain to consumers that what they are paying for is not a purchase, but a license.[357] Book publishers noted that providing clear terms on websites and in EULAs will help further stimulate development of a variety of business models, and concluded that they and their retailers should strive to clarify whether eBooks are licensed or sold and make key terms easy to see and understand.[358] Several parties remarked that consumer education in this area is necessary and may help alleviate any confusion.[359] One rights holder group urged that any Federal

---

buy button in electronic format, I'm not sure any consumer is expecting to resell that in the next hour."); Bridge/Disney (LA) at 155-56.

[353] Sheffner/MPAA (Cambridge) at 226-227. *See also* Adler/AAP (Cambridge) at 219-21 (observing that for antitrust reasons, decisions with respect to how to present a "buy" button could not be made collectively).

[354] PK Nov. Comments at 24-25 ("While copyright holders are under no legal obligation to sell copies of their works, they should be required to be clear if they are not selling copies at all, providing consumers with the information necessary to make their purchasing decisions wisely."); Courtney (Cambridge) at 195 ("Maybe we should stop using the word 'purchase' and 'buy' in our contracts where we're dealing with this, and actually explicitly explain, you're leasing these. You're leasing these songs, you're leasing these e-books, at best, and you can't sell them in a yard sale, and there is no e-book or MP3 used market yet."); Villasenor (LA) at 151-52 ("If there's a button that says 'buy' and a consumer presses the button and finds that he or she in fact owns nothing, I think there's a pretty reasonable argument that there's at least not a particularly forthright disclosure regarding the consumer's rights."); Ossenmacher/ReDigi (Alexandria) at 118-19.

[355] Villasenor (LA) at 151-52. *See also* John Villasenor, *Rethinking a Digital First Sale Doctrine in a Post-Kirtsaeng World: The Case for Caution*, CPI ANTITRUST CHRON., May 2013(2) at 9.

[356] Adler/AAP (Cambridge) at 221 ("it probably would make more sense for the copyright owner to inform all the distributors that these are the types of things you need to make sure that our customers . . . know."); Sheffner/MPAA (Berkeley) at 121 (stating that there can "be improvement in the way that these things are described so the consumer knows exactly what he or she is getting[,]" but also maintaining that that "doesn't mean that saying that you buy access to a movie or a piece of software or piece of music is necessarily misleading.").

[357] *See, e.g.*, Dare/Oracle (Berkeley) at 86-87; Kupferschmid/SIIA (Cambridge) at 208.

[358] AAP Jan. Comments at 5 ("to avoid any undue assumptions that eBooks must be acquired and used in exactly the same way as physical books, publishers and their retailers should strive to clarify whether eBooks are licensed or sold to consumers and make key terms easy to see and understand.").

[359] *See, e.g.*, PK Nov. Comments at 25; Villasenor (LA) at 151-52.

Government effort to examine consumer expectations and EULAs should not be limited to or focused solely on offerings of copyrighted works.[360]

C.   Conclusions and Recommendations

1.   Overview

The Task Force has heard that the current online marketplace provides some of the benefits traditionally provided by the first sale doctrine. Others, including the ability of a consumer to resell a purchased copy or to lend it without restriction, are not replicated.[361] Based on the evidence presented, however, it is difficult to measure the value of this loss, or to weigh it against the overall consumer benefits of today's digital offerings. At the same time, the risks to copyright owners' primary markets as described by the Copyright Office in its 2001 Report do not appear to have diminished, or to have been ameliorated by the deployment of effective new technologies. And an expanded first sale doctrine could curtail at least some of the flexibilities of new business models. Accordingly, we cannot at this time recommend extending the first sale doctrine to apply to digital transmissions of copyrighted works.

2.   Benefits of the First Sale Doctrine Provided by the Current Online Marketplace

The record created by the comments and roundtable discussions on this topic indicates that the marketplace for online delivery of works is providing a number of the benefits of the first sale doctrine to varying degrees. A number of popular online services permit copies to be shared with or lent to family and friends, although sharing features do not necessarily mirror the ease of the first sale doctrine.[362] Other services offer rental of copies or access-based equivalents.[363] While they generally do not permit transfers of ownership of a digitally transmitted copy, they typically do deliver a principal benefit of secondary markets—lower prices than for the purchase of new copies.[364]

Online services also have the potential to offer advantages not available in the physical world.[365] Consumers today have many more options to obtain access to and copies of creative works in a wide variety of formats and on a wide variety of terms and price points. These include both permanent and temporary downloads and streaming services, with offerings that can be tailored to the consumer's needs and resources. As noted above, these offerings may not always be

---

[360] SIIA Jan. Comments at 11.

[361] *See* text at note 233.

[362] *See* discussion *above,* Part B.2.a.i (Sharing/Lending). For example, some digital lending programs are limited to members of a household or to a 14 day time period, while a physical copy of a book under the first sale doctrine can be lent to any person for any period of time.

[363] *See* discussion *above,* Part B.2.b (Access-Based Services), p. 42.

[364] *See* discussion *above,* Part B.2.a.ii (Lower-Priced Copies), p. 41.

[365] *See* discussion *above,* Parts B.2.b (Access-Based Services), p. 42 & B.4.b (Loss of Market Flexibility), p. 52.

perfect substitutions for the first sale doctrine, but they offer options and benefits to consumers that do not exist with physical copies.

Several commenters correctly observed that copyright owners are not compelled to extend those benefits and will only do so as long as it is in their own interest.[366] But these types of offerings seem widespread, well-established as a feature of the online market, and responsive to consumer demands. The Task Force expects that copyright owners will continue to recognize that their markets will grow as they find innovative ways to meet the changing demands of consumers. As rational commercial actors, they presumably have a strong financial interest in satisfying their customers and therefore in improving the online experience through new technologies, features, and products as well as attractive pricing. Nevertheless, while a significant number of works continue to be available in physical formats, the rising trend of digital-only goods may well require future analysis of the impact on consumers of a shift from a statute-based to a permission-based regime.

3.      Consumers' Inability to "Resell" Downloaded Copies

One core benefit of the first sale doctrine is not replicated in the online marketplace. A consumer who has obtained a copy of a work from a digital transmission is not entitled to sell, freely share, or give away that copy by transmitting it to a third party, as he could do in the world of physical copies. It is difficult, however, to determine the value of this lost benefit.

Little empirical evidence of the lost value to consumers was presented to the Task Force on this point. While some consumers might be interested in reselling digital files, we do not know how many, for which types of works, or what the prices would be. There is also little data from the physical world on which to base a comparison, although it is reasonable to assume that used copies cost less to consumers. The Task Force would have liked to have seen information as to how many consumers have taken advantage of the right to resell their books, CDs or DVDs, why they do so,[367] or the value of those copies.[368] Data on the savings consumers have realized from purchasing used copies also would have been useful, although it is reasonable to assume that the price of used copies (other than rare editions) is usually considerably lower than the price of new ones. This makes it difficult, based on the record, to evaluate what consumers have lost due to their inability to resell downloaded copies.

While we do not have sufficient data to conduct an authoritative cost-benefit analysis of the trade-offs between the consumer benefits from the first sale doctrine and from licensed online services, a few conclusions can be drawn. In the online marketplace, more and more consumers

---

[366] *See* discussion in text *above* at p. 45 and in notes 265-268.

[367] For example, it may well be that one of the motivations for selling used copies is to eliminate the clutter caused by the accumulation of books and other objects that take up space. This motivation would be considerably reduced in the online environment.

[368] The only information provided to the Task Force appears to be a statement in the comments of ReDigi Inc. that "[a]ccording to Commerce Department figures, video rental in the United States is a $9.5 billion industry. Video game retailer GameStop (GME) reported nearly $2.4 billion in 2009 revenue from used game sales." ReDigi Nov. Comments at 4.

are gaining access to and receiving copies of creative works through licensed services that offer a variety of options at a variety of price points (including, in the case of subscription services, virtually unlimited access to large numbers of works for a monthly fee). Many of these prices appear to compare favorably to the cost of new physical goods.[369] Whether consumers who would have purchased used books, CDs, etc., but now go online to obtain copies or gain access are overall better off is not clear. (Of course, consumers still have the option to purchase used physical copies of many works, either online through merchants such as eBay or offline through a used book sale or retail outlet.)

### 4. Other Concerns Raised

#### a. Library Lending

As described above,[370] libraries have raised issues relating to licensing terms and restrictions on their ability to lend eBooks to patrons. Libraries fulfill their public interest mission by providing their patrons with a wide range of eBook choices, and should be able to continue to meet the educational and informational needs of their patrons in the digital age. Libraries are also facing increasing economic hurdles posed by declining funding with increasing requests for access.[371] On the other hand, to the extent that libraries transmit the newest eBooks and other digital materials to recipients without any limits, publishers have legitimate concerns that they could effectively become market competitors.[372]

The Task Force heard that each major publisher has a different set of terms and conditions for library eBook lending, and antitrust constraints prevent them from establishing standard practices or uniform contracts.[373] Thus, while libraries might prefer to face a uniform set of publisher policies in order to simplify administration of their lending programs, the prospects for an industry-wide outcome are slim.

---

[369] *See, e.g., note* 238 *above* (information as to comparative prices of a digital textbook and its traditional print counterpart). Additional information reflecting low prices was provided for music, *see* note 275 *above,* and motion pictures, *see* text at and in notes 252-254.

[370] *See* Part B.3.c.i (Library Lending), p. 46 *above.*

[371] "Today's public libraries are grappling with a 'new normal' of flat or decreased funding, paired with increased demand for public library technology resources." The American Library Association reports that "Twenty-three states reported cuts in state funding for public libraries from 2010–2011 to 2011–2012. For three years in a row, more than 40 % of participating states have reported decreased public library funding." *The 2012 State of America's Libraries*, AMERICAN LIBRARY ASSOCIATION, http://www.ala.org/news/mediapresscenter/americaslibraries/soal2012/public-libraries (last visited October 1, 2015).

[372] Commenters indicated that such concerns may be addressed by current licensing restrictions that limit such lending to one patron at a time. *See, e.g.* Klossner (Berkeley) at 102-03 ("I think libraries are okay with buying a single copy and loaning one, but there's a little bit of education on the patron side of why we only own one digital copy at a time."); StBeneStJohn Nov. Comments at 1. *See also* Adler (Cambridge) at 163-66 (outlining licensing arrangements). To the extent that library lending involves library patrons "willing and able to wait their turn for the limited loans and use of library materials," *see* text at note 279, the inefficiencies built into lending processes may avoid crossing the line of competing with the commercial market.

[373] See discussion in text at note 290.

It also appears that since the Green Paper was released, publishers' licensing policies have become at least somewhat more responsive to the concerns expressed by libraries. Since the last roundtable, the American Library Association has made available a table entitled "Big Five Publishers and Library Lending" which provides details of the licensing practices of the major book publishers with respect to library lending of eBooks.[374] That table indicates that the major publishers will now license their entire catalogs to libraries for e-lending. Some publishers offer perpetual licenses permitting an unlimited number of loans (sometimes limited to one user at a time), while others have limits of one or two years, or 26 or 52 loans, after which renewal would be required.

Other library concerns relate to the price and other terms under which the books are offered.[375] Although publishers assert that the terms and conditions of their licenses are designed to replicate what libraries have traditionally done with hard copies of books that they lend,[376] at least with respect to academic libraries, licensing restrictions may be more onerous in some cases than existing practices.[377]

Based on the record before it, the Task Force concludes that licensing agreements between eBook publishers and libraries are new and evolving, and we worry that early government intervention into the eBook market could skew the development of innovative and mutually beneficial arrangements. More time should be given to see whether market forces, and initiatives such as the Statement of Common Understanding noted by some library organizations, will produce desired outcomes. If over time it becomes apparent that libraries have been unable to appropriately serve their patrons due to overly restrictive terms imposed by publishers, further action may be advisable. This could involve convening library and publisher stakeholders to work out statements of best practices, or amending the Copyright Act to address the library concerns raised here.[378]

---

[374] Robert C. Maier, *Big Five Publishers and Library Lending*, AMERICAN LIBRARY ASSOCIATION, http://www.americanlibrariesmagazine.org/wp-content/uploads/2015/04/BigFiveEbookTerms042215.pdf (last updated Apr. 22, 2015).

[375] An August 2014 article in *American Libraries* suggests that while "all of the Big Five publishers now offer their full ebook catalogs to public libraries[,] . . . the bad news continues to be price, loan limits, and consortium access." Rob Maier, *Macmillan's Full Catalog of Ebooks Now Available to Public Libraries*, AMERICAN LIBRARY ASSOCIATION, (Aug. 4, 2014), http://americanlibrariesmagazine.org/blogs/e-content/macmillans-full-catalog-of-ebooks-now-available-to-public-libraries/.

[376] *See* discussion at note 291.

[377] *See* discussion at notes 287-288.

[378] *See Hearing: The Register's Perspective on Copyright Review Before The Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 114th Cong., 1st Sess. 14-15 (April 29, 2015) (statement of Maria A. Pallante, United States Register of Copyrights and Director of the U.S. Copyright Office), *available* at http://copyright.gov/laws/testimonies/042915-testimony-pallante.pdf (stating that the Office is "ready to update the exception that provides a safe harbor for libraries and archives" and that Section 108 "must be completely overhauled.").

### b. Preservation and Privacy

As to the assertions by some commenters that the first sale doctrine serves additional purposes such as preservation and privacy,[379] the Task Force agrees that these are important goals. But while they may be furthered in some circumstances by application of the first sale doctrine, we do not believe that they are central to the doctrine's core purpose: to permit the alienation of tangible personal property.[380] Nor has the record in the proceeding shown that extending first sale to digital transmissions is the best way to secure their protection.

As technologies continue to evolve and new distribution mechanisms supplant the old, the preservation of digital content raises challenges. To some degree, technology may provide new solutions, but libraries and archives play a critical role in preserving digital content for posterity and transferring it to new formats when the original ones become obsolete.[381] The Task Force recognizes the possibility that some licensing restrictions impede libraries' ability to fulfill that mission. As noted in the Green Paper, library preservation activities are addressed in Section 108 of the Copyright Act, and the Copyright Office and the Library of Congress have been actively engaged in considering its revision.[382] The Task Force recommends that issues relating to libraries' ability to preserve eBooks and other works in digital formats should be considered in that context, but recognizes the need to continue to monitor legal and marketplace developments to ensure that library lending and preservation concerns are addressed.

Outside the context of libraries and archives, the first sale doctrine may also have the effect of enhancing preservation, and it will continue to play this role in the physical world. The real challenges for digital preservation go well beyond first sale and the ability to transfer copies. Some of the problems identified in this proceeding relate to the state of technology: copies residing on devices that become obsolete and distribution depending on technologies that cease to function.[383] Other problems are a consequence of the larger digital ecosystem, and the fact that entities who at one time hold the technological key to granting access to services or works may go out of business or disappear from the marketplace, taking that technology with them.[384]

---

[379] *See above* at Parts B.3.c.ii (Preservation), p. 48 & iii (Privacy), p. 49.

[380] *See* Green Paper at 35 (first sale doctrine "originated to ensure a consumer's control over her tangible physical property"); the Copyright Office Report at 86 ("The tangible nature of the copy is not a mere relic of a bygone technology. It is a defining element of the first sale doctrine and critical to its rationale. This is because the first sale doctrine is an outgrowth of the distinction between ownership of intangible intellectual property (the copyright) and ownership of tangible personal property (the copy)."). While other uses by the owner of a copy, such as modifying, repairing and displaying it, *see* PK Nov. Comments at 16, may be privileges that ordinarily accompany ownership of chattels, there is nothing in the first sale doctrine itself or in the text of section 109(a) that addresses them.

[381] The Task Force notes that the application of fair use to library activities and the digitization of library collections has recently been the subject of attention in the courts. *See, e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. Oct. 16, 2015); *Authors Guild v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014).

[382] Green Paper at 24. *See above* note 378.

[383] *See* note 298 and accompanying text

[384] This problem may be ameliorated to at least some extent if orphan works legislation is adopted. *See* U.S. Copyright Office, Orphan Works and Mass Digitization: A Report of the Register of Copyrights (2015), *available at* http://copyright.gov/orphan/reports/orphan-works2015.pdf (last visited Oct. 16, 2015); U.S. Copyright

Whether the recipient of a digitally transmitted copy owns or merely possesses that copy seems unlikely, however, to determine whether that copy will be preserved. And to the extent that the existence of multiple copies in multiple locations in itself makes it more likely that the work will be preserved,[385] this could be said of any proliferation of copies.The preservation of personal collections may be better answered by other doctrines that are outside the scope of first sale, but this issue merits monitoring as the market evolves.

As to privacy, the Task Force is actively engaged in reviewing the nexus between privacy policy and innovation in the Internet economy.[386] We recognize that online commerce presents new risks relating to personal privacy, such as the possibility that licensing of eBooks could permit the identification of individual readers, including in the library context. Almost all states in the country have library-specific privacy laws,[387] and we expect that those laws will weigh into the on-going conversations between publishers and the library community on the relationship of licensor vendor data and licensing terms.[388] Outside of the library context, this issue is not specific to application of the first sale doctrine, but involves the broader question of how privacy is maintained in the context of online transactions generally.[389] Based on the record before it, the Task Force does not at this time have specific recommendations in the absence of broader progress on privacy in the online context.

### c. Sales of Consumer Devices and Products

As noted above,[390] some commenters raised issues relating to the sale of consumer products, such as automobiles, refrigerators, and thermostats, many of which now operate with the assistance of embedded software. Their concern was that manufacturers might assert that the software in the consumer product was licensed rather than sold, casting doubt on the consumer's ability to resell or repair the product. A similar concern was raised about the ability of the owner of a computer or other device onto which digital copies of copyrighted works had been downloaded to transfer those copies as part and parcel of a resale of the device. Although neither of these issues relate to our inquiry on digital transmissions of copies, we make a few observations.

---

OFFICE, REPORT ON ORPHAN WORKS, A REPORT OF THE REGISTER OF COPYRIGHTS 27, 28-29 (2006), *available at* http://copyright.gov/orphan/orphan-report-full.pdf.

[385] PK Nov. Comments at 14.

[386] *See Privacy*, NTIA, http://www.ntia.doc.gov/category/privacy (last visited Oct 16, 2015).

[387] *State Privacy Laws Regarding Library Records*, AMERICAN LIBRARY ASSOCIATION, http://www.ala.org/advocacy/privacyconfidentiality/privacy/stateprivacy (last visited October 1, 2015).

[388] The Task Force will continue to monitor this issue in conjunction with the Institute of Museum and Library Services.

[389] As one professor observed, if there is any sacrifice in privacy by a recipient of a digital download, it is not the result of nonapplication of the first sale doctrine but rather the nature of the delivery technology. Villasenor (Alexandria) at 104-05.

[390] *See above* Part B.3.c.iv (Issues Relating to Sales of Consumer Devices), p 23.

The first sale doctrine permits the owner of a lawfully made copy to resell or give away that copy. That privilege extends to lawful copies that are embedded in a device owned by a consumer, whether the copy was already installed on the device at the time the consumer acquired it or was lawfully downloaded by the consumer after the consumer acquired the device, so long as the copy is transferred as part and parcel of a transfer of the device itself.[391] As noted in the Copyright Office Report, when a work has been lawfully downloaded onto a hard drive, "the first sale doctrine applies fully with respect to the tangible object (e.g., the user's hard drive) in which the work is embodied."[392]

However, as noted above, copyright owners sometimes make digital copies available pursuant to licenses that characterize the transaction as something other than a sale.[393] The Task Force did not hear evidence that licenses purporting to restrict a consumer's ability to resell have been used with respect to embedded software that operates a functional product, other than a computer or related equipment.[394] Thus, the record before us does not establish that the kinds of consumer products identified above are currently sold subject to such licenses. We do believe, however, that the alienability of everyday functional products is an important issue for consumers. If the market develops so that such devices are commonly sold with restrictions on subsequent purchasers' use of necessary software, further attention would be warranted.

In the case of devices containing downloads of copies of works, when the downloading is performed under a license, there may be policy reasons not to allow resale. As noted above,[395] it is common for licenses for music, books, and movies to permit the licensee to make multiple copies on multiple devices for her own personal use, or to share copies with others. Such licenses may also forbid the licensee to transfer the downloaded copy, even as part of a transfer of the consumer product onto which the copy was downloaded. Such a restriction is not unreasonable in a case where the licensee has, pursuant to the license, made or shared additional copies of the downloaded work. The licensee has gained the benefit of his bargain, exercising the privilege to make additional copies, in exchange for the inability to transfer copies of the downloaded work when he sells the consumer product. And unlike a sale of a physical copy, the sale of the consumer product onto which a copy was downloaded would not deprive the licensee of all of his copies of the downloaded work.

---

[391] Software and music files that were downloaded illegally cannot be resold because they were not lawfully made. *See* H.R. REP. 94-1476 at 79 (1976) ("To come within the scope of section 109(a), a copy or phonorecord must have been 'lawfully made under this title,' though not necessarily with the copyright owner's authorization. For example, any resale of an illegally 'pirated' phonorecord would be an infringement, but the disposition of a phonorecord legally made under the compulsory licensing provisions of section 115 would not."), *available at* http://www.copyright.gov/history/law/clrev_94-1476.pdf.

[392] The Copyright Office Report at xviii, 78, 87, 100 ("a lawfully made tangible copy of a digitally downloaded work, such as a work downloaded to a floppy disk, Zip$^{TM}$ disk, or CD-RW, is clearly subject to section 109.").

[393] As noted in the Green Paper, to the extent that such licensing practices permit licensors to avoid application of the first sale doctrine, the result might be to render the doctrine meaningless for works that are only offered by means of such licenses. Green Paper at 36.

[394] *See* text at note 309.

[395] *See* notes 232-236.

The Task Force takes note of the observation that regardless of the legal consequences, it is not realistic to expect that someone who gives away an old device along with copies of works loaded onto it will seek permission[396] from all of the copyright owners (but as a practical matter someone who gives away such a device can avoid any potential liability by simply deleting the copies it contains). Of course, the likelihood that any copyright owner would assert a claim of infringement based upon such a low-value gift, or even be aware of it (as distinguished from commercial sales of devices along with loaded content), is low.

Given all of these considerations, the Task Force concludes that, at this time, the case has not been made in the record to change the law to address the sale of products or devices. Moreover, some of the concerns expressed may be better addressed through sections of the Copyright Act other than first sale.[397]

> 5. The Risks of Extending the First Sale Doctrine to Digital Transmissions

>> a. Potential Damage to Primary Markets

Numerous commenters described the potential harm to markets for creative works if copies could be transmitted digitally from one purchaser to other potential purchasers.[398] Many stressed the continued validity of the Copyright Office's conclusions that extending the first sale doctrine to digital transmissions would have harmful effects on primary markets due to the quality of digital copies and the efficient means of instantaneous, worldwide online dissemination.[399] As the Copyright Office noted:

> Physical copies of works degrade with time and use, making used copies less desirable than new ones. Digital information does not degrade, and can be reproduced perfectly on a recipient's computer. The "used" copy is just as desirable as (in fact, is indistinguishable from) a new copy of the same work. Time, space, effort and cost no longer act as barriers to the movement of copies, since digital copies can be transmitted nearly instantaneously anywhere in the world with minimal effort and negligible cost. The need to transport physical

---

[396] *See* note 311.

[397] The repair issue in particular could be addressed in the context of sections 117 or 1201. Section 117 provides for certain limitations on exclusive rights relating to computer programs, including for purposes of machine maintenance and repair. Section 1201, the prohibition on circumventing technological measures that protect copyrighted works, is subject to a number of exceptions and limitations, including exceptions adopted every three years in a rulemaking proceeding conducted by the Copyright Office. 17 U.S.C. § 1201(a) (1) (B)-(D). The sixth triennial rulemaking recently concluded, and the final rule includes an exemption for computer programs that control motorized land vehicles for purposes of diagnosis, repair and modification of the vehicle. *See* Exemptions to Prohibition Against Circumvention, 37 C.F.R. § 201.40(b)(6) (2015), *available at* http://www.ecfr.gov/cgi-bin/text-idx?SID=d422a7163d1dd24d7c9c17f87254a03d&mc=true&node=se37.1.201_140&rgn=div8; Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Notice of Proposed Rulemaking, 79 Fed. Reg. 73856, 73868-69 (Dec. 12, 2014), *available at* http://www.gpo.gov/fdsys/pkg/FR-2014-12-12/pdf/2014-29237.pdf.

[398] *See* p. 51 *above*, Part B.4.a (Potential Effect on Primary Markets).

[399] *See id.*

copies of works, which acts as a natural brake on the effect of resales on the copyright owner's market, no longer exists in the realm of digital transmissions.[400]

In the Green Paper, we asked whether there have been any changes in technological capabilities that would alter any of the conclusions reached by the Copyright Office in 2001. The evidence presented to us indicates that the technology to effectively prevent the retention of copies after a transmission has not yet become a practical reality.[401] If this does come to pass, it may affect our analysis of the impact on primary markets. In any event, while such a technology might dampen some of the negative effect on the primary market by avoiding a multiplication of copies emanating from a single source, it would not address the issues raised by the Copyright Office Report in the passage quoted above.[402]

Based on the record, the Task Force concludes that the Copyright Office's 2001 observations are still valid. Applying Section 109 to digital transmissions could risk causing substantial harm to the primary market for creative works (and to the income of creators as well as copyright owners).

### b. Loss of Flexibility

The Task Force is persuaded that an overly broad application of the first sale doctrine could also impede the continued development of the growing range of flexible new licensing models and variable pricing. Considerable evidence was presented that such models are becoming more and more prevalent and that they provide real value to consumers above and beyond traditional ownership models.

If the first sale doctrine were extended to apply to these new offerings to the extent they involve transfers of ownership (either on their face or as interpreted by the courts), or by expanding it to cover at least some license arrangements, it could lessen the willingness of copyright owners to continue to offer the current range of options of different uses on different terms. Rather, they would presumably need to price their offerings to take into account the purchaser's ability to resell and the resulting impact on their markets.

---

[400] The Copyright Office Report at 82-83 (citation omitted). Those conclusions were quoted with approval by the U.S. District Court for the Southern District of New York in the only reported case to address the issue. *Capitol Records, LLC v. ReDigi, Inc*, 934 F. Supp.2d 640, 656 (S.D.N.Y. 2013).

[401] *See* Part B.5, ("Forward and Delete" Technology), p. 52 *above*. However, such a technology and new business models may yet emerge. We note that several major companies have already filed patents intended to enable a digital resale marketplace. *See* David Streitfeld, *Imagining a Swap Meet for eBooks and Music*, N.Y. Times, Mar. 7, 2013, *available at* http://www.nytimes.com/2013/03/08/technology/revolution-in-the-resale-of-digital-books-and-music.html?_r=2. Amazon has secured at least two patents for a system that would enable resale of digital goods. The latest patent from June 2015 is for "a content management system [that] couples DRM protection of content items with a digital content store to allow content items to be transferred or resold from one user to another." U.S. Patent No. 9,064,276 (filed May 24, 2011), *available at* http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1=9064276.PN.&OS=PN/9064276&RS=PN/9064276.

[402] The Copyright Office Report at 98-100.

### 6. The Balance of Benefits and Risks

The ultimate question is whether there is sufficient evidence of a real-world problem to justify the risks involved in expanding the application of the first sale doctrine to digital transmissions at this time.

In the current online marketplace, consumers appear to have retained some benefits that parallel those provided by the first sale doctrine. These include some ability to share with friends and family and to try before buying, as well as opportunities to enjoy works at prices lower than purchasing new physical copies. In the digital marketplace, consumers are also able to enjoy greater flexibility and choice, including with respect to pricing. This point was widely acknowledged by commenters across the board, despite understandable concerns expressed by some about whether these benefits are permanent and the degree of control retained by copyright owners. And of course this is not an either/or choice—physical markets, subject to first sale, continue to exist as well for most if not all types of works.

Other benefits have undeniably been lost, primarily relating to the inability to resell copies or establish a secondary market.[403] It is difficult, however, to evaluate the extent of that loss, given the lack of evidence of consumer desires and any comparison of pricing in the secondary physical market to low-priced online offerings. In evaluating the total mix, the Task Force cannot conclude that there has been a substantial net economic loss for consumers at this point in time.

At the same time, we have been presented with persuasive arguments that there would be a significant risk of harm to the market for creative works if the first sale doctrine were extended to digital transmissions. There is the potential for substitution in the market from perfect copies, with one-to-one substitution of customers; and the potential multiplication of copies is not today clearly avoidable through the use of technology. We do not believe that the compromises put forward by commenters would adequately address these problems. Most included as a necessary component the automatic deletion of the transmitter's copy, which does not at this point seem feasible and which does not address the harm from "used" digitally transmitted copies competing in the marketplace with new copies. Others proposed expanding the doctrine to lawful possessors as well as owners of copies, which would not address the concerns about proliferation of copies and which would expand the first sale doctrine well beyond its roots in the alienability of personal property.[404] And distinguishing between categories of works based on consumer expectations seems a difficult task,especially given the dearth of evidence on this point.

Based on the record before us, The Task Force concludes that amending the law is not advisable at this time. We have seen insufficient evidence to show that there has been a change in

---

[403] As explained *above* at Part B.3.b (Loss of Resale and Lending Markets), p. 46, other negatives identified by commenters either may be being resolved in the marketplace or do not have a clear causal relationship to the first sale doctrine.

[404] *See, e.g.* CIS-EFF Nov. Comments at 17-18; ORI Nov. Comments at 5. To the extent that this proposal is based on the increasing use of licensing, when a court construes a purported license to in fact constitute a sale, the first sale doctrine will apply. Moreover, the proposed solution would go far beyond addressing any issues relating to licensing. If the first sale doctrine were to apply to all "possessors" of a copy, as asserted by these stakeholders, then someone who had borrowed a copy would be entitled to sell that copy.

circumstances since the Report in 2001—if anything, the change has been for the better in terms of the consumer experience. However, given that this conclusion is based in part on existing market conditions, we also believe that developments should continue to be monitored to ensure that the marketplace continues to evolve in ways that benefit consumers. If that is not the case, there will be opportunities to address changed circumstances in the future.

### 7. Improve Consumer Information and Awareness

The Task Force does believe that there is a need to provide consumers with more clarity about the nature of the transactions they enter into when they download copies of works. As one consumer advocate said, "While copyright holders are under no legal obligation to sell copies of their works, they should be required to be clear if they are not selling copies at all, providing consumers with the information necessary to make their purchasing decisions wisely."[405]

It does not appear that consumers have a clear understanding whether they own or license the products and services they purchase online due in part to the length and opacity of most EULAs, the labelling of the "buy" button, and the lack of clear and conspicuous information regarding ownership status on websites.[406] The Task Force believes that consumers would benefit from more information on the nature of the transactions they enter into, including whether they are paying for access to content or for ownership of a copy, in order to instill greater confidence and enhance participation in the online marketplace.[407] No solution will likely ever entice consumers to read the fine print of EULAs, but online services can find other ways to inform consumers of the salient features of those licenses.

There was general agreement that few consumers read the EULAs that govern their relationship with the online service, and many asserted that EULAs are difficult for consumers to understand. This situation is hardly unique to content delivery services; consumers encounter lengthy EULAs in a wide variety of activities.[408] One practice that was the subject of considerable discussion does appear to be specific to the online delivery of creative works, however: the use of the "buy" button (or buttons with similar designations such as "purchase" or "own") in cases where no purchase is taking place. Although the record before us is devoid of any actual evidence as to what consumers understand when they click on the "buy" button, common sense indicates that some significant group believes that ownership of a copy is being transferred to them.[409]

---

[405] PK Nov. Comments at 24-25.

[406] Meghan Neal, *Do You Ever Own your eBooks*, MOTHERBOARD (Aug. 19, 2013), http://motherboard.vice.com/blog/do-you-ever-own-your-e-books. *But see* CA Jan. Comments at 15 (discussing Amazon's eBook service as a benefit of licensing).

[407] Online consumer protection and education is in the legal spotlight. For example, the U.S. Court of Appeals for the Ninth Circuit recently held that if an online merchant has an arbitration agreement or other important terms and conditions on its website, those legal notices need to be in a place where the user is expected to find them. *See Nguyen v. Barnes & Noble, Inc.,* 763 F.3d 1171, 1178-79 (9th Cir. 2014).

[408] *See* Part B.7 (Consumer Expectations and Contract Terms), p. 55 *above*.

[409] That is, at least, a reasonable inference in cases where a copy of a work is transmitted to the consumer. In contrast, when a consumer is paying for access through a streaming service, even when presented with a "buy"

In any event, there is no reason why an online service that provides copies of works to consumers must use the word "buy" to describe the act of payment and downloading of a copy. There are alternatives that should be just as workable. It should be possible for online services to find an alternative for transactions that are not sales—i.e., that do not involve transfers of ownership.

With that in mind, the Task Force recommends the creation of a multistakeholder process to establish best practices in communications to consumers in connection with online transactions involving creative works. There are two related tasks that such a process could undertake in order to clarify what consumers may do with copies obtained by means of digital transmissions. The first, and simplest, task would be to arrive at a list of alternatives to the "buy" button. The focus here would be on labels that communicate in a word or two what it is that the consumer is paying for without affirmatively suggesting that he is obtaining ownership of a copy. A list of terms that should not be used, presumably with "buy," "own," and "purchase" at the top of the list, would also be a useful pursuit. Second, the multistakeholder group could establish best practices on how to inform consumers clearly and succinctly about the terms of EULAs regarding whether they "own" the copies provided and what they may do with them. One approach might be to produce a standardized form of notice, placed in or accessed from a conspicuous location on an e-commerce website or app, advising consumers in plain language about the terms in a license that cover the disposition of digitally transmitted copies.

---

button, he probably realizes that all that he is buying is access, and not a property interest or even possession (much like paying for HBO or cable).

## V. Assessing Statutory Damage Awards

### A. Introduction

In the Green Paper, the Task Force explained that the Copyright Act allows plaintiffs to seek statutory damages for copyright infringement as an alternative to actual damages, and that they have become increasingly important in cases of online infringement, where the scope of the infringing use may not be ascertainable.[410]

The Task Force observed that concerns had been raised about the application of statutory damages against individual file-sharers who make infringing content available online, and against online services, which can be secondarily liable for infringement of large numbers of works.[411] With respect to individuals, we observed that the size of the awards in two infringement cases involving file-sharers had led to calls for changes in the levels of statutory damages.[412] With respect to online service providers, we described a debate between those who argue that the prospect of large statutory damages awards chill investment and innovation and those who assert that this prospect is necessary to deter infringing services that have the potential to cause great financial harm.[413]

The Task Force accordingly sought comments and convened public discussions regarding the application of statutory damages in the contexts of (1) individual file-sharers and (2) secondary liability for large-scale online infringement. Below we review the public commentary and set forth three recommendations for amendments to the Copyright Act.

### B. Stakeholder Views

#### 1. Individual File-Sharers

##### a. The Level of Statutory Damages

The Task Force heard differing viewpoints about whether the full range of statutory damages permitted under current law should be applied to individual file-sharers. Many commenters addressed the perceived fairness of enforcement activities vis-à-vis individual defendants generally, including whether the possibility of large statutory damages awards impedes individuals' ability to defend themselves or gives rise to abusive tactics. The Task Force also received proposals that addressed other concerns about litigation against individual file-sharers.

Much of the discussion focused on the only two such cases with reported trial verdicts, both of

---

[410] Green Paper at 51.

[411] *Id.* at 48-50.

[412] *Id.*

[413] *Id.* at 52.

which resulted in high statutory damages awards that received considerable publicity.[414]

Those favoring an adjustment of the permissible range of statutory damages pointed to the large jury awards in these cases as examples of the "unpredictability and irrationality" of the statutory damages regime.[415] According to those commenters, individual file-sharers who infringe a handful of works for private, non-commercial purposes should not be required to pay damages that are disproportionate to the market value of the works.[416] Nor, in their view, does it make sense to impose large damages awards on individuals who cannot pay anywhere near the amounts awarded.[417] Some argued that the awards in these cases "exceed[ed] any rational measure of deterrence," noting potential due process concerns.[418]

---

[414] The jury award in *Tenenbaum* was for $675,000 ($22,500 for each of 30 infringed works). *Sony BMG Music Entm't v. Tenenbaum*, 721 F. Supp. 2d 85 (D. Mass. 2010), *aff'd in part, vacated in part, rev'd in part*, 660 F.3d 487 (1st Cir. 2011), *remanded to* 2012 U.S. Dist. LEXIS 119243 (D. Mass.Aug. 23, 2012), *aff'd by* 719 F.3d 67 (1st Cir. 2013). The three trials in *Thomas* resulted in awards of $222,000, $1.92 million and $1.5 million ($9,250, $80,000 and $62,500 per work), respectively. *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1227 (D. Minn. 2008); *Capitol Records Inc. v. Thomas-Rasset*, 680 F. Supp. 2d 1045, 1049 (D. Minn. 2010); *Capitol Records Inc. v. Thomas-Rasset*, 680 F. Supp. 2d 1045, 1050 (D. Minn. 2010). It appears that only a few file-sharing cases against individuals have been litigated to the point where statutory damages have been awarded, and in most cases those awards have been made as part of default judgments against defendants who did not appear. *See* below note 559 (statutory damages awards against peer-to-peer file-sharers in cases culminating in default judgments typically range between $750 and $6,500 per work). Those cases that settled appear to have involved much lower amounts. *See* Menell Jan. Comments at 26 (noting that the "overwhelming majority of defendants" sued by the RIAA settled for between $3,000 and $5,000). *See also* note 443 and accompanying text below (asserting settlement amounts range from $2,000 to $10,000).

[415] CIS/EFF Nov. Comments at 20.

[416] *See, e.g.* PK Nov. Comments at 30; CDT Nov. Comments at 7 ("awards of hundreds or thousands of times the value of the infringed works raise serious questions"); Menell Jan. Comments at 67.

[417] *See* CEA Nov. Comments at 4 ("some of the most publicized judgments are far in excess of what defendants are able to pay, which again raises questions about the marginal deterrence value of these massive sanctions") & n.15; Coleman (Cambridge) at 103-104 ("courts should consider or instruct juries to consider the ability to pay, because what's punitive for me and what's punitive for some very wealthy person or some very poor person are three different things."); CDT Nov. Comments at 7-8 ("[B]eyond a certain point, higher and higher damage awards likely have vanishingly small marginal impact on deterrence . . . [f]or individuals, damages on the measures of hundreds of thousands of dollars are likely well past the point at which additional damages cease to achieve additional deterrence."); CIS/EFF Jan. Comments at 2 (citing *The Scope of Copyright Protection: Hearing Before the S. Comm. On Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 12-13 (2014) (statement of David Nimmer, Professor from Practice, UCLA School of Law, Of Counsel, Irell & Manella, LLP, Los Angeles)). Public Knowledge also noted the significant economic impact statutory damage awards may have on individual infringers. *See* Griffin/PK (Cambridge) at 94.

[418] CIS/EFF Nov. Comments at 20. *See also* CIS/EFF Jan. Comments at 1 ("[l]acking any explicit connection to actual harm, or other guidelines for consistent application, damage awards are often excessive beyond any reasonable measure of either compensation or deterrence"); CCIA Nov. Comments at 4 (questioning the "additional marginal deterrence . . .achieved by multiplying judgments tenfold"); Public Knowledge Nov. Comments at 30 & n.63 and accompanying text (citing scholarly commentary and cases raising potential due process concerns); CCIA Nov. Comments at n.12 (listing cases in which federal judges questioned awards); Menell Jan. Comments at 29.

Those arguing against any changes reasoned that the statutory damages system is flexible enough to accommodate appropriate remedies for noncommercial individual actors.[419] One commenter stated that the status of the individual, or the activity in which he is engaged, should be a factor for the court to consider in determining where within the range of statutory damages the award should fall: if the activity is noncommercial, the award should fall lower in the range; if it is for-profit and commercial, the award should fall higher in the range.[420] In defending the potentially high awards in file-sharing cases, commenters pointed out that one individual can do a lot of harm even if the infringing activity was not commercial, especially in the case of pre-release works.[421] They noted that the defendants in the two cited cases were not merely downloading copyrighted works but also were found liable for uploading and mass distribution.[422] Moreover, some added that the defendants were found to have lied about their activities and continued to engage in illegal file-sharing even after receiving notice of their infringing behavior, and that both the juries and appellate courts in those cases determined that the statutory damages awarded were appropriate and justified.[423] It was pointed out that in recent cases involving default judgments against file-sharers, courts have rendered judgments "on the lower end of the allowable infringement scale."[424]

Several stakeholders argued that the amounts awarded as statutory damages ought to have some correlation to actual damages.[425] Yet others stressed that statutory damages are available in part because of the difficulty of proving the amount of harm. Independent filmmakers pointed out that damages for copyright infringement are difficult to calculate due to lack of adequate data from infringers, who do not typically keep records of their illegal reproductions or sales.[426] Another commenter stated that "[t]his is particularly true when you're looking at online infringements where a single case of uploading makes works available to the entire Internet population without authorization."[427] One noted the Eighth Circuit's statement that "Congress was well aware of the threat of noncommercial copyright infringement when it established the

---

[419] CA Jan. Comments at 21; Borkowski (LA) at 23-24; Tepp (Berkeley) at 160-61; Sheffner/MPAA (Nashville) at 15-16.

[420] Sheffner/MPAA (Nashville) at 15-16.

[421] *See* Aistars/CA (Alexandria) at 33-34, Tepp (Alexandria) at 72-73, Sheffner/MPAA (Nashville) at 29-30; Stilwell (LA) at 57-58 ("If an individual is leaking a copyrighted work before its street date, it causes substantial harm, and the courts should have the present level of discretion to address the really bad actor individuals[.]").

[422] CA Jan. Comments at 22 (stating that the award reflected "[Tenenbaum's] own admission . . . that he had distributed thousands of recordings beyond the thirty at issue and . . . that [he] was not simply downloading but also uploading and making the songs accessible to the entire internet").

[423] ASCAP *et al.* Jan. Comments at 7; RIAA Nov. Comments at 9.

[424] Aistars/CA (Alexandria) at 63.

[425] CIS/EFF Nov. Comments at 25 (proposing a correlation between actual damages and statutory damages, or requiring that plaintiffs show why actual damages cannot be proven); Menell Jan. Comments at 78. Additional proposals are listed in Part 3 (Statutory Damages) II.B.3, *below*.

[426] IFTA Nov. Comments at 4.

[427] Aistars/CA (Alexandria) at 32-33. *See also* Tepp (Alexandria) at 28.

lower end of the range."[428] Several observed that statutory damages need not bear any relationship to actual damages and that deterrence of future infringement by other potential infringers as well as the defendant is an important purpose of statutory damages awards.[429] On the other hand, one commenter wrote that "no commenter provides any evidence that damages are difficult or impossible to prove in every copyright suit, or even most," and argued that modern civil discovery tools can help calculate actual harm.[430]

### b.  Inconsistencies in Application

A number of commenters asserted that because there is no specific set of factors or guidelines to be used in calculating statutory damages awards, troubling inconsistencies in their levels can arise.[431] One commenter pointed out that damages are "untethered from anything."[432] While few examples involving file sharing were offered, the four different verdicts in the two cases discussed above represent a wide array of awards based upon similar or identical facts.[433]

Copyright owner groups as well as consumer advocates and other stakeholders suggested that it would be helpful to provide courts with guidance on factors to consider when setting statutory damages awards.[434] Several noted that although some model jury instructions already exist,[435] they are not being used in a consistent manner or in every circuit.[436]

---

[428] CA Jan. Comments at 21 (quoting *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 908-09 (8th Cir. 2012)).

[429] Sheffner/MPAA (Berkeley) at 137; Marks/RIAA (Nashville) at 17; Aistars (Alexandria) at 32-34; CA Jan. Comments at 19-20, 22-23; RIAA Nov. Comments at 9-11; SIAA Jan. Comments at 17, 19-20; AAP Nov. Comments at 9-10; MPAA Nov. Comments at 7.

[430] CIS/EFF Jan. Comments at 2 (emphasis in original). *See also id*. at 3 ("We believe reliable research will show that proof of damages (to the degree ordinarily required by courts) will be readily available in most copyright cases, and that such proof is not categorically more difficult in copyright cases. If so, statutory damages should be explicitly tied to actual harm, or a reasonable multiple in cases of willful infringement, perhaps with an exception for cases where proof of damages is truly and demonstrably impossible to obtain.").

[431] CCIA Nov. Comments at 6 (noting that "[c]ourts could benefit from more guidance for calculating damage awards than merely stating, as 17 U.S.C. §504(c)(1) does, 'as the court considers just.'"). *See also* Samuelson and Wheatland, *Statutory Damages, a Remedy in Need of Reform*, 51 WM. & MARY L. REV. 439, 501-09 (2009), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1375604 (proposing "a set of principles for awarding statutory damages in copyright cases"); CIS/EFF Jan. Comments at 1-4 (stating that absent statutory guidelines and consistent caselaw, "copyright litigation becomes a high-stakes casino game").

[432] Sohn/CDT (Alexandria) at 25 ("[statutory] damages . . . aren't tied to the amount of harm caused. They aren't tied in any way to the amount of unjust profits or any realistic assessment of what an appropriate deterrent would be.").

[433] *See above* note 414 and accompanying text. *See also* Pamela Samuelson, Phil Hill &Tara Wheatland, *Statutory Damages: A Rarity in Copyright Laws Internationally, But For How Long?* 60 J. COPYRIGHT SOC'Y 529, 553 & n.101 (Summer 2013) (citing cases to illustrate the point that even identical fact patterns can result in different award amounts) (referenced by CEA Nov. Comments at 3 n.12; DiMA Nov. Comments at 8 n.18).

[434] *See, e.g.*, RIAA Nov. Comments at 11; DiMA Nov. Comments at 9 ("[P]olicymakers should consider at a minimum enacting mandatory guidelines that would outline the proper factors that courts should consider when imposing statutory damage award."); CIS/EFF Nov. Comments at 27 ("Congress should enact a set of guidelines for judges and juries in setting statutory damage amounts. Such guidelines would make damages awards more

c.   Litigation Abuse

Several commenters claimed that the potential high levels of statutory damages are linked to troubling enforcement tactics, often at the expense of individual defendants.[437] In their view, the statutory damages regime has helped foster a "nationwide plague of lawsuit abuse over the past three years" by entities that they label "copyright trolls."[438] They pointed to reports that attorneys representing copyright holders have filed hundreds of lawsuits against tens of thousands of anonymous Internet users,[439] representing a substantial percentage of copyright suits filed in the federal courts in recent years.[440] According to the commenters, these cases are rarely if ever litigated; instead, attorneys file "boilerplate complaints based on a modicum of evidence, calculated to maximize settlement profits by minimizing costs and effort"[441] and use the courts' subpoena power to identify Internet users, often in multiparty John Doe actions.[442] Then, commenters allege, they engage in a campaign of threats of high potential damages and harassment to coerce their targets into paying settlements of $2,000 to $10,000.[443] This is a

---

predictable, and predictability would make the law a better guide for public behavior, allowing users of copyrighted works to better assess risk and act accordingly."); Samuelson (Berkeley) at 157.

[435] *See below* note 521.

[436] Perzanowski (Nashville) at 35-36 ("Sometimes [juries] are given guidance, sometimes there are factors that are helpful. That's not always the case, right? And so if we think these factors are useful, maybe one thing that we should do is talk about building those factors not into jury instructions, but building them into the statute."); Sheffner/MPAA (Berkeley) at 154-55 (observing that juries in some circuits are "given a number of factors" and that the jury system "is sometimes unpredictable").

[437] *See, e.g.* Menell Jan. Comments at 64 ("Many of those who continue to wield the statutory damage cudgel are widely viewed as opportunists looking for undeserved windfalls."); CDT Nov. Comments at 8; Bridges Nov. Comments at 1-12.

[438] CIS/EFF Nov. Comments at 21.

[439] Stoltz/EFF (LA) at 43 (noting that "multi-defendant John Doe lawsuits" accounted for "one-third of all copyright suits filed in the United States in 2013" (citing Matthew Sag, *Copyright Trolling, An Empirical Study,* 100 IOWA L. REV. 1105, 1108-09 (2015)); Internet Association Nov. Comments at 4 (citing James DeBriyn, *Shedding Light on Copyright Trolls: An Analysis of Mass Copyright Litigation in the Age of Statutory Damages,* 19 UCLA ENT. L. REV.79, 91 (2012) ("Nearly 100,000 Does were named in copyright lawsuits over a period of thirteen months, starting from January 1, 2010")); ICC Nov. Comments at 4.

[440] *See* Menell Jan. Comments at 32-33 (noting lawsuits against thousands of porn file-sharers). *See also* Sag, note 439 *above*, at 117 ("[Multi-defendant John Doe" copyright lawsuits] were almost non-existent ten years ago. As of 2013, they were the majority of filings in 19 of the 92 federal district courts.").

[441] CIS/EFF Nov. Comments at 21 (quoting *Ingenuity 13 LLC v John Doe,* No 2:12-cv-8333ODW, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013) (issuing sanctions against principals of Prenda Law)). *See also* Menell Jan. Comments at 33 (quoting court's description of lawsuits that are "essentially an extortion scheme" in *Malibu Media, LLC v. John Does 1 through 10,* 2012 WL 5382304 *3 (C.D. Cal. 2012)).

[442] In John Doe actions, defendants are identified initially as "John Doe" because their actual identity is unknown. *See John Doe Definition,* DICTIONARY.COM, http://dictionary.reference.com/browse/john-doe (last visited Oct. 28, 2015). For example, Prenda filed suit against over 1,000 John Does in a single case seeking to obtain identifying information about the defendants. *See* Bridges Nov. Comments at 11.

[443] CIS/EFF Nov. Comments at 21. *See* Bridges Comments at 4-10 (many accused infringers capitulate to demand letters to avoid the risks and costs associated with litigation); CDT Comments at 8 (asserting that the current statutory damages regime "can lead to a 'shakedown' dynamic"); NMR Nov. Comments at 24 ("This has created a

particular concern with respect to suits about copyrights covering adult content, where the Task Force has noted a large number of settlements that may have been motivated in part by the defendants' desire to avoid having their names associated with such content.[444] Such "predatory" enforcement may contribute to a negative public image of copyright.[445]

This behavior was characterized as the product of a "litigation business model where a plaintiff uses copyright law 'not to protect its property from unlicensed use, but rather to generate profit from use even in the absence of articulable harm to' the plaintiff."[446] One commenter stated that "[h]olders of low-value copyrights in unsuccessful movies or low-cost pornography, and even invalid assignments of rights in newspaper articles, use the threat of statutory damages to turn litigation threats into a profit center."[447] Another predicted that if statutory damages were calibrated to much lower levels, then this behavior would disappear.[448]

While some copyright owners acknowledged that there have been instances of "overly aggressive litigators" pursuing actions against individual file-sharers to extract quick settlements, they rejected the idea that such tactics are "the result of copyright law in general or the current statutory damages regime in particular."[449] They asserted that in contrast to the "patent trolls"[450] that have been the subject of recent scrutiny in Congress, it appears unlikely that "copyright

---

climate in which large-scale plaintiffs frequently exploit small-scale defendants' lack of sophistication and resources to extract inappropriate settlements from them.").

[444] *See* Green Paper at 47 & n.243. *See also* Matthew Sag, *Copyright Trolling, An Empirical Study,* 100 IOWA L. REV. 1105, 1108-09 (2015) (referenced by Stoltz/EFF (LA) at 43) (describing a large increase in lawsuits by that industry and noting that "of the 3817 copyright law suits filed in 2013, over 43% were against John Does and more than three-quarters of those related to pornography").

[445] AIPLA Jan. Comments at 7-8; Bridges Nov. Comments at 11-12; CDT Jan. Comments at 6-8; Menell Jan. Comments at 32-33 (discussing Righthaven and porn file-sharing suits as support for position that the public perception of copyright law has declined significantly in the post-Napster era and that this decline impacts the law's efficacy and vitality); Samuelson (Berkeley) at 167-68 (remarking that the "disrespect issue is even more serious than the troll issue").

[446] IAC Nov. Comments at 4 (quoting James DeBriyn, *Shedding Light on Copyright Trolls: An Analysis of Mass Copyright Litigation in the Age of Statutory Damages,*" 19 UCLA ENT. L. REV.79, 89 (2012)); Coleman (Cambridge) at 114. The economic viability of these suits is said to depend upon suing as many defendants as possible in a single action to keep costs low, leveraging the threat of high statutory damages awards in order to maximize the defendants' willingness to settle. *See* Bridges Nov. Comments at 11; Sag, *above* note 439, at 1109-10, 1116, 1129 & 22.

[447] CIS/EFF Nov. Comments at 22 (footnotes omitted); *see also* Menell Jan. Comments at 32.

[448] Bridges Nov. Comments at 14.

[449] CA Jan. Comments at 22.

[450] The term "patent troll" has been used to refer to "a person or company that . . . focuses on aggressively or opportunistically enforcing [] patent[s] against alleged infringers" after having "acquire[d] such patents with no intent to use, further develop, produce, or market the patented inventions." Black's Law Dictionary 1219 (10th ed. 2014). Several bills have recently been introduced to combat litigation abuse by such entities. Protecting American Talent and Entrepreneurship Act (PATENT) Act, S.1137, 114th Cong. (2015); Targeting Rogue and Opaque Letters Act (TROL), H.R. 2045, 114th Cong. (2015); Demand Letter Transparency Act, H.R. 1896, 114th Cong. (2015); The Innovation Act, H.R. 9, 114th Cong. (2015).

trolls" will become a pervasive problem.[451] They stated that "the major content industries have abandoned aggressive direct enforcement against file-sharers and have emphasized ways of channeling consumers into a growing range of authorized channels."[452]

A number of commenters pointed out that courts have already stopped the litigation efforts of the two most well-known enforcement entities, Righthaven and Prenda Law, and have sanctioned the parties and counsel involved.[453] One copyright owner association asserted that, as a result of such corrective actions by the courts, "these schemes have crumbled under their own weight" and that the failure of such abusive litigation schemes "will likely deter future efforts at similar conduct."[454] In its view, the solution to the "copyright troll" problem that some commenters seek—capping potential awards of statutory damages—is not only unnecessary, but would "undermine the ability of copyright owners with legitimate claims to enforce their rights."[455] Some urged that even a narrowly focused cap on statutory damages to combat trolling behavior would be inappropriate, since in the digitally networked environment an individual infringer is capable of causing just as much harm as a corporation.[456]

---

[451] AAP Jan. Comments at 15-16. *See also* Tepp (LA) at 60-61.

[452] Menell Jan. Comments at 67. *See also* Bridges Nov. Comments at 3 (noting that the RIAA "announced that it had abandoned the practice of seeking statutory damages for music downloads").

[453] Menell Jan. Comments at 33 & n.129; CA Jan. Comments at 22; AAP Jan. Comments at 15-16 (citing *Ingenuity 13 LLC v. John Doe*, Case No. 12-cv-8333-ODW, 2013 WL 1898633, at 1-2*, *5 (C.D. Cal., May 6, 2013)); *see also* Bridges Nov. Comments at 5-9 (discussing *Righthaven* and *Prenda* litigation). Numerous courts have ordered Righthaven to pay attorneys fees to prevailing defendants *See, e.g., Righthaven LLC v. Wolf,* 813 F. Supp. 2d 1265 (D. Colo. 2011); *Righthaven LLC v. DiBiase,* No. 2:10-cv-01343-RLH -PAL, 2011 U.S. Dist. LEXIS 124127 (D. Nev. Oct. 26, 2011); *Righthaven LLC v. Hoehn,* No. 2:11-cv-00050-PMP-RJJ, Doc. 43, Order Granting Defendant's Motion for Attorney's Fees (D. Nev. Aug. 15, 2011); *Righthaven LLC v. Democratic Underground, LLC,* No. 2:10-cv-01356-RLH-GWF, 2012 U.S. Dist. LEXIS 82301 (D. Nev. June 14, 2012); *Righthaven LLC v. Leon,* No. 2:10-cv-01672-GMN-LRL, 2011 U.S. Dist. LEXIS 72043 (D. Nev. July 5, 2011). *See also Righthaven LLC v. Democratic Underground, LLC,* No. 2:10-cv-01356-RLH-GWF, Transcript of Order to Show Cause Hearing & Minutes of Proceedings from Show Cause Hearing, Docs. 137-38 (D. Nev. July 14-15, 2011) (sanctioning Righthaven in the amount of $5,000, pursuant to Fed. R. Civ. P. 11 and the court's inherent authority, for intentional misrepresentations to the court).

[454] MPAA Jan. Comments at 13.

[455] *Id. See also* CA Jan. Comments at 22 ("Copyright owners as a whole should not be punished for the short-lived, ill-advised litigation tactics employed by a small number of individuals, since judicial safeguards against those sort of actions are already readily available and used by courts when appropriate."); Borkowski/RIAA (Cambridge) at 116 ("there are ways not to throw the baby out with the bath water, because there are legitimate uses of statutory damages."); Tepp/U.S. Chamber (Berkeley) at 160-61; Matthew Sag, *Copyright Trolling, An Empirical Study,* 100 Iowa L. Rev. 1105, 1114-15 (2015) (arguing that "[n]ot all BitTorrent lawsuits qualify as copyright trolling" and pointing to the RIAA's campaign of lawsuits against individual file-sharers from 2003-2008 as an example of litigation that was not intended to create a revenue stream but rather was intended to deter) (referenced by Stolz (LA) at 43).

[456] MPAA Jan. Comments at 13.

### d. Solutions Proposed by Stakeholders

Based on the concerns described above, a number of commenters urged that individual infringers should be treated differently, subject to a lower range of statutory damages.[457] One expressed a preference for legislation that would "recalibrate" statutory damages in cases against individuals, such as by reducing the maximum permissible awards.[458] Several stakeholders suggested the creation of guidelines in order to avoid disproportionate or unpredictable results.[459]

Another proposal was to provide special treatment for "non-commercial" infringements. For example, commenters sought reductions in the minimum and maximum statutory damages awards in cases involving personal, noncommercial uses of copyrighted works, including but not limited to file-sharing.[460] With respect to the maximum award, some commenters pointed to Canadian law, which places a $5,000 maximum on non-commercial uses.[461] One proposed that the total amount of statutory damages awarded in a single case should be capped at $150,000.[462] That commenter also recommended separating the compensatory function of statutory damages from the deterrence function by having separate provisions for each, arguing that if those functions were separated, "courts would not be tempted to confuse the two and award beyond-punitive damages against everyday individual infringers."[463]

Another commenter proposed that plaintiffs be required to make an election of statutory damages prior to trial or the filing of a summary judgment motion,[464] as a means to avoid their "gaming the system" by threatening draconian statutory damages throughout litigation in order to extract higher settlements. In addition, it suggested aligning the statutory damages "willfulness" standard with that set forth by the Federal Circuit for willful patent infringement, requiring the

---

[457] For example, Public Knowledge stated that potentially high litigation costs, attorneys' fees, and actual damages awards are powerful deterrents in and of themselves so that there is no need for statutory damages awards to be so high for individual infringers. Griffin/PK (Cambridge) at 100.

[458] CDT Nov. Comments at 10-11.

[459] *Id. See* discussion *above*, notes 434 & 436.

[460] CIS/EFF Jan. Comments at 36 & n.79. *See* Herlihy (Cambridge) at 91 (suggesting a statutory damage award of $750 per work.); Bridges Nov. Comments at 14 (proposing awards below the $750 statutory minimum for file-sharing cases).

[461] *See* Bridges Nov. Comments at 13-14; CIS/EFF Nov. Comments at 26. In contrast to the "per work" amount set forth in the United States, the Canadian cap applies to "all works" in a proceeding. Section 38.1 of [Canada] Copyright Act, RSC 1985 (authorizing statutory damages between $500 and $20,000 for commercial infringement and between $200 and $5,000 for infringements for non-commercial purposes, "with respect to all infringements involved in the proceedings for all works or other subject matters"), *available at* http://laws-lois.justice.gc.ca/eng/acts/C-42/page-41.html (last accessed on Nov. 17, 2015).

[462] Bridges Nov. Comments at 13. Bridges further suggested that the $150,000 cap apply to the total awards against all defendants in a single case, and in addition, that it apply to "all cases the copyright holder files against the same defendants in a single 36-month period." *Id.*

[463] *Id.* at 14 (citing Pamela Samuelson & Tara Wheatland, *Statutory Damages in Copyright Law: A Remedy in Need of Reform*, 51 WM. & MARY L. REV. 439, 509 (2009)).

[464] CCIA Nov. Comments at 7. Under existing law, a plaintiff may elect statutory damages at any time before final judgment is entered. 15 U.S.C. § 504(c)(1).

plaintiff to "show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement."[465]

Some tied the possibility of a separate forum for small claims to the issue of statutory damages, suggesting that such a forum would provide a more effective venue for individuals to resolve copyright disputes.[466] This approach was welcomed by a number of rights holders, who supported the idea of a small claims forum where cases could be brought against individual infringers in a cost-effective way.[467] Implicit in these proposals is that, as the Copyright Office recommended in its 2013 report on small claims, there would be a cap on the amount of statutory damages that could be awarded.[468] An association of Internet and e-commerce companies was also positive about this idea, remarking that the "result would be an enforcement option for rights owners that both is far much less expensive to bring and that yields damages awards that are proportionate to the offense and enjoy broad legitimacy."[469] One commenter predicted that the establishment of a small claims forum would itself increase deterrence if infringers knew that hundreds of copyright owners were now able effectively to assert their rights.[470]

Another suggested approach to the issue of individual infringers was to focus on copyright education. Several copyright owner groups stated that educating users about legal options for accessing content is the primary approach to direct individuals away from infringement, coupled with graduated response systems that involve sending alerts "to direct individuals away from infringement."[471]

---

[465] CCIA Nov. Comments at 7 (citing *In re Seagate Technologies*, LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007)). *See also* IAC Nov. Comments at 5 (questioning whether "willfulness" "should mirror the *Seagate* definition in patent law.").

[466] *See, e.g.*, Menell Jan. Comments at 67 & 75 (arguing that a "parking ticket" approach to copyright infringement through a small claims tribunal for non-commercial, small-scale infringements would "impose just enough cost upon file-sharers to encourage participation in what is hope will be a growing competitive marketplace for content"); Pietz (LA) at 36; NMR Nov. Comments at 24-29.

[467] ICC Nov. Comments at 4 (arguing that high statutory damages in individual federal court infringement actions "are poorly tailored to address problems of individual infringement"); SGA Nov. Comments at 1-4; Carnes/SGA (Nashville) 25-26, 63. *See also* MPAA Jan. Comments at 7 (supporting Copyright Office inquiry into feasibility of creating a copyright small claims court).

[468] The Copyright Office recommended that a copyright tribunal be established within the Copyright Office to serve as a voluntary alternative for litigation of low-value infringement claims, with a $15,000 per work cap on statutory damages and a $30,000 cap on all damages (actual or statutory) in a single action. U.S. COPYRIGHT OFFICE, COPYRIGHT SMALL CLAIMS: A REPORT OF THE REGISTER OF COPYRIGHTS 4 (September 2013) [hereinafter "COPYRIGHT OFFICE SMALL CLAIMS REPORT"], *available at* http://copyright.gov/docs/smallclaims/usco-smallcopyrightclaims.pdf.

[469] ICC Nov. Comments at 4. *See also* Menell Jan. Comments at 75; NMR Nov. Comments at 24-25; SGA Nov. Comments at 1-4.

[470] Carnes/SGA (Nashville) at 25-26.

[471] *See* CA Jan. Comments at 21. *See also* Marks/RIAA (Nashville) at 24; A2IM Nov. Comments at 4. Another commenter suggested that a graduated response program "should significantly reduce the extent to which copyright owners need to sue" individuals in order to reduce illegal file sharing. Sydnor Nov. Comments at 5.

## 2.   Secondary Liability for Large Scale Online Services

### a.   Chilling Effects

With respect to online service providers, the question posed by the Task Force was how statutory damages should be calculated in cases involving secondary liability where hundreds of thousands of works may have been infringed.[472] In addition to concerns expressed about statutory damages generally, the comments most relevant to this question focused on whether potentially huge statutory damages awards have a "chilling effect" on innovation and investment.

Critics of the current statutory damages regime pointed to a number of lawsuits against technology companies, generally involving services offering methods of digital distribution that enable large-scale copyright infringement by third parties.[473] In determining the responsibility of these companies for the illegal activities of the users, the courts have applied various theories of direct and secondary liability.[474] Although many of these cases ultimately settled, the levels of potential liability have fueled headlines and commentary.[475]

Technology companies and public interest advocates asserted that the magnitude of statutory damages awards available in such cases have had a chilling effect on innovation and

---

[472] Green Paper at 52.

[473] Cases cited include: *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 313 (S.D.N.Y. 2011) (identified in Internet Society Jan. Comments at 4-5; Menell Jan. Comments at 77-78) (*Limewire*); *Disney Enterprises, Inc. v. Hotfile Corp.*, No. 11-20427-CIV, 2013 U.S. Dist. LEXIS 172339 (S.D. Fla. Aug. 28, 2013), *aff'g in part*, 798 F. Supp. 2d 1303 (S.D. Fla. 2011 (noted by CEA Nov. Comments at 2); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3D 1020 (9th Cir. 2013), *cert. dismissed sub nom., Fung v. Columbia Pictures Indus.* 134 S. Ct. 624 (2013) (*Isohunt*) (identified in CEA Nov. Comments at 4; WGAW Jan. Comments at 2); *In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003) (referenced in Menell Jan. Comments at 21); *UMG Recordings, Inc. v. MP3.com, Inc.*, No. 00 Civ. 472 (JSR), 2000 WL 1262568 at *1, *6 (S.D.N.Y. Sept. 6, 2000) (identified, *inter alia,* in Carrier Jan. Comments at 11-14; CIS/EFF Nov. Comments at 23-24); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 US 913 (2005) (*Kazaa and Grokster*) (identified by Menell at 21); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (2001) (identified by Menell at 21; CEA at 2); *Paramount Pictures Corp. v. ReplayTV, Inc.*, 298 F. Supp. 2d 921 (C.D. Cal. 2001) (discussed in CEA Nov. Comments at 2, n.2; referenced by CIS/EFF Nov. Comments at 23). *See also* Menell Jan. Comments at 20-21, 28, 77-78 (discussing ReplayTV, Kazaa, Grokster, Morpheus, Scour, Napster, MP3.com, MP3Board.com, and Limewire); Green Paper at 49.

[474] *See* Green Paper at 47-48. Attempts have also been made to extend secondary liability to cover investors, corporate officers and directors in such services. *See* Carrier Jan. Comments at 5-6 & 14-15; CCIA Nov. Comments at 5; CEA Nov. Comments at 2.

[475] *See, e.g.,* Jim Hu, *Ruling Against MP3.com Could Cost $118 million,* CNET, Jan. 2, 2002, *available at* http://www.cnet.com/news/ruling-against-mp3-com-could-cost-118-million/ (reporting award of $25,000 per violation against MP3.com, "possibly exposing the company to damages of $118 million") (cited in Carrier Comments at 11 note 35); Dawn Kawamoto, *Lawsuits Dampen VCs' File-sharing Enthusiasm,* CNET NEWS, Sept. 4, 2000, *available at* http://news.cnet.com/2100-1023-245275.html ("The threat of vicarious liability has scared off many venture firms from the file-sharing arena") (cited in Carrier Comments at 15). *See also* Menell at 18-24 (describing the post-Napster litigation); Greg Sandoval, *Lime Wire settles with RIAA for $105 million,* CNET, May 12, 2011, *available at* http://news.cnet.com/8301-31001_3-20062418-261.html (noting that Lime Wire's chairman and CEO Mark Gorton was found personally liable for copyright infringement and could have been required to pay up to $1.4 billion and reported that the plaintiffs "pressed for a $75 trillion verdict [that] the Court labeled [] 'absurd'") (cited, for another purpose, in RIAA Nov. Comments at 10 & n.32).

investment.[476] One commenter cited an amicus curiae brief to the Supreme Court by a group of venture capitalists arguing that statutory damages have "crushing implications for vendors of multi-purpose technologies, where damages from unforeseen users can quickly mount in the millions or even billions of dollars[,]" and that in this respect secondary liability for copyright infringement is "qualitatively different from most other sorts of business risks that investors can insure against or build into their business calculations."[477] Another commenter pointed to a survey of investors in digital content intermediaries that it said confirmed "that uncertainty around liability risks deter[ring] investment in this field."[478]

Commenters also pointed to innovative companies that they say were bankrupted by litigation even though they were ultimately found to be non-infringing.[479] According to one commenter, potential statutory damages will deter some new business plans that rely on fair use from moving forward.[480] At the same time, several noted that "[e]vidence for the innovation-chilling effect

---

[476] Carrier Jan. Comments at 15, 17-18; CCIA Nov. Comments at 4; CDT Nov. Comments at 8-9 (listing cases and potential awards); CIS/EFF Nov. Comments at 23 (listing new technologies, such as ReplayTV and MP3.com, allegedly driven out of business by copyright lawsuits); IAC Nov. Comments at 2-4; CEA Nov. Comments at 2-3. *See also* AIPLA Jan. Comments at 7 ("The potential for extremely high statutory damages may discourage innovation by mass digitization and online services that use large numbers of copyrighted works.").

[477] CDT Comments at 10 (quoting the Brief of the National Venture Capital Association as Amicus Curiae in Support of Respondents to the Supreme Court in *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913 (2005)). *See also* CCIA Nov. Comments at 7 (noting that for online services "[t]he $750 floor means that . . . potential damages quickly reach uninsurable levels that deter investment"). Another commenter asserted that venture capitalists are cautious because personal liability has been common in copyright cases, and "[a]s a result, small firms with disruptive new ideas often will not be able to bring the ideas to the market. In fact, such a chilling effect at least partially explains why funding for these firms has fallen in recent years." Carrier Jan. Comments at 15.

[478] CCIA Nov. Comments at 5 (citing Matthew Le Merle *et al.*, Booz & Company, *The Impact of U.S. Internet Copyright Regulations on Early-Stage Investment: A Quantitative Study* (2011), *available at* http://www.strategyand.pwc.com/media/uploads/Strategyand-Impact-US-Internet-Copyright-Regulations-Early-Stage-Investment.pdf). CCIA also asserted that that a Second Circuit decision creating "legal certainty" inspired up to an estimated $1.3 billion in investment in U.S. cloud computing firms. *See id.* at 5 (citing Josh Lerner, Analysis Group, *The Impact of Copyright Policy Changes on Venture Capital Investment in Cloud Computing Companies* (2011), *available at* http://www.analysisgroup.com/uploadedfiles/content/insights/publishing/lerner_fall2011_copyright_policy_vc_investments.pdf (last visited Oct. 2, 2015).

[479] IAC Nov. Comments at nn.8-9 (citing Eliot Van Buskirk, *Veoh Files for Bankruptcy After Fending Off Infringement Charges*, Wired, Feb. 12, 2010, *available at* http://www.wired.com/2010/02/veoh-files-for-bankruptcy-after-fending-off-infringement-charges/ (reporting that Veoh, after prevailing in a copyright infringement suit filed by Universal Music Group, entered bankruptcy due to "distraction of the legal battles, and the challenges of the broader macro-economic climate") and Ali Sternburg, *15 Technologies That Content Industries Sued After Diamond Rio*, Disruptive Competition Project, October 8, 2013, *available at* http://www.project-disco.org/intellectual-property/100813-15-technologies-that-content-industries-sued-after-diamond-rio/, (an article cataloguing 15 different new technologies that were sued over the previous 15 years and identifying ReplayTV, Mp3.com, MP3Tunes, iCraveTV, ClearPlay, Veoh, Vimeo, YouTube, Cablevision, Zediva, Redigi, Dish Hopper, Aereo, TVEyes); CIS/EFF Nov. Comments at 23 (referring to ReplayTV and MP3.com as having been "driven out of business by copyright lawsuits.").

[480] *See* Bridges Jan. Comments at 10-11.

will . . . usually not be readily apparent. In most cases, the public doesn't see and will likely never know about the innovations that don't happen and the features that aren't offered."[481]

Critics raised questions as to whether the rationale for calculating statutory damages on a per-work basis is appropriate, given that the service providers are unable to directly control the number of works infringed by their users, and in light of the sheer number of works that may be involved.[482] Several commenters expressed the view that the statutory damages amounts awarded for large-scale infringement are inappropriate because they are "punitive" in nature, claiming that there is "no evidence that . . . large statutory damages are necessary or beneficial."[483] One referred to such damages as a "corporate death penalty" that was never intended by Congress.[484] They challenged the view that statutory damages of this magnitude are necessary to deter infringement,[485] and asserted that in these circumstances too they should be calibrated to actual harm.[486]

In contrast, rights holder groups disputed the claimed "chilling effect" on innovation, asserting a lack of support by empirical evidence.[487] Several pointed to the many existing services as evidence that the availability of statutory damages does not compromise the development of legitimate digital content services.[488] One academic who was generally critical of high statutory damages awards acknowledged that although "it seems reasonable to surmise that digital technology innovators would invest their resources and energies elsewhere" in light of such "potentially crushing liability," in fact there has been "no shortage of tantalizing new digital

---

[481] CDT Nov. Comments at 9 (noting also that "[t]he threat of massive statutory damages [that] forced [a defendant] to seek a declaratory judgment before rolling out the product, slowing the pace of innovation substantially"). *See* AIPLA Jan. Comments at 7 ("It is difficult, if not impossible, to quantify empirically how much innovation is discouraged by the current statutory damages system. Nevertheless, the potential legal exposure may create incentives that undermine investment in technologies, even where services have a good faith belief that their actions are lawful.").

[482] CDT Comments at 10 ("The argument that statutory damages need recalibration in cases of secondary liability is particularly strong because a secondary infringer doesn't control the number of works ultimately infringed. . . . Internet platforms operate at massive scale, meaning that users' infringements can quickly multiply and escalate a platform's possible damages to incredible heights."). *See also* PK Nov. Comments at 32-33.

[483] CDT Nov. Comments at 10. *See also* PK Nov. Comments at 31, CIS/EFF Nov. Comments at 20; CCIA Nov. Comments at 4 ("When cases are brought against an intermediary for third party conduct, particularly where the intermediary was endeavoring to comply with the DMCA, a punitive mechanism is generally inappropriate.").

[484] Carrier Jan. Comments at 16. Carrier also noted that high awards also make it difficult for a small company to post bond to appeal an adverse judgment. *Id.* at 12.

[485] CDT Nov. Comments at 9 ("for most legitimate businesses, the risks of having the business declared unlawful and shut down and then having to pay actual damages and profits would be significant enough to deter business models based on blatant or rampant infringement."); CCIA Nov. Comments at 4.

[486] Menell Jan. Comments at 78; Stoltz/EFF (LA) at 45 (" . . . [it] is really especially true in the secondary liability context that we have to start with the actual harm"). *See also* IAC Nov. Comments at 5 (requesting the Task Force to consider whether damages should be calculated to approximate actual damages).

[487] IPO Jan. Comments at 4.

[488] RIAA Nov. Comments at 10 (listing legitimate new services that developed notwithstanding *LimeWire* case that settled for $105 million.); ASCAP *et al*. Jan. Comments at 7; Digital Liberty Jan. Comments at 3.

technologies—from the iPod to image search engines, YouTube, Facebook, Google's Book Search, BitTorrent, iPhone, iPad, Kindle, and Twitter—that could be (and have been) portrayed as facilitating copyright infringement."[489]

### b. Deterrence and Incentives

Copyright owners stressed that one of the main advantages of the current statutory damages regime is its deterrent effect against highly damaging behavior. They argued that high levels of statutory damages are necessary in order to thwart massive infringing activity, and therefore courts must have the power to award them. They also asserted that the costs and efforts associated with trying to shut down illegal file-sharing "enterprises" that reach audiences of millions justify large damages.[490] As to the arguments against the punitive aspect of such damages, the MPAA remarked that "[t]he concept behind secondary liability is that the intermediary has profited from or knowingly contributed to the infringement at issue. If such intermediaries are 'being penalized,' it is because of their own connection to the infringing activity, not as helpless or disinterested victims of third-party behavior."[491]

In the copyright owners' view, statutory damages are important to incentivize online services to implement access and use controls to avoid massive infringement, especially where new technologies make it easy to distribute copyrighted content without authorization.[492] Several also expressed the view that rather than hindering the development of legitimate services or platforms, statutory damages have promoted the creation and development of new distribution services, providing them protection from competition by infringing services and from other forms of piracy.[493]

### c. Solutions Proposed by Stakeholders

Those concerned about excessive awards against online services proposed solutions similar to some proposed with respect to individual infringers. Among the solutions offered, either to apply in all cases, or only with respect to online services, were:

- Adopting mandatory factors to be considered in assessing statutory damages.[494]

- Ensuring that statutory damages more closely track actual harm, damages, or profits.[495]

---

[489] Menell Jan. Comments at 78 (concluding that "[t]he relatively modest capital requirements associated with innovation in digital distribution technologies, research and social norms, risk and liability-insulating institutions, and the importance of technological advance in fields unaffected by copyright liability dampen the chilling effects of disproportionate copyright liability").

[490] ITIF Nov. Comments at 3.

[491] MPAA Jan. Comments at 12.

[492] A2IM Nov. Comments at 4; AAP Nov. Comments at 10.

[493] IFTA Nov. Comments at 4 ("Rather than hinder the development of legitimate services or platforms to deliver content, statutory damages provide an essential mechanism of protection for legitimate portals that license independent films and television programming."); Tepp (Alexandria) at 28-29.

[494] DiMA Nov. Comments at 9; CIS/EFF Nov. Comments at 27.

- Requiring the plaintiff to demonstrate why actual damages or profits are particularly difficult to prove.[496]

- Reducing the minimum per work award,[497] or limiting the total amount of statutory damages that may be awarded in a single case against all defendants or within a set time period.[498]

- Reducing or denying statutory damages when the defendant reasonably believed that its use of the copyrighted work was non-infringing, or had a strong if ultimately losing fair use claim.[499]

- Giving courts discretion whether to apply the "per-work multiplier."[500]

- Exempting secondary infringers entirely from statutory damages.[501]

### 3.    The Innocent Infringement Defense

Although the Task Force did not specifically request comments relating to the innocent infringement provision of Section 504 of the Copyright Act,[502] which allows the reduction or remittitur of statutory damages in certain circumstances, a few commenters proposed its reform, including but not limited to cases involving individual file-sharing and online services.

Several asserted that, in practice, the reduced minimum amounts have rarely been awarded.[503] One study found "only two cases in the four-decade history of the current Copyright Act in which the defendant successfully invoked the discretionary 'innocent infringer' reduction in

---

[495] CDT Nov. Comments at 11; Menell Jan. Comments at 78; CIS/EFF Nov. Comments at 25 ("in ordinary cases without evidence of particularly egregious conduct, courts could limit statutory damages to small multiples (two or three times) over actual damages or profits").

[496] CIS/EFF Nov. Comments at 26.

[497] CCIA Nov. Comments at 6-7.

[498] Bridges Nov. Comments at 13.

[499] CIS/EFF Nov. Comments at 25; CDT Nov. Comments at 11. *See* discussion below of proposals to amend section 504's innocent infringement provision.

[500] PK Nov. Comments at 35. By "per-work multiplier," the Task Force understands Public Knowledge to be referring to the requirement that a minimum of $750 *per work* be awarded in statutory damages.

[501] Carrier Nov. Comments at 19.

[502] Section 504 includes a procedure for reducing or remitting (*i.e.* refraining from imposing) statutory damages in cases of "innocent infringement." The minimum statutory damages award per work may be reduced from $750 to $200 when the "infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright." 17 U.S.C. §504(c) (2). Statutory damages will be completely remitted for employees of nonprofit educational institutions, libraries or archives who infringe the reproduction right, when they believed with reasonable grounds that the activity was a fair use. *Id.*

[503] Samuelson (Berkeley) at 148; CIS/EFF Jan. Comments at 3.

minimum damages."[504] The minimum damages provision was described as "almost useless"[505] because under Sections 401(d)[506] and 402(d),[507] the reduction is not available where a copyright notice appears on the infringed work.[508] Thus, "even if the infringer had a reasonable good faith belief that his or her action might fall within an exception or the terms of a license, a court cannot reduce the statutory damages if a notice was affixed to the work."[509]

The second prong of the "innocent infringer" provision, under which courts are required to remit statutory damages in limited circumstances, was also the subject of proposals for change. A library association commenter asserted that this provision "is of little benefit to libraries in the Internet age" because it applies only to the reproduction right and so does not cover many online uses that implicate other rights.[510] Motion picture companies objected to this proposal, noting that "internal library reproductions have far less of an impact on the market value of works than online (or offline) distributions and public performances."[511]

Library representatives took the position that the remittitur provision is too narrow in other respects as well. First, they noted that it applies only to cases in which the defendant had a good faith belief that the use was permitted under section 107, and not by any other exception to the Copyright Act.[512] They proposed that Congress modify the statute by permitting reduction or complete remittitur of statutory damages, regardless of whether copies of the infringed work bore a copyright notice, whenever the court finds that the defendant believed and had reasonable grounds for believing that his or her use did not infringe. They also proposed extending the benefit of remittitur beyond the current coverage of public broadcasters and employees of nonprofit educational institutions, libraries and archives to cover acts by "nonprofit institutions,

---

[504] CIS/EFF Jan. Comments at 3 (citing Pamela Samuelson & Tara Wheatland, *Statutory Damages in Copyright Law: A Remedy in Need of Reform*, 51 WM. & MARY L. REV. 439, 474-75 & n.175 (2009) (surveying copyright damages cases and finding two cases applying the "innocent infringer" minimum: *Warner Bros., Inc. v. Dae Rim Trading, Inc.*, 677 F. Supp. 740, 769-70 (S.D.N.Y. 1988), *aff'd in part by Warner Bros., Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1122 (2d Cir. 1989); *D.C. Comics, Inc. v. Mini Gift Shop*, 912 F.2d 29, 35-36 (2d Cir. 1990)).

[505] LCA Nov. Comments at 2.

[506] *See* 17 U.S.C. §401(d): " Evidentiary Weight of Notice.— If a notice of copyright in the form and position specified by this section appears on the published copy or copies to which a defendant in a copyright infringement suit had access, then no weight shall be given to such a defendant's interposition of a defense based on innocent infringement in mitigation of actual or statutory damages, except as provided in the last sentence of section 504 (c) (2)."

[507] *See* 17 U.S.C. §402(d) (same as § 401(d) with respect to sound recordings).

[508] CCIA Nov. Comments at 6 (noting that this limitation "makes little sense in the online world").

[509] LCA Nov. Comments at 2. *See, e.g., BMG Music v. Gonzalez,* 430 F.3d 888, 892 (7th Cir. 2005), *cert. denied Gonzalez v. BMG Music,* 547 U.S. 1130 (2006).

[510] LCA Nov. Comments at 2-3.

[511] MPAA Jan. Comments at 11.

[512] LCA Nov. Comments at 2.

individual file sharers, and secondary infringers alike" whenever any of them reasonably believe their acts are noninfringing.[513]

Motion picture companies opposed this proposed expansion too, observing that it is difficult to imagine how file-sharers could reasonably believe their use was noninfringing and that secondary infringers include those who build their business models on infringement.[514] A recording industry representative argued that $200 is not a lot to pay for an infringement even if it was innocent.[515]

### C. Conclusions and Recommendations

#### 1. Overview

In reviewing the positions and proposals set forth by stakeholders, the Task Force is mindful that statutory damages are intended to "provide reparation for injury" as well as to "discourage wrongful conduct."[516] We agree that there is a need for effective enforcement tools, including meaningful statutory damages, to curb the online piracy that can undermine the value of rights and hobble the development of legitimate markets. At the same time, however, it is important to avoid excessive and inconsistent awards that risk encouraging disrespect for copyright law or chilling investment in innovation. And the abusive enforcement campaigns reported by commenters should not be tolerated.

Accordingly, the Task Force recommends three amendments to the Copyright Act to address some of the concerns presented and to better balance the needs of copyright owners, users, and intermediaries.[517] First, we recommend incorporating into the statute a list of factors for courts and juries to consider when determining the amount of a statutory damages award. Second, we recommend changes to the copyright notice provisions that would expand eligibility for the lower "innocent infringement" statutory damages awards.[518] We also propose that, in cases involving non-willful secondary liability for online services offering a large number of works, courts be given discretion to assess statutory damages other than on a strict per-work basis. Together, these changes should maintain the goals of compensation and deterrence that the statutory damages regime supports while providing courts with improved tools to appropriately calibrate the awards.[519]

---

[513] *Id.* at 3. *See also* CIS/EFF Nov. Comments at 25-26.

[514] MPAA Jan. Comments at 11.

[515] Borkowski/RIAA (LA) at 23.

[516] *Sony BMG Music Entertainment v. Tenenbaum,* 719 F.3d 67, 71 (1st Cir. 2013) (quoting *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 233 (1952)).

[517] None of these measures would affect the authority of federal courts to award other relief permitted under statute or to consider the facts of a particular case in applying the law.

[518] We make no specific recommendations on the other proposed changes to the innocent infringement provision of Section 504, as there was insufficient opportunity to develop a full record. *See* below p. 97.

[519] In addition, as discussed below, the Task Force recommends further consideration of the small claims tribunal concept presented by the Copyright Office. *See* Section V, Part C.2.d (Establish a Streamlined Procedure for

2.    Recommendations

a.    Specify Factors in the Copyright Act to Consider in Assessing Statutory Damages

The Task Force recommends that Congress enact a new paragraph in Section 504 of the Copyright Act specifying factors that must be considered when determining statutory damage award amounts. The aim is to ensure a greater degree of predictability in copyright infringement cases across the country and address some other concerns raised in this proceeding.[520] In considering what factors should be included, we have drawn upon existing model jury instructions[521] as well as federal case law.[522] The Task Force considered proposing federal model jury instructions, but concluded that a statutory set of factors would be preferable since they will be binding on all courts.[523] We believe that litigants and courts would be well-served by

Adjudicating Small Claims), p. 99, *below* & notes 466-470, p. 78 *above* (setting forth stakeholder support of small claims tribunal in the online file-sharing context).

[520] Other federal laws include factors for courts to consider in assessing statutory damages. *See* Truth in Lending Act of 1968 ("TILA"), 15 U.S.C. § 1640(a) (providing a floor and ceiling for damages against creditors and enumerating a nonexclusive list of factors to be considered); Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(a) (listing factors similar to those in TILA). *Cf.* U.S. SENTENCING GUIDELINES MANUAL § 2B5.3 cmt. notes 2 & 5 (2014) (list of factors in Federal Sentencing Guidelines for copyright infringement cases), *available at* http://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2014/GLMFull.pdf.

[521] Instructions on statutory damages for copyright infringement are included in the model jury instructions of three federal judicial circuits: the Seventh, Ninth, and Eleventh Circuits. The Seventh Circuit's model jury instructions list the following factors: the revenues that plaintiff lost because of the infringement; the difficulty of proving plaintiff's actual damages; the circumstances of the infringement; whether defendant intentionally infringed plaintiff's copyright; and deterrence of future infringement. Federal Civil Jury Instructions of the Seventh Circuit § 12.8.4 (2015) [hereinafter 7th Circuit Model Jury Instructions], *available at* https://www.ca7.uscourts.gov/Pattern_Jury_Instr/7th_cir_civil_instructions.pdf. The Eleventh Circuit's model instructions list the same factors. Eleventh Circuit Civil Pattern Jury Instructions § 9.32 (2013) [hereinafter 11th Circuit Model Jury Instructions], *available at* http://www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/FormCivilPatternJuryInstruction.pdf. The Ninth Circuit's model jury instructions are very general and do not include a list of factors, stating only that the purpose of statutory damages "is to penalize the infringer and deter future violations of the copyright laws." *See* Ninth Circuit Manual of Model Jury Instructions § 17.25 cmt. (Civil) (2007 & Supp. 2014) [hereinafter 9th Circuit Model Jury Instructions], *available at* http://www3.ce9.uscourts.gov/jury-instructions/sites/default/files/WPD/Civil_Jury_Instructions_2014_6.pdf.

[522] Numerous judicial decisions discuss factors to be used in determining the amount of statutory damages. "Among the most common list of factors recited are the relationship between the statutory damages sought and any actual damages or profits, whether the infringement was willful or innocent, the need for deterrence, defendant's past infringement record, defendant's cooperation after the matter was brought to its attention, and the scope of the infringement. No one factor is more important than any other." 6 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 22:174 (2015) (footnotes omitted). *See also* 5 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §14.04 [B][1][a](footnote omitted). The Task Force's proposed factors 1, 2, 3, 6 and 8, discussed below, address those considerations.

[523] The Circuit Court of Appeals' model jury instructions do not have the force of law. *See* Resolution of the Eleventh Circuit Judicial Counsel dated May 29, 2013, located at the 11th Circuit Model Jury Instructions 2 (noting that its resolution authorizing the distribution of the pattern jury instructions "shall not be construed as an adjudicative approval of the content of such instructions which must await case-by-case review"); 7th Circuit Model Jury Instructions 1 (2015) (noting that the instructions were only pattern instructions and that "[n]o trial judge was

requiring consideration of a uniform set of factors designed to result in an appropriate award based upon the facts of each case.

The nine factors listed below are those that will most often be applicable in a statutory damages determination.[524] We believe that they should be non-exclusive, so that courts are not foreclosed from considering other factors that may be relevant in a particular case.[525]

The Task Force proposes a new clause in subsection Section 504(c)[526] as follows:

> FACTORS TO CONSIDER -- In making any award under this subsection, a court shall consider the following nonexclusive factors in determining the appropriate amount of the award:

> (1)      The plaintiff's revenues lost and the difficulty of proving damages.

> (2)      The defendant's expenses saved, profits reaped, and other benefits from the infringement.[527]

> (3)      The need to deter future infringements.

> (4)      The defendant's financial situation.

> (5)      The value or nature of the work infringed.

> (6)      The circumstances, duration, and scope of the infringement, including whether it was commercial in nature.

---

required to use them"), 9th Circuit Model Jury Instructions 2 (2007) (noting that the instructions "are models" and are not "intended to discourage judges from using their own forms and techniques for instructing juries"). *See above* note 521.

[524] These proposed factors reflect factors contained in model jury instructions published by in the American Bar Association, with minor changes in the order in which the factors are listed and in their wording. AMERICAN BAR ASSOCIATION, MODEL JURY INSTRUCTIONS COPYRIGHT, TRADEMARK AND TRADE DRESS LITIGATION § 1.7.8 Todd S. Holbrook & Alan N. Harris eds. 2008) [hereinafter ABA MODEL JURY INSTRUCTIONS]. They also include additional factors taken from the Seventh and Eleventh Circuits' model jury instructions. *See above* note 521.

[525] The Task Force recognizes that there may be additional circumstances that the court will consider in particular cases. *See, e.g. UMG Recordings, Inc. v. MP3.com, Inc.,* No. 00 Civ. 472, 2000 WL 1262568 at *5 (S.D.N.Y. Sept. 6, 2000) (noting that defendant's conduct "has on the whole been responsible and this is a mitigating factor in defendant's favor"); *Dream Games of Ariz., Inc. v. PC Onsite,* 561 F.3d 983, 992-93 (9th Cir. 2009) ("decision maker may consider plaintiff's conduct during litigation.").

[526] If this recommendation is enacted into law, the current clauses will need to be renumbered.

[527] Two of the factors in the ABA model instructions have been combined into this single factor: ABA factors 2 ("The expenses saved or profits reaped by defendant in connection with the infringement") and 3 ("Other benefits that infringement may have provided to defendant") ("The defendant's expenses saved, profits reaped, and other benefits that infringement may have provided to defendant"), because they both address what the defendant gained as a result of the infringement. *See* ABA MODEL JURY INSTRUCTIONS §§ 1.7.8(2) & 1.7.8(3).

(7)     In cases involving infringement of multiple works, whether the total sum of damages, taking into account the number of works infringed and number of awards made, is commensurate with the overall harm caused by the infringement.

(8)     The defendant's state of mind, including whether the defendant was a willful or innocent infringer.

(9)     In the case of willful infringement, whether it is appropriate to punish the defendant and if so, the amount of damages that would result in an appropriate punishment.

When calculating the total award, all of these factors should be weighed holistically, in the context of the entire case, to ensure that the overall award is appropriate.[528] Below we explain various factors' relevance to the issues raised in the comments and roundtables.

i.     Relating Awards to Actual Harm and Benefits

The first two proposed factors address concerns expressed by both defenders and critics of the current statutory damages provision. Critics have urged that the level of any statutory damages awarded should be pegged to the amount actual harm.[529] Copyright owners view statutory damages as at least in part a means to be compensated for the harm they have suffered and to obtain restitution for the profits or other benefits received by the defendant as a result of the infringement.[530] At the same time, they stressed that statutory damages are available precisely because it is often difficult to prove whether or how much a plaintiff was harmed by the infringement, and deterrence generally requires levels above actual harm.[531]

The Task Force agrees that statutory damages should bear some relationship to the amount of actual harm suffered by the plaintiff and any financial benefits accruing to the defendant, in circumstances where these amounts are calculable.[532] However, given the frequent difficulty of proving actual damages, a plaintiff that fails to provide evidence of harm should not be precluded from a statutory damages award. Moreover, the correlation need not be exact and other factors may affect the ultimate award. As the Court of Appeals for the Second Circuit recently observed, "Although revenue lost is one factor to consider, we have not held that there must be a direct correlation between statutory damages and actual damages. To suggest otherwise is to ignore the

---

[528] *See Dream Games of Arizona, Inc. v. PC Onsite,* 561 F.3d 983, 992 (9th Cir. 2009) (in determining statutory damages award, jury is "guided by what is just in the particular case") (internal quotes and citations omitted).

[529] *See* discussion *above* at note 425.

[530] *See* discussion *above* at note 421.

[531] *See* discussion *above* at notes 426-427. *See also Sony BMG Music Entm't v. Tenenbaum,* 660 F.3d 487, 502 (1st Cir. 2011); *Douglas v. Cunningham,* 294 U.S. 207, 209 (U.S. 1935) (interpreting the 1909 Act); *Brady v. Daly,* 175 U.S. 148, 154 (1899).

[532] *See Bait Productions v. Angelica Murray,* No. 8:13-cv-0169-T-33AEP, 2013 US Dist. Lexis 120170, *15-16, 2013 WL 4506408, *6 (M.D. Fla. Aug. 23,2013) ("statutory damages are not intended to provide a plaintiff with a windfall recovery; they should bear some relationship to the actual damages suffered") (internal quotes omitted) (quoting *Clever Covers Inc. v. Sw Fla. Storm Def. LLC,* 554 F Supp. 2d 1303, 1313 (M.D. Fla. 2008)).

various other factors a court may consider and the purposes of statutory damages in the willful infringement context."[533]

### ii.    Relating Awards to Value of Works

The Task Force also agrees with courts and commenters that the value or nature of the infringed work (the fifth proposed factor), should be an important element in statutory damage determinations.[534] An award that takes into account the likely heightened magnitude of harm to the market for a pre-release work may enable the copyright owner to receive a more appropriate level of compensation than an award of actual damages. On the other hand, when the infringed work is of minimal commercial value, a lower award may be appropriate. This can help address concerns about "holders of low-value copyrights … using the threat of statutory damages to turn litigation threats into a profit center."[535]

### iii.    Assessing Deterrence and Punishment

As noted in the Green Paper, deterrence is a fundamental goal of the Copyright Act's statutory damages system[536] and is cited in most model jury instructions and court opinions.[537] Effective

---

[533] *Psihoyos v. John Wiley & Sons, Inc.,* 748 F.3d 120, 127 (2d Cir. 2014). *See also Webloyalty.com, Inc. v. Consumer Innovations, LLC,* 388 F. Supp. 2d 435, 442-43 (D. Del. 2005); *Fitzgerald Pub. Co. Inc. v. Baylor Pub. Co., Inc.,* 670 F.Supp. 1133, 1140 (E.D.N.Y. 1987). In *RSO Records, Inc. v. Peri,* 596 F.Supp. 849, 862 (S.D.N.Y. 1984), the court observed:

> Undoubtedly assessed statutory damages should bear some relation to actual damages suffered. Because statutory damages are often used in cases where actual damages cannot be precisely calculated, however, they cannot be expected to correspond exactly. Further, courts have also recognized that Congress's provision for a greater award in cases of willful infringement indicates that statutory damages may in such cases exceed the amount of documented damages. By taking on a partially punitive character, such awards serve the Copyright Act's twofold purpose of compensation and deterrence.

[534] *See* ABA MODEL JURY INSTRUCTIONS § 1.7.8(4) (Factor 4); *see also* 9th Circuit Model Jury Instructions § 17.25 cmt. (2007 & 2014 Supp.). *See also F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 232 (1952) (statutory damages vest trial courts with broad discretion to determine "what is just in the particular case, considering the nature of the copyright . . .") (quoting *L.A. Westermann Co. v. Dispatch Printing Co.*, 249 U.S. 100, 106-107 (1919; *Dream Games of Arizona, Inc. v. PC Onsite,* 561 F.3d 983, 992 (9th Cir. 2009) (jury has wide discretion in determining statutory damages award, "guided by what is just in the particular case, considering the nature of the copyright…"[internal quotes and citations omitted]); *Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.,* 807 F.2d 1110, 1117 (2d Cir. 1986) (listing the "the value of the copyright " as one factor to be considered when determining the award amount); *Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398, 403 (S.D.N.Y. 2002) ("Factors considered relevant to determining an appropriate statutory damages award include …the value of the copyright").

[535] *See* text *above* accompanying note 447, p. 75.

[536] *See* Green Paper at 51. *See also Sony BMG Music Entm't v. Tenenbaum,* 719 F.3d 67, 71 (1st Cir. 2013).

[537] *See* ABA MODEL JURY INSTRUCTIONS § 1.7.8(6) (Factor 6); 7th Circuit Model Jury Instructions §12.8.4(2015); 11th Circuit Model Jury Instructions § 9.32 (2013); 9th Circuit Model Jury Instructions § 17.25 cmt. (2007 & Supp. 2014); *Cass County Music Co. v. C.H.L.R., Inc*., 88 F.3d 635, 643 (8th Cir. 1996); *Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398, 403 (S.D.N.Y. 2002) (statutory damages further "the Copyright Act's dual objectives of compensating copyright owners for past infringement and deterring future infringement").

deterrence will normally require an amount greater than the expenses saved by the infringer or the harm caused to the rights holder.[538] As noted by the Register of Copyrights, if the amount of damages awarded is not greater than an infringer would have had to pay to comply with the law, many users would conclude that it is to their advantage to simply infringe and wait to see whether they are sued, since the ultimate price of using a work will be the same.[539] Deterrence in this context focuses not only on deterring a particular defendant from infringing again, but also on discouraging other potential infringers—a point repeatedly made by copyright owners.[540]

Although it is impossible to predict with certainty what unlawful activities will be deterred due to the potential size of damages awards, statutory damages in order to be effective should be assessed at a level sufficient to deter further infringement both by the defendant and by others.[541]

(a) The Defendant's State of Mind

The amount necessary to deter will vary from case to case due in part to the defendant's state of mind. The more willful the infringement, the higher the award that may be needed to deter such future acts, as one who consciously engages in an infringing act is more likely to become a repeat infringer unless deterred.[542] Deterrence may also be relevant where the infringement is not

---

[538] "[F]oremost, the court must award an amount that will put the defendant on notice that it costs more to violate the copyright law than to obey it." *Dream Dealers Music v. Parker,* 924 F. Supp. 1146, 1153 (S.D. Ala. 1996). To further the goal of deterrence, "statutory damages awards frequently greatly exceed the actual damages shown." *Stevens v. Aeonian Press, Inc.,* No. 00 Civ. 6330 (JSM), 2002 U.S. Dist LEXIS 20189, *7(S.D.N.Y. Oct. 23, 2002). *See also F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 233 (1952) ("Moreover, a rule of liability which merely takes away the profits from an infringement would offer little discouragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy."); *Chi-Boy Music v. Charlie Club, Inc.,* 930 F.2d 1224, 1229 (7th Cir. 1991) (considering the deterrent purpose of statutory damages and awarding "approximately three times the amount due under past license agreements"); *Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., Inc.,* 807 F.2d 1110, 1117 (2d Cir. 1986).

[539] Copyright Office Small Claims Report 21, *above* note 468.

[540] *See above* note 429 and accompanying text.

[541] *See Illinois Bell Tel. Co. v. Haines & Co.,* 905 F.2d 1081, 1089 (7th Cir. Ill. 1990) ("A damage award greater than profits is also proper to put *potential infringers* on notice that "it costs less to obey the copyright laws than to violate them.") (quoting *Int'l Korwin Corp. v. Kowalczyk,* 855 F.2d 375, 383 (7th Cir. 1988)) (emphasis added) (internal quotation omitted); *Broadcast Music v. R Bar,* 919 F. Supp. 656, 660 (S.D.N.Y. 1996). *See also* Bruce P. Keller & Jeffrey P. Kunard, Copyright Law: A Practitioner's Guide §12.4 (Prac. L. Inst. ed., 2012) ("the deterrent effect on the defendant and third parties").

[542] To some extent, this factor is already built into the statutory text, insofar as the potential range of statutory damages depends upon whether the infringement was willful ($750-$150,000), innocent ($200-$30,000) or "knowing" ($750-$30,000). 17 U.S.C. § 504(c) (2015). However, the defendant's consciousness of whether he or she was infringing also comes into play as courts consider how high, within the statutory range, the award should be. The fact that an infringement is willful does not require an award higher than the maximum award for a non-willful infringement; in many cases involving willful infringement, the court has awarded $30,000 or less in statutory damages. 6 William F. Patry, Patry on Copyright § 22:180 (2015); *Peer Int'l Corp. v. Luna Records, Inc.,* 887 F. Supp. 560, 569 (S.D.N.Y.1995); *Richard Feiner and Co., Inc. v. Passport Int'l Productions, Inc.,* No. 97 Civ. 9144(RO),1998 WL 437157, *2 n.8 (S.D.N.Y. July 31, 1998) ("a finding of willful infringement does not mandate enhanced damages").

willful but nevertheless careless.[543] On the other hand, deterrence will be less critical in cases of innocent infringement, since one who was not aware and had no reason to believe that she was infringing will not need to be deterred from future infringements.

In the file-sharing context, the defendant often knowingly disseminates large numbers of copies,[544] so this factor is not likely to lower an award. On the other hand, in the case of remixes, a defendant may have reasonably and in good faith reached the erroneous conclusion that her remix is a fair use.[545] In such circumstances, it would be appropriate to consider an award in the low end of the range. Similarly, this factor may help address concerns about the chilling effect of high levels of damages against innovative online services. For online services that reasonably believed that they were engaging in noninfringing conduct, this factor would reduce the likelihood of a very high award.

### (b) The Defendant's Financial Situation

The Task Force recognizes the concern that some awards of statutory damages can be far beyond the capacity of the defendant to pay—whether an individual or a start-up business. Requiring juries and judges to consider the defendant's financial situation (the fourth factor) when assessing the level of the award will help address that concern.[546]

This factor is closely tied to both the deterrence and the punishment aspects of statutory damages. The amount necessary to deter a multi-billion dollar company from infringing for commercial profit will be far greater than the amount necessary to deter a private individual with limited income from engaging in noncommercial file-sharing. Similarly, a judgment of a few thousand dollars may serve as meaningful punishment for an low-income individual, but not a major corporation.[547]

---

[543] *See Los Angeles News Serv. v. Reuters TV Int'l,* 942 F. Supp. 1275, 1283 (C.D. Cal. 1996) (statutory damages "particularly necessary to deter what may be at most careless infringement by major news-disseminating organizations whose business it is to supply audiovisual news material worldwide for a fee"), *aff'd in part, rev'd in part,* 149 F.3d 987 (9th Cir. 1998).

[544] Not surprisingly, plaintiffs in file-sharing cases generally allege willful infringement. *See* Christopher Cotropia & James Gibson, *Copyright's Topography: An Empirical Study of Copyright Litigation,* 92 TEX. L. REV. 1981, 2004 (2014), *available at* http://www.texaslrev.com/wp-content/uploads/CotropiaGibson92-7.pdf (finding that in all 512 file-sharing cases surveyed, plaintiffs sought injunctions and statutory damages based on willful infringement).

[545] *See above* Remix discussion, Section III, Part B.2.a (Fair Use), pp. 10-11 & Part C.2 (Provide Greater Clarity for Fair Use: Guidelines and Best Practices), pp. 27-29.

[546] *See* discussion *above* at p. 71 and note 417.

[547] It is a standard practice in non-copyright cases to consider the defendant's financial situation whenever punitive damages are awarded. 22 Am. Jur. 2d Damages § 623 (2015) ("While it is usually only one of several considerations relative to the determination of the amount of punitive damages, the wealth or financial condition of the defendant should be taken into account in determining the proper amount of punitive damages since the degree of punishment or deterrence is to some extent proportionate to the means of the wrongdoer. In other words, the amount of an award of punitive damages must relate to and not be disproportionate to the defendant's ability to pay. Courts do not require, or invite, the financial ruination or bankruptcy of a defendant liable for punitive damages.") (Footnotes omitted).

(c) The Nature of the Infringement

The appropriate level of the award will also depend upon the circumstances, nature and scope of the infringement (the sixth factor).[548] The analysis under this factor would justify a higher award for an enterprise that spent months or years engaged in widespread infringing activity than for an individual fan who creates an infringing mashup of excerpts from television series episodes. The distinction between non-commercial and commercial purposes also should be addressed under this factor, with infringements conducted for commercial gain typically justifying a higher award than those conducted for non-commercial, personal purposes.[549]

(d) Punishing Willful Infringement

The ninth factor addresses whether it is appropriate to punish the defendant and would apply only in cases involving willful infringement.[550] In such cases, statutory damages have been held to also serve a punitive function,[551] differing from the deterrence element by focusing on the defendant's past behavior. The Task Force believes it is appropriate for the court to consider those punitive purposes, including in cases involving individual file-sharers or mass online services, where warranted, bearing in mind the degree of the defendant's willfulness[552] and the

---

[548] *See* ABA Model Jury Instructions § 1.7.8(5) (Factor 5); 7th Circuit Model Jury Instructions § 12.8.4 (2015); *See F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 232 (1952) ("the court's conception of what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like, is made the measure of the damages to be paid") (quoting *L.A. Westermann Co. v. Dispatch Printing Co.*, 249 U.S. 100, 106-07 (1919)); 9th Circuit Model Jury Instructions § 17.25 (2007 & 2014 Supp.); *Dream Games of Arizona, Inc. v. PC Onsite,* 561 F.3d 983, 992 (9th Cir. 2009).

[549] A number of commenters proposed reducing the maximum statutory damages award specifically for noncommercial uses. *See* note 460 *above* and accompanying text. The Task Force does not believe that a bright line between commercial and noncommercial uses is justified in the statutory damages context, particularly given that a noncommercial use can cause just as much harm to the market for a copyrighted work.

[550] *See* ABA Model Jury Instructions §1.7.8(10) (Factor 10) ("In the case of willful infringement, the need to punish the defendant, if you find punishment appropriate under the facts"); 9th Circuit Model Jury Instructions § 17.25 (2007 & 2014 Supp.) (stating that the purpose of statutory award "is to penalize the infringer and deter future violations of the copyright laws.").

[551] *See Feltner v. Columbia Pictures,* 523 U.S. 340, 352 (1998) ("an award of statutory damages may serve purposes traditionally associated with legal relief, such as compensation and punishment"); *Sony BMG Music Entm't v. Tenenbaum,* 660 F.3d 487, 514 (1st Cir. 2011) ("statutory damages, unlike punitive damages, have both a compensatory and punitive element"); *Dream Games of Arizona, Inc. v. PC Onsite,* 561 F.3d 983, 992 (9th Cir. 2009); *Cass County Music Company v. C.H.L.R., Inc.,* 88 F.3d 635, 643 (8th Cir. 1996); *Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.,* 807 F.2d 1110, 1117 (2d Cir. 1986).

[552] *See above* pp. 71-72 and notes 417 and 421, and discussion of Factor 8 (The Defendant's State of Mind), p. 90. The fact that punitive considerations may be taken into account in awarding statutory damages does not, however, mean that they are subject to the jurisprudence governing awards of punitive damages. Courts of appeals that have addressed that issue have concluded that due to the way in which the statutory damages provisions of the copyright law are structured, the factors considered under punitive damages cases such as *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), are not applicable. *See Sony BMG Music Entm't v. Tenenbaum*, 719 F.3d 67, 70 (1st Cir. 2013) ("The concerns regarding fair notice to the parties of the range of possible punitive damages awards, which underpin Gore, are simply not present in a statutory damages case where the statute itself provides notice of the scope of the potential award. Moreover, Gore's second and third guideposts cannot logically apply to an award of statutory damages under the Copyright Act."); *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 907-908 (8th

defendant's financial condition.[553] Of course, where the online service is found secondarily liable for enabling the conduct of third parties without any element of willfulness on its part, this factor would not apply.

iv.  Adjusting for Multiple Works

The seventh factor—whether the total sum of damages, taking into account the number of works infringed and number of awards made, is commensurate with the overall harm caused by the infringement—can help address the concerns expressed by many commenters that awards involving numerous works can become excessive. This is intended to ensure that the overall award is proportionate to the harm and not simply a mechanical function of adding a number of individual awards for each infringed work.[554]

Just as a license to use multiple works may cost less than multiple license fees to use a single work, the compensatory aspect of a statutory damages award need not always increase equally for each additional infringed work. At least some of the amount needed to deter future infringements or to punish a willful infringer may be taken into account in the evaluation of the damages for the infringement of one work, and less may be required for any further deterrent effect in awarding statutory damages for other works in the same lawsuit. On the other hand, a jury might properly conclude that each act of infringement warrants an additional and equal degree of deterrence and/or punishment.

In cases involving a large number of works, this factor permits the court to take a holistic approach, adjusting the award for each work to ensure that the overall award is appropriate in magnitude. Nevertheless, the statute still requires at least the minimum possible award for each work infringed, limiting the bounds of the court's discretion.[555] The Task Force's third recommendation below giving courts the additional option, in certain cases involving large

---

Cir. 2012) (concluding that the Gore guideposts for punitive damage awards "would be nonsensical if applied to statutory damages.").

[553] *See* the discussion of Factor 4 (The Defendant's Financial Situation), *above,* p.91.

[554] *See* ABA MODEL JURY INSTRUCTIONS §1.7.8(8) (Factor 8) ("The number of works infringed and number of awards made (that is, the overall result)"). *See also UMG Recordings v. MP3.com,* No. 00 Civ. 472, 2000 U.S. Dist. LEXIS 13293, *15 (S.D.N.Y. Sept. 6, 2000) ("I believe any attempt to reduce this determination to some kind of mathematical formula or equation is spurious. There are a great many factors to consider and the Court must weigh them as best it can, based on the evidence and on the Court's reasoned evaluation of all the relevant factors and their interplay."); *Capitol Records, Inc. v. Thomas-Rasset,* 692 F.3d 899, 910 ("The absolute amount of the award, not just the amount per violation, is relevant to whether the award is 'so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.' The recording companies here opted to sue over twenty-four recordings. If they had sued over 1,000 recordings, then a finder of fact may well have considered the number of recordings and the proportionality of the total award as factors in determining where within the range to assess the statutory damages.") (citation omitted) (quoting *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919)).

[555] *See, e.g. Dream Games of Ariz., Inc. v. PC Onsite,* 561 F.3d 983, 992 (9th Cir. 2009) ("'If statutory damages are elected, [t]he [jury] has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima.'") (quoting *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990)).

numbers of works, to assess statutory damages other than on a strict per-work basis is intended to supplement the discretion permitted under this factor.

v.    Promoting Consistency and Transparency

As pointed out by many commenters, the broad range of potential statutory damages—from $200 to $150,000—confers flexibility but also can engender uncertainty and inconsistency.[556] Although compensatory, deterrent, and punitive functions are all considered in granting awards, courts do not always make clear the extent to which each is relevant in any given case, and as a rule juries offer no explanations of the bases for their awards.[557] Nor are juries consistently given detailed instructions on how to determine the amount of the award. The Task Force believes that additional guidance would help to harmonize judgments and provide greater stability.

The Task Force also recommends that courts consider articulating on the record, or asking juries to return special verdicts that indicate, which part of each statutory damages award represents compensation to the copyright owner and which part is awarded for purposes of deterrence or punishment. This practice would add more transparency and clarity, assisting in any appellate review.

vi.    Other Proposals

*Reducing the Minimum/Maximum Levels.* Based on the record before us, the Task Force does not recommend reducing the minimum or maximum levels for statutory damages. We believe the concerns raised in these proceedings can be addressed through our other recommendations, without affecting the entire range of cases as to which Congress has established the existing parameters.

With respect to file-sharing, statutory damages must take into account not merely the defendant's personal use, but his or her acts in uploading and distributing copies to potentially numerous recipients.[558] And while statutory damage awards of $150,000 per work are rare, there may be cases, including in the context addressed in these proceedings, where such awards are justified due to the need to deter and punish willful infringement.[559]

---

[556] *See* discussion *above* notes 419, 431-433.

[557] Although one commenter suggested that separate awards should be issued for purposes of compensation and deterrence, as a practical matter this would be difficult given the need to weigh different factors together when making an award. *See* note 463 and accompanying text, *above.*

[558] *See Sony BMG Music Entm't v. Tenenbaum,* 660 F.3d 487, 502 (1st Cir. 2011). *See also Arista Records LLC v. Usenet,* No. 07 Civ. 8822 (HB), 2010 U.S. Dist. LEXIS 96957, 16-17 (S.D.N.Y. Sept. 16, 2010) (rejecting a defendant's argument that damages per work should have been limited to the value of an individual download of a sound recording since "defendants had over 15,000 subscribers, each of whom might have otherwise purchased plaintiffs' songs").

[559] The typical range of statutory damages awards against peer-to-peer file-sharers has been between $750 and $6,500 per work. *AF Holdings LLC v. Bossard*, 976 F. Supp. 2d 927, 930-31 (W.D. Mich 2013) (summarizing damages awards "in cases involving intentional copyright infringement by use of BitTorrent or other file-sharing protocols"); *Riding Films, Inc. v. John Does 1-65,* Case No. 2:13-cv-44, 2015 U.S. Dist. LEXIS 2438, *5 (S.D. Ohio January 8, 2015). In at least a handful of file-sharing cases, however, courts have awarded default judgments for the

In addition, while most of this section addresses the potential negative impact of the maximum level of statutory damages, some commenters have also expressed concern about the minimum amount of statutory damages permitted under the Act.[560] Under the Task Force's proposal, for example, an innocent infringer would still be subject to the $200 per-work statutory minimum while a non-innocent infringer would be subject to at least a $750 per-work minimum. Even these low sums, however, could still have a crippling effect in the online context when multiplied by the number of works at issue in a given case.[561]

*Amending "Willfulness" Definition.* Although a few commenters suggested aligning the definition of "willfulness" to mirror the patent infringement standard, the Task Force is not prepared to make such a recommendation at this time as the change would not be limited to the contexts of file-sharing and online services, and the issue was not raised by the questions presented in this process so as to allow adequate input and development of the record.

*Curbing Litigation Abuse.* As discussed above, the Task Force heard concerns about so-called "copyright trolls" that use the threat of statutory damages to obtain settlement fees from alleged infringers.[562] Some have suggested that Congress consider recalibrating statutory damages specifically to discourage misuse of the system.[563] We do not recommend such changes at this time.

With respect to the proposal to require election of statutory damages prior to trial or the filing of a summary judgment motion,[564] for example, it is not clear how this would meaningfully impede a plaintiff's ability to "extract higher settlements." The typical complaint made against the so-called "copyright trolls" who are the targets of this proposal is that they use the threat of high statutory damages awards to pressure a potential defendant to settle prior to filing a lawsuit in order to avoid incurring any substantial litigation-related expenses.[565] Plaintiffs employing such a strategy, a necessary component of which is to avoid the costs of a trial on the merits or any substantial motion practice, would rarely if ever reach the point where they would have to make an election even if the statute were amended as proposed. Moreover, there will be few circumstances under which such a plaintiff would elect not to seek statutory damages, since it will be unlikely to be able to prove actual damages higher than a potential statutory damages award.

---

maximum amount of $150,000 per work for willful infringement. *CP Prods. Inc. v. Glover,* No. 1:12-cv-00808-JMS-DML, 2013 U.S. Dist. LEXIS 184573 (S.D. Ind. Mar. 26, 2013) (granting default judgment and awarding $150,000 in statutory damages for infringement of one copyrighted work); *AF Holdings LLC v. Lessere*, Case No. 12-CV-22156-UU, Default Final Judgment, Doc. 25 (S.D. Fla. Oct. 9, 2012) (granting default judgment and awarding $150,000 in statutory damages for infringement of one work).

[560] *See above* notes 460, 497, 503-509 and accompanying text.

[561] *See above* note 555 and accompanying text.

[562] *See above* Part B.1.c. (Litigation Abuse), pp. 74-77.

[563] *See above* notes 460-465, pp. 77-78.

[564] *See* text accompanying note 464 *above.*

[565] *See* discussion *above,* Part B.1.c (Litigation Abuse), p. 74.

The Task Force recognizes that the abusive enforcement actions described by commenters may facilitate unfair settlements, and can serve as a profit-making business for unscrupulous plaintiffs seeking a quick reward. Such actions are harmful to the copyright system as well as the judicial system. At the same time, most rights holders who assert infringement claims, including some who file John Doe lawsuits against numerous defendants, are not engaging in vexatious litigation.[566] While the potentially high level of statutory damages may at times encourage abusive enforcement activities, it also permits awards that are appropriate for harmful acts of infringement.[567] The unfair tactics used by certain litigants should be curbed without cutting back a remedy that serves legitimate purposes of compensation and deterrence. The courts are well-positioned to evaluate such tactics and have sanctioned counsel and parties who pursue baseless, reckless, or vexatious claims.[568]

Courts can also deprive such litigants of the ability to use the tactics that make such litigation profitable. In fact, a decision by the U.S. Court of Appeals for the District of Columbia Circuit last year may cripple the ability to pursue "John Doe" suits against file-sharers as a business model.[569] Its holdings, if adopted in the other judicial circuits, promise to make it much more difficult to pursue a strategy of suing as many defendants as possible in a single action to keep costs low and to settle quickly.[570] If over time such measures prove insufficient to curb the problem of litigation abuse, it may be necessary to take further steps to consider possible alternative solutions. Ultimately, the interests of rights holders, consumers, and online platforms are harmed by abusive litigation, and preventing such strategies is an important goal.

---

[566] *See above* note 455 and accompanying text.

[567] *See above* note 455.

[568] *See above* notes 453-454 and accompanying text.

[569] The court held that the mere fact that two or more defendants accessed the same file through BitTorrent provides an insufficient basis for joinder; joinder requires that the defendants were participating in the same BitTorrent "swarm" *at the same time,* something that should significantly reduce the number of defendants who can be joined in a single suit. The court also held that a plaintiff suing a large number of Doe defendants and seeking discovery of their identities must have a good faith belief that each of the defendants may be found in the district in which the suit was pending. *AF Holdings, LLC v. Doe,* 752 F.3d 990 (D.C. Cir. 2014).

[570] *See* note 446 and accompanying text, *above*. One critic of "copyright trolls" has made the following observation about the implications of the court's ruling:

> [S]ince D.C. may have been the only court that still allowed trolls to engage in mass filing against multiple John Doe defendants, the loss of that option should discourage, if not stem altogether, further troll activity. After all, the porn troll business model is built largely on the troll's ability to get into court with such mass filings without having to do any of the hard work of identifying specific defendants. Once in the courtroom door, the troll can merely raise the fear that defendants might be identified through the discovery process. That then allows the troll to threaten the "outing" of a defendant as an illegal downloader, often of a pornographic movie, which threat can then be leveraged into a quick settlement that the defendant agrees to only as a means of concealing his or her identity and good name.

Kevin Goldberg, *Porn Troll Patrol: D.C. Circuit Rules Against 'John Doe' Lawsuits*, COMMLAWBLOG (June 4, 2014), http://www.commlawblog.com/2014/06/articles/intellectual-property/porn-troll-patrol-d-c-circuit-rules-against-john-doe-lawsuits/ (last visited Oct. 28, 2015).

b.  Remove Notice Bar to the Innocent Infringement Defense

Reduced damages awards for innocent infringement appear to be infrequent, in part because existing law bars invocation of this defense where a notice is present on copies of the work.[571] The Task Force believes that this obstacle to the potential for reduced statutory damages should be removed. We therefore recommend amending the notice provisions in the Copyright Act so that the innocent infringement defense remains available in cases where there is a copyright notice.[572]

Specifically, the Task Force proposes that Sections 401(d) and 402(d) be amended to provide that the appearance of notice is relevant but not a bar to the assertion of an innocent infringement defense. The existence of a copyright notice should remain a factor for the court to consider when determining whether to reduce the damages award, since it may bear on the defendant's state of mind. If a defendant asserts that he was not aware of and had no reason to believe that the work was protected by copyright, the existence of a copyright notice would tend to undermine that claim. But if a defendant mistakenly believed that he was engaging in a fair use, the notice would not undermine that defense.

This proposal preserves the copyright owner's incentive to provide notice because, depending on the basis for the innocent infringement defense, the notice may still be relevant and even dispositive.

As to the proposals for expanding the mandatory remittitur provision for innocent infringers, to include additional types of defendants or to cover additional rights or exceptions,[573] the Task Force is not prepared to make recommendations at this time as there has been insufficient opportunity for public comment on these issues. The existing provision requiring complete remittitur of statutory damages is narrowly crafted to apply only in cases where the harm to the copyright owner is likely to be negligible, since acts of reproduction by nonprofit entities relying on fair use normally would not cause significant damage. Expanding eligibility for that provision would require a careful consideration based on a full record. As to acts of infringement by employees of libraries and archives who reasonably believe in good faith that their conduct falls within the scope of exceptions other than fair use, the Task Force is not aware of cases in which, if the provision had covered such exceptions, a qualifying entity could have invoked the remittitur provision. It may be that section 108, the exception for libraries and archives, should be included within the scope of that provision, but there has not been an opportunity to fully explore that issue in this proceeding.

c.  Provide Greater Discretion in Cases of Non-willful Secondary Liability for Large Scale Online Services

There is no question that the use of the "per-work multiplier" in the context of online services making entire libraries of works available to the public can result in statutory damages that are

---

[571] *See* text *above* accompanying notes 503-509, pp. 83-84.

[572] LCA Nov. Comments at 2; CCIA Nov. Comments at 6.

[573] *See above,* Part B.3 (The Innocent Infringement Defense), pp. 83-85.

extraordinarily large.[574] These levels of awards could potentially have a chilling effect on investment and innovation. Moreover, the "per work" calculation makes less sense in the context of secondary liability than in cases involving direct infringement. Where an online service provider enables thousands or even millions of users to infringe by offering many copyrighted works to the world at large, there is a more attenuated connection between the service provider's actions and the number of works that are infringed; typically, the service provider will have no control over or knowledge of the number of works that are infringed.

At the same time, the Task Force acknowledges that the potential for harm to individual creators and the creative industries caused by infringement using mass online services is considerable. And while some chilling effect may result from potentially massive damages, the scope of any such chilling effect is unclear. Although some investment may be deterred by uncertain legal environments and litigation over the issue of infringement may have bankrupted some companies, there is little concrete evidence of how much lawful innovation has actually been chilled. Even assuming a reduction in innovation and investment, it is not clear that this was solely the result of the potential magnitude of statutory damages awards—as opposed to potential liability itself, litigation costs or the threat of other remedies such as injunctive relief. And it may well be that the risk of statutory damages has had a positive effect in deterring innovators from engaging in conduct likely to be infringing, or encouraging investment in other innovation instead.

After careful consideration of all of these aspects, the Task Force concludes that an adjustment in the law is advisable. We recommend that section 504 be amended to provide that, in cases of nonwillful secondary liability by online services involving large numbers of infringed works, courts shall have the discretion to depart from the strict "per work" calculus and adjust the overall award to an amount that appropriately reflects the purposes set forth in the statutory factors we have proposed above.[575] This recommendation goes further than the leeway permitted under factor 7 described above, since without this additional change the courts are still bound to the minimum statutory per work amounts. When a court must multiply this minimum by a very large number of copyrighted works, it may not be possible to avoid an excessive outcome.[576]

Congress should consider whether to set a minimum number of infringed works beyond which an additional per-work award would not be mandatory, or whether that number should be determined in each case by the court.[577] Courts would not be required to abandon the strict "per work" method of calculation, but instead would have the discretion to do so if that calculus would lead to a disproportionate overall award. Nor should the enactment of such a provision be read to mean that this is the favored result in cases involving more than the threshold amount.

---

[574] *See* discussion *above* at note 482.

[575] *See above* Part C.2.a.iv (Adjusting for Multiple Works), pp. 93-94 (discussing factor 7).

[576] *See* discussion *above* at note 482.

[577] The per-work minimum would not be suspended with respect to all infringed works in the case, but only with respect to those works beyond the minimum number of works necessary to permit application of the alternative calculation method.It may be worthwhile to conduct a study to determine what the minimum number of works should be.

The Task Force is confident that the courts will be in the best position to determine whether, in each case, the alternative approach should be used.[578]

This flexibility should not, however, be available in cases involving willful infringement or intentional inducement of infringement.[579] These circumstances present the clearest need for deterrence and punishment. Concerns that high statutory damages awards may have a chilling effect on companies engaging in technological innovation are premised on the proposition that such companies should be encouraged to innovate and we should not unduly penalize those that inadvertently cross the line. However, such concerns do not apply with respect to those who infringe willfully, or actively induce infringement by those who use their services or products. In the words of the Supreme Court, "the inducement rule premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful promise."[580]

### d. Establish a Streamlined Procedure for Adjudicating Small Claims

Finally, the Task Force supports the creation of a streamlined procedure for adjudicating small claims of copyright infringement and believes that further consideration should be given to the proposal of the Copyright Office to create a small claims tribunal.[581] The proposal would provide for a cap on awards of statutory and actual damages, limited discovery and counterclaims, assertion of all relevant defenses (including fair use), optional attorney representation, and awards of costs and fees against frivolous litigants.[582] Among other features of the system suggested by the Copyright Office, participation in small claims proceedings would be voluntary and would be administered by a centralized tribunal in a single location.[583] One recommendation of particular relevance to our review here is that the Copyright Office proposal would cap statutory damages awards on both a per work and per case basis.[584]

---

[578] We recognize that in some cases, online services facing claims of secondary liability for non-willful large-scale infringement may fall within one of the safe harbors set forth in 17 U.S.C. § 512.

[579] *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005).

[580] *Id.* at 937.

[581] COPYRIGHT OFFICE SMALL CLAIMS REPORT, note 468 *above*. The Small Claims Report was issued after the Green Paper.

[582] *Id.* at 4, 109-12, 117, 119-20. The Small Claims Report also detailed the current copyright enforcement system, discussed constitutional and federal procedure issues, analyzed state small claims courts and other enforcement bodies, and outlined stakeholder proposals and its recommendations to support the establishment of a small claims tribunal. *Id.* at Sections III-IV and *passim*. In the Green Paper, the Task Force described the then-ongoing study and observed that an alternative to the federal courts could be useful for certain online infringement claims. *See* Green Paper at 58.

[583] *See* Small Claims Report at 97-99, 102-03. While the Task Force agrees that a small claims procedure with all of these features is desirable, we do not necessarily endorse each and every detail of the Copyright Office proposal, nor do we offer a particular legislative proposal at this time. However, we do note that any small claims system should include safeguards to prevent abuse.

[584] *Id.* at 109-112 (discussing stakeholder proposals for the range of damages and recommending a $15,000 per work cap and a cap of $30,000 for all damages in a single case involving a registered work, and half those amounts for

A small claims procedure for infringement claims of relatively low economic value would provide individual and smaller rights holders an alternative mechanism to enforce their rights if they lack the resources to litigate or employ another remedy under the current copyright system.[585] Given a damage cap, alleged infringers in the small claims process would not face the highest levels of statutory damages available under the current system. Other aspects of a small claims process could also help balance the interests of claimants and alleged infringers.

After considering the Copyright Office proposal in light of the comments the Task Force received,[586] we believe that a small claims process should be established to resolve infringement claims involving, inter alia, online file-sharing.[587] Many copyright owners would be willing to trade the potential for higher damages in exchange for lower costs and simpler, more expedited procedures, and defendants would also be attracted to a less costly forum where the exposure to damages is limited.[588] This could also help diminish the risk of disproportionate levels of statutory damages against individual infringers. Both parties would ultimately benefit from a small claims process that aims to streamline copyright litigation while reducing the potential costs for everyone involved.

---

late-registered works); *see also* notes 50-51, 55-56 & 62 and accompanying text, *above* (presenting stakeholder views on capping statutory damages).

[585] We note that if a small claims tribunal can adjudicate file-sharing and other types of claims, it could become a useful venue for rights holders to engage in direct enforcement actions against alleged individual infringers.

[586] *See above,* pp. 77, Part B.1.d (Solutions Proposed by Stakeholders).

[587] A small claims tribunal is not likely, however, to have an appreciable impact on large scale secondary liability cases against online services given the magnitude of potential damages. Although our focus is on file-sharing, a small claims tribunal could also be useful in other infringement cases.

[588] *See* Small Claims Report at 24 ("Copyright owners whose works are infringed often are deterred from enforcing their rights due to the burden and expense of pursuing litigation in the federal system. Especially in the case of lower-value copyright claims, the potential for monetary recovery can be quickly overcome by the costs of discovery, motion practice, and other litigation expenses."); *see also* Green Paper at 58 (noting that a small claims procedure could provide an alternate remedy for rights holders lacking the resources to effectively use the DMCA takedown mechanism).

# APPENDIX I

### Public Comments Submitted on the Green Paper and Abbreviations

The Internet Policy Task Force extends its thanks to all of our colleagues throughout the Executive and Legislative branches who have provided valuable feedback and consultation during the development of this report.

We offer special thanks to all of the individuals and private sector organizations who submitted comments in response to our Notice of Inquiry. Those commenters are listed below with their abbreviation used throughout the White Paper.

### ORGANIZATIONS

| | |
|---|---|
| American Association of Independent Music | A2IM |
| American Free Trade Association | AFTA |
| American Intellectual Property Law Association | AIPLA |
| ASCAP (Joint submission with BMI CMPA NSAI NMPA RIAA SESAC) | ASCAP et al. |
| ASCAP | ASCAP |
| Association of American Publishers | AAP |
| BMI | BMI |
| BSA-The Software Alliance | BSA |
| Califa Group | Califa |
| Center for Democracy and Technology | CDT |
| Electronic Frontier Foundation (joint submission with Stanford University's Center for Internet and Society) | CIS/EFF |
| Computer and Communications Industry Association | CCIA |
| Consumer Electronics Association | CEA |
| Consumer Federation of America | CFA |
| Copyright Alliance | CA |
| Copyright Clearance Center | CCC |
| Creative Commons | CrComm |
| Deviant Art | DeviantArt |
| Digital Library | Digital Library |
| Digital Media Association | DiMA |
| Digital Right To Repair | DRTR |
| Directors Guild of America | DGA |
| eBay | eBay |
| Entertainment Software Association | ESA |
| Future of Music Coalition | FMC |
| Ghostly International | Ghostly |
| Global Intellectual Property Center | GIPC |

| Google | Google |
|---|---|
| Hardin Comments Librarians of Trinity University | Trinity |
| Independent Film and Television Alliance | IFTA |
| Information Technology and Innovation Foundation | ITIF |
| Institute for Policy Innovation | IPI |
| Intellectual Property Owners Association | IPO |
| Internet Association | IAC |
| Internet Commerce Coalition | ICC |
| Internet Infrastructure Coalition | IIC |
| Internet Society | Internet Society |
| Juneau Public Libraries | Juneau |
| Kernochan Center for Law, Media, and the Arts | Kernochan |
| Libraries of the College of Saint Benedict and Saint John | StBeneStJohn |
| Library Copyright Alliance | LCA |
| Motion Picture Association of America | MPAA |
| National Cable and Telecommunications Association | NCTA |
| National Music Publishers Association (joint submission with Nashville Songwriters Association International, SESAC, Inc. Church Music Publishers Association) | NMPA et al. |
| New Media Rights | NMR |
| Ohio Library Council | Ohio Library |
| Organization for Transformative Works | OTW |
| Owners Rights Initiative | ORI |
| Public Knowledge | PK |
| Rain City Video, Inc (joint submission with Screenplay) | Screenplay |
| Recording Industry Association of America | RIAA |
| Redigi | ReDigi |
| ScreenPlay, Inc. and Rain City Video, Inc. | ScreenPlay |
| Software and Information Industry Association | SIIA |
| Songwriters Guild of America | SGA |
| SoundExchange | SX |
| Stanford Center for Internet and Society and Electronic Frontier Foundation | CIS/EFF |
| The Harry Fox Agency Inc. | Harry Fox |
| University of Michigan Library | UofM |
| Wattpad | Wattpad |
| Writers Guild of America West | WGAW |

## INDIVIDUALS

| | |
|---|---|
| Anonymous | Zeke Crater |
| Anonymous2 | Cynthia Dennis |
| Kim Bahnsen | Carrie Devorah |
| Andrew P. Bridges | Mary Emmons |
| Kimberly A. Brosan | Samantha A. Evangelho |
| Stuart N. Brotman | Anthony Fabbri |
| Christan Bulin | Marion Gropen |
| Marilynn Byerly | Joseph Harris |
| Michael A. Carrier | Richard Hausdorff |
| Gian Caterine | Candice M. Hughes |
| Rowena Cherry | Nesha Jones |
| Tanya Denckla Cobb | Derek Khanna |
| Derek Khanna & John Tehranian | Stephanie Osborn |
| Dina LaPolt & Steven Tyler | Karen Ranney |
| John Lomenick | Morris Rosenthal |
| Frank Lowney | Pamela Samuelson |
| Deborah Macgillivray | Meredith Schwartz |
| Andrew R. Mancuso | SIM |
| Peter Menell | Thomas D. Sydnor II |
| Michael Masnick | Larry Wilt |
| John Edwin Miller | Ahmed Al-Yousif |
| Richard Naylor | Matthew Zagaja |

# APPENDIX II

### Participants in Public Meeting and Roundtable Discussions

The Internet Policy Task Force offers special thanks to all of the individuals and private sector organizations and our colleagues at the Copyright Office who participated in our Public Meeting on Copyright Policy, Creativity & Innovation in the Internet Economy, and those who participated in our Roundtables on Remixes, First Sale Doctrine, and Statutory Damages. Those participants are listed below with their affiliated organization, and the abbreviation used throughout this report.

| Name | Organization | Organization Abbreviation | Location |
|------|-------------|--------------------------|----------|
| Allan Adler | Association of American Publishers | AAP | Alexandria, Cambridge |
| Sandra Aistars | Copyright Alliance | CA | Alexandria, Nashville |
| John Beiter | Shackelford, Zumwalt & Hayes | | Nashville |
| George Borkowski | Recording Industry Association of America | RIAA | Cambridge, Los Angeles |
| K. Christopher Branch | KC Branch Firm | | Los Angeles |
| Catherine Bridge | Walt Disney Company | Disney | Los Angeles |
| Chris Brown | Brown & Rosen LLC | | Cambridge |
| Scott Burroughs | Doniger/Burroughs APC | | Los Angeles |
| Rick Carnes | Songwriters Guild of America, Inc. | SGA | Nashville |
| David Carson | International Federation of the Phonographic Industry | IFPI | Alexandria |
| Ronald Coleman | Geotz Fitzpatrick | | Cambridge |
| Jay Cooper | Greenburg Traurig | | Los Angeles |
| Kyle Courtney | Harvard University | | Cambridge |
| Alex Curtis | Creator's Freedom Project | | Nashville |
| Tiki Dare | Oracle | | Berkeley |
| Don Dennis | Law Firm of Don R. Dennis Jr. | | Los Angeles |
| Peter DiCola (Professor) | Northwestern University Law School | | Alexandria |
| Dennis Dreith | AFM & SAG-AFTRA Fund | AFM/SAG-AFTRA | Los Angeles |
| Evan Engstrom | Engine Advocacy | Engine | Berkeley |
| Markham Erickson | Internet Association | | Alexandria |
| Scott Evans | Adobe | | Berkeley |

| Name | Organization | Organization Abbreviation | Location |
|---|---|---|---|
| Gerald Fox | Gerard Fox Law | | Los Angeles |
| Kenneth Freundlich | Freundlich Law | | Los Angeles |
| George Borkowski | Recording Industry Association of America | | Cambridge |
| Jacqueline Charlesworth | U.S. Copyright Office | | Nashville, Los Angeles |
| Daniel Gervais (Professor) | Vanderbilt University Law School | | Nashville |
| Anne Gililand | UNC Chapel Hill | | Cambridge |
| David Given | Phillips, Erlewine, Given & Carlin, LLP | | Berkeley |
| Jodie Griffin | Public Knowledge | PK | Cambridge |
| Ganka Hadjipetrova | Hadjipetrova Law | | Berkeley |
| Dr. E. Michael Harrington | Berklee Online | | Nashville |
| Alan Harrison | McCormick, Paulding & Huber LLP | | Cambridge |
| David Herlihy (Professor) | Northeastern University | | Cambridge |
| Cheryl Hodgson | Hodgson Legal | | Los Angeles |
| Douglas Kari | Arbitech | | Los Angeles |
| Teri Karobonik | New Media Rights | NMR | Los Angeles |
| Courtney Klossner | Librarian, Digital Media Consultant | | Berkeley |
| Meg Kribble | American Association of Law Libraries | AALL | Cambridge |
| Keith Kupferschmid | The Software & Information Industry Association | SIIA | Cambridge |
| Dina LaPolt | LaPolt Law, P.C. | | Los Angeles |
| Steven Marks | Recording Industry Association of America | RIAA | Nashville |
| Walter McDonough | Future of Music Coalition | FMC | Cambridge |
| Corynne McSherry | Electronic Frontier Foundation | EFF | Berkeley |
| Peter Menell (Professor) | UC Berkeley School of Law | | Alexandria, Berkeley |
| Deborah Moore | Film Producer | | Los Angeles |
| Stephanie Moore | Engine Advocacy | Engine | Berkeley |
| Helene Muddiman | Hollywood Elite Composers | Hollywood Composers | Los Angeles |
| David Newhoff | Writer, Filmmaker, Blogger of "Illusion of More" | | Cambridge |

| Name | Organization | Organization Abbreviation | Location |
|---|---|---|---|
| John Ossenmacher | ReDigi | | Alexandria |
| Maria Pallante | U.S. Copyright Office | | Alexandria |
| Aaron Perzanowski (Professor) | Case Western Reserve University | | Nashville |
| Morgan Pietz | The Pietz Law Firm | | Los Angeles |
| Tammy Ravas | Music Library Association | MLA | Berkeley |
| Betsy Rosenblatt | Organization for Transformative Works | OTW | Los Angeles |
| Jay Rosenthal | National Music Publishers' Association | NMPA | Alexandria, Cambridge |
| Jennifer Rothman (Professor) | Loyola Law School | | Los Angeles |
| Pam Samuelson (Professor) | UC Berkeley School of Law | | Berkeley |
| Eddie Schwartz | Music Creators North America | MCNA | Nashville |
| Josh Schiller | Boies, Schiller & Flexner LLP | | Alexandria |
| Vicki Sheckler | Recording Industry Association of America | RIAA | Berkeley |
| Ben Sheffner | Motion Picture Association of America, Inc. | MPAA | Berkeley, Cambridge, Nashville |
| Ed Shems | Graphic Artists Guild | GAG | Cambridge |
| Emery Simon | BSA, The Software Alliance | BSA | Alexandria |
| Sherwin Siy | Public Knowledge | PK | Alexandria |
| David Sohn | Center for Democracy & Technology | CDT | Alexandria |
| Tim Stehli | HoriPro Entertainment Group, Inc. | HoriPro | Nashville |
| Rachel Stilwell | The Law Office of Rachel Stilwell | | Lost Angeles |
| Mitch Stolz | Electronic Frontier Foundation | EFF | Berkeley, Los Angeles |
| John Strohm | Loeb & Loeb LLP | | Nashville |
| Steve Tepp | <u>Sentinel Worldwide</u> GIPC, U.S. Chamber of Commerce | <u>Sentinel</u> U.S. Chamber | Alexandria Berkeley, Los Angeles, Nashville |
| Karyn Temple Claggett | U.S. Copyright Office | | Alexandria |
| Nissan Thomas | Law Office of Nissan Thomas | | Los Angeles |
| Christian Troncoso | Entertainment Software Association | | Los Angeles |

| Name | Organization | Organization Abbreviation | Location |
|---|---|---|---|
| Ty Turley-Trejo | Brigham Young Univ. Copyright Licensing Office | | Los Angeles |
| Rebecca Tushnet (Professor) | Organization for Transformative Works | OTW | Alexandria |
| John Villasenor (Professor) | University of California, Los Angeles | | Alexandria, Los Angeles |